# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
May 3, 2016 Session

## DAVID LYNN JORDAN v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C-11-159     Don R. Ash, Senior Judge**

_____

**No. W2015-00698-CCA-R3-PD  -  Filed October 14, 2016**

_____

The petitioner, David Lynn Jordan, appeals the post-conviction court's denial of his petition for post-conviction relief in which he challenged his convictions of three counts of first degree premeditated murder, two counts of felony murder, two counts of attempted first degree murder, two counts of aggravated assault, and one count of leaving the scene of an accident and his sentences of death.  On appeal, the petitioner contends that (1) he received ineffective assistance of counsel during both the guilt and penalty phases of the trial; (2) the venue of the trial in Madison County, Tennessee, violated his rights to a fair trial and due process; (3) the State committed prosecutorial misconduct by suppressing evidence; (4) the selection and impaneling of the grand jury was unconstitutional; (5) the post-conviction court erred in denying his motion to continue the evidentiary hearing; (6) the post-conviction court erred in allowing trial counsel to assist the State during the evidentiary hearing; (7) the post-conviction court erred in excluding an expert witness; (8) Tennessee's death penalty scheme is unconstitutional; (9) his death sentence is disproportionate; and (10) cumulative error warrants a new trial.  Upon reviewing the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Sarah R. King and Kelly A. Gleason, Assistant Post-Conviction Defenders, Nashville, Tennessee, for the appellant, David Lynn Jordan.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Counsel; James G. Woodall, District Attorney General; and Al Earls and Jody S. Pickens, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTS

The petitioner's convictions arose from a shooting on January 11, 2005, at the Tennessee Department of Transportation (TDOT) facility in Jackson, Tennessee, where the petitioner killed three people: Renee Jordan, his thirty-one-year-old wife who was employed at TDOT; Jerry Hopper, an employee of the Tennessee Division of Forestry who was at the TDOT office; and David Gordon, a motorist the petitioner ran off the road en route to the TDOT garage. The petitioner also shot and injured two other TDOT employees, James Goff and Larry Taylor. Following a jury trial, the petitioner was convicted of three counts of first degree premeditated murder, two counts of felony murder, two counts of attempted first degree murder, two counts of aggravated assault, and one count of leaving the scene of an accident. The trial court merged the felony murder convictions with the premeditated murder convictions involving the same victims and the aggravated assault convictions with the attempted murder convictions.

The jury sentenced the petitioner to death for each of the three first degree murder convictions. As to the first degree murder of Renee Jordan, the jury found that the State had proven the following statutory aggravating circumstances beyond a reasonable doubt: (1) the petitioner knowingly created a great risk of death to two or more persons other than the victim murdered during the act of murder; (2) the murder was especially heinous, atrocious, or cruel; (3) the murder was knowingly committed, solicited, directed, or aided by the petitioner while he had a substantial role in committing or attempting to commit first degree murder; (4) the petitioner committed mass murder; and (5) the petitioner knowingly mutilated the victim's body after death. See Tenn. Code Ann. § 39-13-204(i)(3), (5), (7), (12), (13). As to the first degree murder of Jerry Hopper, the jury based the sentence of death upon the following aggravating circumstances: (1) the petitioner knowingly created a great risk of death to two or more persons other than the victim murdered during the act of murder; (2) the murder was committed for the purpose of avoiding, interfering with, or preventing the lawful arrest or prosecution of the petitioner or another; (3) the murder was knowingly committed, solicited, directed, or aided by the petitioner while the petitioner had a substantial role in committing or attempting to commit first degree murder; and (4) the petitioner committed mass murder. See id. at (i)(3), (6), (7), (12). As to the first degree murder of David Gordon, the jury based the sentence of death upon the following aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel; (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the

2

petitioner or another; (3) the murder was knowingly committed, solicited, directed, or aided by the petitioner while he had a substantial role in committing or attempting to commit first degree murder; and (4) the petitioner committed mass murder. See id. at (i)(5), (6), (7), (12).

The trial court sentenced the petitioner as a Range I, standard offender to consecutive terms of twenty-five years for each of the attempted first degree murder convictions, six years for each of the aggravated assault convictions, and thirty days for leaving the scene of an accident. The Tennessee Supreme Court affirmed the petitioner's convictions and sentences on direct appeal. See State v. Jordan, 325 S.W.3d 1, 15-16 (Tenn. 2010). In doing so, the court concluded that the evidence was insufficient to support the aggravating circumstance that the petitioner murdered the victims "for the purpose of avoiding, interfering with, or preventing [his] lawful arrest or prosecution" as it applied to the first degree murders of Mr. Hopper and Mr. Gordon. Id. at 72-73; see Tenn. Code Ann. § 39-13-204(i)(6). The court, however, concluded that the jury's erroneous consideration of the (i)(6) aggravating factor was harmless beyond a reasonable doubt. Jordan, 325 S.W.3d at 75.

The petitioner subsequently filed a petition for post-conviction relief, which was later amended on multiple occasions following the appointment of counsel. Following an evidentiary hearing, the post-conviction court entered an order denying relief. This appeal followed.

## TRIAL PROCEEDINGS

The Tennessee Supreme Court summarized the evidence presented at trial in its opinion on direct appeal as follows:

The State's theory at trial was that [the petitioner] first threatened and then decided to murder his wife because he believed she was having an affair with a co-worker, Johnny Emerson, and because she told him she wanted a divorce.

Johnny Emerson testified that he was employed as a mechanic at the TDOT garage where Mrs. Jordan worked. Emerson explained that he and Mrs. Jordan were "just real good friends," but acknowledged that their relationship had developed "[a] little bit" beyond a co-worker relationship. Physically, their relationship was limited to hugging and kissing. Emerson said that Mrs. Jordan had been talking about getting a divorce. On one occasion, [the petitioner] telephoned Emerson at home regarding his relationship with Mrs. Jordan. [The petitioner] told Emerson that he was

3

"too old" for Mrs. Jordan and that he "needed [his] ass whooped." Emerson agreed with [the petitioner] that he "didn't have no business doing what [he] did." [The petitioner] also contacted Emerson's wife on numerous occasions. At some point prior to January 11, 2005, Emerson informed Mrs. Jordan that he was not going to divorce his wife. Emerson testified that he was not at work on January 11, 2005, because he was on medical leave.

Linda Sesson Taylor, an attorney in Jackson, testified that Mrs. Jordan hired her on December 14, 2004, to represent her in divorce proceedings against [the petitioner]. She said she initially prepared the necessary documents for a contested divorce, and Mrs. Jordan told her she would have the money to pay her fee after the Christmas holiday. Taylor said she also prepared the paperwork to obtain a restraining order against [the petitioner], and Mrs. Jordan had an appointment scheduled for January 12, 2005. Taylor identified a page out of her phone message book indicating that Mrs. Jordan had called her office on January 11, 2005, at 9:56 a.m. wanting to know how much Taylor charged for an uncontested divorce.

Kevin Deberry, the next-door neighbor of [the petitioner] and Mrs. Jordan, testified that Mrs. Jordan called him on the night of January 10, 2005, and was upset with [the petitioner]. About an hour later, [the petitioner] came to Deberry's house and asked Deberry to take Mrs. Jordan's dog to their house and get his house key, but Deberry refused to do so. [The petitioner] then told Deberry if he did not take Mrs. Jordan's dog to her, he "was gonna take it over there and shoot it in the driveway." As [the petitioner] turned to walk away, Deberry noticed what he believed to be a "snub-nose .38" in [the petitioner]'s back pocket. [The petitioner] then turned around and told Deberry that he "better watch [his] back, you never kn[o]w which way the bullets are gonna fly." Deberry called Mrs. Jordan and told her to take her child and leave the house because [the petitioner] was on his way over there. Mrs. Jordan told Deberry that [the petitioner] had left some threatening voice mails on her phone. [The petitioner] later called Deberry and apologized. The two men talked "for awhile" and Deberry offered [the petitioner] a drink. [The petitioner] declined but called back later and accepted Deberry's offer of alcohol. Deberry said that he took a half-gallon bottle of vodka to [the petitioner's] house at about 1:00 a.m. and put it in the freezer. Although [the petitioner] and his children were still up when he arrived, Deberry did not stay and returned home.

4

Kenneth Evans, Mrs. Jordan's cousin, testified that he was aware that [the petitioner] and Mrs. Jordan were having marital problems and, on January 10, 2005, Mrs. Jordan called and told him that "she was about to have a nervous breakdown, and she was scared of [the petitioner], that he was calling threatening her." Mrs. Jordan told Evans that [the petitioner] "was on his way out to the house and that he said . . . it didn't matter how many lawyers she had and how much money she had, that what he had for her wasn't going to do her any good." Evans advised Mrs. Jordan to leave the house and go to the police department, but she refused to do so, saying that [the petitioner] had "had run-ins with the police department before. He would shoot me there whether the police was there or not, and he would probably shoot them, too." Evans then told her to come to his house, which she did. After she arrived, they took Mrs. Jordan's three-year-old daughter to Mrs. Jordan's mother's house. Evans later hid Mrs. Jordan's car at a friend's house, and they returned to Evans' home around 10:30 p.m.

The following morning, January 11, 2005, Mrs. Jordan and Evans, a TDOT "[p]arts runner," went to work. Mrs. Jordan worked in the office of the TDOT garage, which was commonly referred to as "the crow's nest." That morning, Evans was in the crow's nest with Mrs. Jordan until approximately 11:10 a.m., when he left to go pick up some parts. Ricky Simpson and James Goff were in the office with Mrs. Jordan when he left.

Vernon L. Stockton, Sr. testified that on January 11, 2005, he was employed as an equipment mechanic at the TDOT garage which was located in the same building as the crow's nest where Mrs. Jordan worked. He said he knew that Mrs. Jordan and [the petitioner] were having marital problems. Between 9:30 and 10:00 a.m. on the morning of January 11, Mrs. Jordan handed Stockton her portable phone when it rang and asked him to answer it. Stockton recognized the caller's voice as that of [the petitioner]. [The petitioner] asked to speak to Mrs. Jordan, but Stockton told him that she was in the restroom because she did not want to talk to him. Stockton said he later left TDOT to pick up some parts and was not present when the shooting occurred.

Sonny Grimm testified that he was riding in a Ford pickup while Paul Forsythe was driving it westbound on Lower Brownsville Road on January 11, 2005. The two men worked for Ralph's Trailers and were on their way to pick up some starter fluid for a backhoe. A green car was traveling in front of them. As they approached Anglin Lane, Grimm saw

5

[the petitioner], who was driving a red pickup truck, run a stop sign and strike the green car, knocking it off the road. Grimm wrote down the license plate number of [the petitioner's] vehicle; he said that [the petitioner] continued traveling toward the TDOT garage. Grimm, Forsythe, and the driver of the green car followed [the petitioner] to the garage. There, Grimm saw people running everywhere. Forsythe gave the driver of the green car the license plate number of the red pickup truck. [The petitioner] came out of the garage and told the driver of the green car, "You better leave." The driver responded, "I'm not going [any] where." [The petitioner] said, "yes, you are, too," reached inside his truck, pulled out a rifle, and shot the driver.

Paul Forsythe testified that, on the morning of January 11, 2005, he and Sonny Grimm were traveling west on Lower Brownsville Road behind a green car when they saw a red Mazda pickup truck come down Anglin Lane, run a stop sign, and strike the green car, knocking it off the road. Forsythe followed the truck to get its license plate number for the driver of the green car. Because he was driving, Forsythe called out the license number to Grimm, who wrote it down. The pickup truck then ran a four-way stop and turned into the main entrance of TDOT. Forsythe called 911 and pulled into the TDOT parking lot. The green car then pulled up, the driver got out, and Forsythe gave the driver, David Gordon, the tag number of the pickup truck. As Gordon was walking back to his car, [the petitioner] came out of the TDOT building and told Gordon to leave. When Gordon said, "I'm not going [any]where," [the petitioner] said, "You will" and then reached inside his truck and pulled out a long gun. Gordon threw his hands up in the air and told [the petitioner], "Please don't shoot. Wait a minute." However, [the petitioner] started shooting, and Forsythe and Grimm fled the scene.

Randy Joe Perry, a TDOT employee, testified that on January 11, 2005, [the petitioner] came to the TDOT garage and pushed Perry out of his way as he approached the steps leading up to the crow's nest where Mrs. Jordan worked. David Pickard, another TDOT employee who was standing near Perry, said, "Who was that son-of-a-bitch?" [The petitioner], who had his right hand in his coat pocket, turned around and gave Perry and Pickard a "hard look" before going upstairs to the crow's nest. Perry then heard three or four gunshots and, looking through the window in the crow's nest, saw [the petitioner] pointing a gun at Jerry Hopper who was sitting in a chair. Perry heard another gunshot and saw Hopper slump over. Hearing more gunshots, Perry ran and got behind his truck. Shortly thereafter, [the

6

petitioner] calmly walked outside to his vehicle. Perry next noticed a man get out of another vehicle and walk toward [the petitioner]. [The petitioner] reached inside his truck and retrieved a rifle. The man who had been walking toward [the petitioner] stopped and raised his hands. A few seconds later, [the petitioner] fired several shots at the man. Perry described the shots as coming from a "fully automatic" and so quick that he could not count them. The man [the petitioner] shot "went out of sight down behind the vehicle." [The petitioner] walked over to the fallen man, shot again, "and then he turned and just calmly walked back towards his truck, put the rifle in his truck, just eased in there and drove off just as easy" toward the front gate.

David Thomas Pickard testified that he was standing near the stairs with Randy Perry and other employees when [the petitioner] came in the garage and shoved him and Perry backwards as he walked past the group of men. Pickard responded by saying, "Who does that crazy son-of-a-bitch think he is?" [The petitioner], who smelled of alcohol, turned around and got in Pickard's face "like he wanted to whoop [him]." [The petitioner] then proceeded upstairs to the crow's nest where Mrs. Jordan was facing the window. Pickard saw [the petitioner] shoot Mrs. Jordan and described the shooting: "The first time it went 'Pow' and she went like this and come back and he went 'Pow, Pow, Pow,' like that." Pickard ran out of the garage to his office located across from the garage. After instructing the employees in his office to lock the door, Pickard went back outside and saw [the petitioner], pistol in hand, exit the garage and go to his truck and retrieve a rifle. Pickard went back inside the office and, a few minutes later, saw [the petitioner] leave in his truck. Pickard then went to the crow's nest where he saw Mrs. Jordan and Jerry Hopper lying on the floor. He said he looked at Mrs. Jordan and knew she was dead, but Hopper was still alive and a man was trying to resuscitate him. Outside in the parking lot, Pickard saw another man lying on the ground. He said the man was not dead at that time, but he "was turning real yellow-looking and blood was everywhere."

James Goff testified that he was in the crow's nest with Mrs. Jordan, Larry Taylor, and Jerry Hopper when [the petitioner] came in, raised his shirt, and pulled out what appeared to be a nine-millimeter pistol. Mrs. Jordan had her back to the door, and [the petitioner] called out her name. Mrs. Jordan turned around, and [the petitioner] started shooting. Goff stated that [the petitioner] was about 6 feet away. [The petitioner] shot Mrs. Jordan in the chest and fired additional shots, including what appeared

7

to be a shot to the forehead. [The petitioner] then shot Hopper. Taylor dove under a desk, and [the petitioner] shot Goff in the leg, the right side of the neck, the arm, and the stomach. Although he did not see Taylor being shot, Goff heard two more shots and heard Taylor grunt. As [the petitioner] was leaving the crow's nest, Goff heard him mutter, "I love you, Renee."

After [the petitioner] left the room, Goff got up and asked Taylor about his condition. He saw Hopper lying on the floor "in bad shape" and Mrs. Jordan was dead. Goff was then able to make his way to the main office for help. He said he was hospitalized for three days as a result of his injuries.

Larry Taylor testified that he was ending a telephone call inside the crow's nest when [the petitioner] entered the room, stood there "for a moment or so," pulled his coat back, brandished a weapon, and took a "police stance." [The petitioner] then called Mrs. Jordan by name and, when she turned to face him, shot her. One gunshot struck her in the stomach area. She fell back in a chair, and [the petitioner] fired two additional shots, with the second shot striking her torso "a little higher up" and the third shot striking her in the head. Mrs. Jordan fell to the floor, and Taylor could tell that she was dead. Taylor dove under a desk for protection, heard more gunshots, and saw Goff fall. He then heard more gunshots and felt pain in his legs. Taylor heard the door close, and Goff asked him if he was all right before leaving the room. Taylor then got up and saw Hopper on the floor on his knees with his face in his hands and saw Mrs. Jordan on the floor with her face in a pool of blood. He called 911 and was trying to assist Hopper when he heard the door open and saw [the petitioner] with "a rifle-type gun." Taylor looked [the petitioner] "square in the eye" and stood back up, holding both his hands in front of him. He asked [the petitioner] if he could leave, and, after a brief pause, [the petitioner] said, "Yeah, you can go out now." After Taylor got downstairs, he heard gunshots in rapid succession and hurriedly went out the door. He saw Goff, who was "kind of delirious" and holding a towel to his neck, and told another employee, Alvin Harris, to drive Goff to the hospital in the parts truck. Taylor then got in his car and drove himself to the hospital where he was treated for the gunshot wounds to his legs.

Freddie Ellison, a reserve sheriff's deputy and a mechanic at TDOT, testified that when he returned to the garage from his lunch break around 11:30 a.m., people were running out of the garage. He then observed [the petitioner], whom he had known for approximately twenty years, walk out

8

the roll-up doors of the garage. Ellison asked [the petitioner] what he was doing. [The petitioner] raised his right hand and Ellison saw two semi-automatic handguns. [The petitioner] said, "Go on. Back off. Just go on. Back off." [The petitioner] had his hand on one of the guns. Ellison retreated to the back of the building where he observed David Gordon pull up in a green car. Gordon announced that "[t]he guy in the red pickup truck has run over me," and Ellison advised Gordon to "back off" because [the petitioner] had a gun. Gordon refused, stating that he had the police on the way. Ellison then heard "automatic" gunfire and called the Madison County Sheriff's Department for assistance. He and Willie Martin left TDOT and went "out on 223." He saw [the petitioner] leave in his red pickup truck, driving normally and headed toward Jackson.

Shortly thereafter, Ellison observed an unmarked police unit and advised dispatch to instruct the unit to follow [the petitioner]. Ellison then returned to the TDOT garage and saw David Gordon on the ground. Gordon had been shot multiple times. Inside the crow's nest, Ellison discovered "blood all over the floor" and saw Mrs. Jordan lying on the floor with multiple gunshot wounds. He described Mrs. Jordan as being "shot all to pieces," including being shot in the forehead. Jerry Hopper had been shot several times in the chest.

Alvin Harris, a "store clerk" at TDOT who picked up and delivered parts, testified that he heard gunshots and went to the garage where he encountered Goff who was holding his throat and bleeding. He also saw Taylor who was "real pan icky" and pointed to his legs when Harris asked him if he was hurt. Taylor told Harris that [the petitioner] had shot Mrs. Jordan and that she was "gone." Because Goff was losing a lot of blood and Harris feared death was imminent, Harris decided to drive Goff to the hospital rather than wait for the ambulance.

Darrell Vaulx, a TDOT mechanic, testified that as he was leaving the shop on January 11, 2005, he saw [the petitioner], Mrs. Jordan, Hopper, and Taylor through the glass window in the crow's nest. [The petitioner] pointed a gun at Mrs. Jordan, and she fell. Vaulx heard two more gunshots and saw [the petitioner] turn toward the men in the crow's nest. Vaulx said he and other employees ran outside to the parking lot where Vaulx saw [the petitioner's] red Mazda pickup truck. Vaulx then saw [the petitioner] come outside and calmly walk to his truck. Thinking that [the petitioner] was leaving, Vaulx ran inside to the crow's nest where he found Mrs. Jordan on the floor with three gunshot wounds to the head. Someone yelled, "He's

9

coming back," and Vaulx ran back outside to the parking lot and noticed that [the petitioner's] truck was still there. He then heard a noise that sounded like an airgun or a rifle. After someone said [the petitioner] was getting in his truck and leaving, Vaulx went back inside and found Hopper who was "breathing just a little bit" and "[s]quirming" like he was in pain. Vaulx administered CPR to Hopper until the paramedics arrived.

George Washington Bond, a TDOT employee who worked in the car wash room in the garage, testified that he heard "three pops," looked out the window in the garage door, and saw [the petitioner] standing over "the victim." [The petitioner] then looked at Bond and shook his head, which Bond interpreted to mean "[d]on't get involved." Bond saw what appeared to be the grip of a gun in [the petitioner's] hand. [The petitioner] then walked into the garage and went to the crow's nest. Bond saw [the petitioner] pointing a long gun toward where Mrs. Jordan sat. Bond then ran to another building and did not return to the garage. On cross-examination, Bond acknowledged that he did not see [the petitioner] shoot "the victim."

Barbara Surratt, Mrs. Jordan's mother-in-law from a previous marriage, testified that, even after Mrs. Jordan and her son divorced, she remained "very close" with Mrs. Jordan. During the early part of 2005, Mrs. Jordan was staying with Surratt at her home on Old Pinson Road. On January 11, 2005, at approximately 1:30 a.m., Surratt received a telephone call from [the petitioner]. [The petitioner] told her that he knew Mrs. Jordan was not there and asked her to tell Mrs. Jordan "happy birthday" the next time she saw her. Surratt stated that Mrs. Jordan's birthday was not until February. Around 11:30 a.m., Surratt telephoned Mrs. Jordan at work and, during their conversation, heard an "ungodly racket, loud noises" and a sound like "a chair go across the room." She screamed Mrs. Jordan's name, but got no answer. After it became quiet, Surratt heard [the petitioner] say, "Renee. Renee. I hate you."

Jackson Police Sergeant Mike Thomas testified that he was on patrol in an unmarked cruiser on Vann Drive when he received a call about the shooting at the TDOT garage. En route to the scene, Sergeant Thomas was advised that the suspect had a machine gun. Before reaching the TDOT garage, he observed a red Mazda pickup truck matching the description of the suspect's vehicle and began pursuit of the truck. The truck ran a stop sign. Shortly thereafter, a marked patrol unit, driven by Sergeant Sain, passed the truck on Anglin Lane. Sergeant Sain turned his cruiser around

10

and joined the pursuit. Another unmarked unit, driven by Captain Priddy, joined the pursuit after the suspect's vehicle forced Captain Priddy's vehicle off the road. Officer Maxwell placed his patrol cruiser in position to do a partial roadblock. The suspect's vehicle hit Officer Maxwell's car, and Sergeant Thomas pulled in behind it to block it from leaving. The suspect, identified as [the petitioner], was taken into custody. A search of [the petitioner's] person revealed a loaded .45 caliber pistol and a loaded nine-millimeter pistol. Inside [the petitioner's] truck, the officers discovered a rifle and a shotgun.

Officer Ted Maxwell of the Jackson Police Department testified that he responded to a call concerning the shooting at the TDOT garage. En route to the scene, he encountered [the petitioner], driving a red pickup truck, followed by two police units. Officer Maxwell said he was traveling north on Anglin Lane, and [the petitioner] was traveling south. Ultimately, Maxwell managed to stop [the petitioner] by ramming the front of his vehicle. [The petitioner] got out of his vehicle, and Maxwell noticed a gun in the small of his back under his belt. Sergeants Sain and Thomas placed [the petitioner] on the ground and removed two handguns from him that Maxwell identified as an Intra Arm Star .45-caliber semi-automatic with a clip containing six live rounds and one live round inside the chamber, and an Intra Arm Star nine-millimeter semi-automatic with a clip containing two live rounds and one live round in the chamber. Maxwell said that eight .45-caliber and nineteen nine-millimeter rounds were recovered from [the petitioner's] pockets.

Tennessee Highway Patrol Sergeant Johnny Briley testified that he initially received a call regarding a hit-and-run accident on Lower Brownsville Road at Anglin Lane involving a red Mazda pickup truck. While proceeding to that location, he received another call about the shooting at the TDOT garage. He received information that there were multiple victims involved. Before he reached the TDOT garage, he observed that the suspect vehicle had been pulled over by Jackson police officers. He stopped at the scene. Sergeant Briley said that he had known Mrs. Jordan and her family for thirty years and also knew [the petitioner]. As [the petitioner] stood up, he told Sergeant Briley, "She fucked me over, Johnny." Sergeant Briley responded, "No, she didn't, David." Sergeant Briley, who was standing within a foot of [the petitioner], detected an odor of alcohol on [the petitioner's] person. [The petitioner] was subsequently placed in the backseat of a police car.

Jackson Police Officer Rodney Anderson testified that, en route to the scene of the shooting, he received a call that the suspect was headed down Anglin Lane. Officer Anderson turned onto Anglin Lane where he observed a vehicle matching the description of the suspect's vehicle between two patrol cars. The driver of the vehicle, [the petitioner], was taken into custody and placed in the backseat of Officer Greer's marked police unit. As Officers Greer and Anderson were transporting [the petitioner] to the Criminal Justice Complex, [the petitioner] spontaneously told them that:

> he could have cut the police in half with his weapon, that he had full auto. He stated that his wife's dead and she's full of holes. He stated she drove him crazy . . . by fucking around on him, and he advised that he shot her with her brother's gun. He also stated that he feels sorry for his daughters, and that Mrs. Jordan wouldn't be fucking around on anybody else.

[The petitioner] also said that the other people "just got in the way" and asked how many people were hurt. [The petitioner] also said that his wife "hurt him and tore his heart out" and that he had been "going crazy" for a month. Officer Anderson said that [the petitioner] smelled of alcohol.

Investigator Jeff Shepherd of the Jackson Police Department testified that, as part of his investigation, he retrieved and recorded voice mail messages left on Mrs. Jordan's cell phone. The audiotape of the messages was entered into evidence and played for the jury; a transcript of the messages was also provided. The messages included one left at 10:48 p.m. on January 10, 2005, stating "You're the only asshole on the face of this earth that I truly hate"; one left at 2:11 a.m. on January 11, 2005, stating "I'll see you at work, bitch"; one left at 2:17 a.m. on January 11, 2005, stating "I hope you go to work tomorrow, bitch, 'cause you'll be there one day. It may not be tomorrow, but I will catch up with your raggedy ass. Your day is coming."; and one left at 2:19 a.m. on January 11, 2005, stating "You home wreckin', low life, sorry mother fuckin' bitch. Your ass is gonna pay." Additionally, Investigator Shepherd was involved in the booking process of [the petitioner], during which [the petitioner] asked him if Mrs. Jordan was "real bad messed up." [The petitioner] started crying and told Shepherd that most people probably thought he was crazy, but he was not crazy, he was "driven to crazy." [The petitioner] also

12

said that the assault rifle he used in the shooting belonged to his brother-in-law, Dale Robinson.

Trent Harris, a paramedic at Jackson-Madison County General Hospital, testified that he and Corey Shumate, an emergency medical technician, responded to the scene at the TDOT garage, arriving at 11:39 a.m. They first attended David Gordon, who was lying on his back in the parking lot and appeared to have gunshot wounds to the upper right and upper left portion of his abdomen. Gordon was not breathing but had a faint pulse. Harris intubated Gordon and immediately began transportation to the hospital. En route, Gordon lost a pulse and CPR was initiated. Upon their arrival at the hospital, Gordon's care was transferred to the hospital's trauma team.

Dr. Herbert Lee Sutton, a trauma surgeon at Jackson-Madison County General Hospital, testified that he tried to save David Gordon's life once he arrived at the hospital. Dr. Sutton was able to regain a heartbeat on Gordon and performed surgery to try to stop the bleeding in his abdomen and perineum. Dr. Sutton described what he saw when he surgically opened Gordon's abdomen: "[T]he blast injury from what he was shot with had almost morselized his intestines. It was like soup. And I'm quite sure even if I had stopped him from bleeding and he had regained everything, he probably wouldn't have had any small intestine left from what I could see." Despite all of Dr. Sutton's lifesaving procedures, Gordon died at 12:47 p.m.

Dr. Sutton testified that he also treated James Goff on January 11, 2005, for multiple gunshot wounds which he described as wounds to the left arm, abdomen, left thigh, and neck. The gunshot wound to the neck "went anterior to the trachea and the carotid vessels which are the main vessels that go[ ] to his brain." The bullet did not hit any major arteries or veins. Dr. Sutton stated that Goff remained hospitalized until January 13, 2005.

Eric Leath, a paramedic with the Medical Center EMS, testified that he was also dispatched to the TDOT garage. Upon his arrival, he was directed inside to an office where he observed a man lying on the floor on his back and a woman lying inside the door to the left. The woman had "a massive . . . injury to her head that had blood tissue lying all around, pooled around her head" and had no signs of life. The other victim, Jerry Hopper, was very pale and had "some gasping or . . . agona[l], gasping-type breaths, just very shallow, slow." Hopper had a faint carotid pulse. Leath inserted a

13

breathing tube, but Hopper was unresponsive. A Jackson police officer offered assistance to Leath and began CPR. Hopper was then moved to an ambulance and transported to the hospital. Upon arrival at the hospital, Hopper exhibited no signs of life.

Dr. David James testified that he treated Jerry Hopper, who had two gunshot wounds to his abdomen. Upon Hopper's arrival at the hospital, he was not breathing and all attempts at resuscitation were unsuccessful. Hopper was pronounced dead at 12:34 p.m. Dr. James also treated Larry Taylor at the Jackson-Madison County General Hospital. Taylor had suffered gunshot wounds to both of his upper legs.

Dr. Tony R. Emison, the medical examiner and coroner for Madison County, testified that he requested autopsies on the bodies of the three deceased victims. The bodies were sent to the state medical examiner's office in Nashville.

Dr. Staci Turner testified that she performed the autopsy on Mrs. Jordan. Dr. Turner found that Mrs. Jordan had been shot eleven times, resulting in wounds to the head, torso, and right leg. Dr. Turner found injuries to the scalp, the skull, the bones of the face, the brain, multiple ribs, the right lung, the diaphragm, the liver, the right kidney, the stomach, the small intestine, the urinary bladder, and the uterus. Dr. Turner recovered multiple bullets, bullet jackets, bullet cores and white plastic disk fragments during the autopsy. The gunshot wound to Mrs. Jordan's forehead was fired from a handgun within a foot of the body.

Dr. Turner discovered a visible bullet in a partial exit wound in the back of Mrs. Jordan's head. She recovered the bullet and the jacket that had separated from the bullet. The bullet was identified as a Black Talon-type bullet, one fired from a handgun. She described the bullet as having a bullet core and a jacket, "and when it enters the body, the jacket usually opens and forms sharp points that look like talons." Other fragments discovered in Mrs. Jordan's body were identified as coming from a high-powered assault rifle. Dr. Turner described the wounds associated with the bullets fired from the assault rifle: "They went through multiple ribs on the right side of the body, through the right lung, through the diaphragm . . ., through the liver and the kidney and into the spinal column and then lodged in the muscle of the back with some fragments scattered throughout the organs." Two notes were found in the victim's clothing, both addressed to Mrs. Jordan. One note was signed, "Your faithful faithful worried David."

14

The second note was signed, "Your forgiving husband, David Lynn Jordan." Dr. Turner concluded that the cause of Mrs. Jordan's death was multiple gunshot wounds.

Dr. Amy R. McMaster testified that she performed the autopsy on Jerry Hopper. Hopper had suffered multiple gunshot wounds and had multiple abrasions and lacerations resulting from these wounds. Dr. McMaster discovered a gunshot wound to the right wrist and two gunshot wounds to the right side of his abdomen. She recovered two projectiles from Hopper's body. The projectiles were large caliber deformed hollow point bullets, which were consistent with those fired from a nine-millimeter weapon. Dr. McMaster concluded that the cause of Jerry Hopper's death was multiple gunshot wounds.

Dr. McMaster testified that she also performed the autopsy on David Gordon. Gordon had multiple gunshot wounds and injuries associated with the wounds. Although no exact number of wounds could be determined, Gordon had been shot at least thirteen times. He had wounds to his right thigh, right forearm, right lower abdomen, right and left sides of the torso, buttocks, and left hip. The projectiles recovered from these wounds were consistent with a 7.62 millimeter round. Dr. McMaster concluded that the cause of Gordon's death was multiple gunshot wounds.

Sergeant Mike Turner of the Jackson Police Department testified that he collected evidence from the red Mazda pickup truck. Among the items he recovered were: a loaded Norinco SKS 7.62 assault rifle with twenty-six rounds in the magazine and one in the chamber; a black bag containing a large quantity of assorted ammunition; a loaded Mossberg twelve-gauge shotgun with two rounds in the magazine and one in the chamber; loose ammunition; a 7.62 magazine with fourteen rounds of ammunition; two spent 7.62 casings; and a .38 special caliber Winchester spent casing.

Agent Cathy Ferguson of the Tennessee Bureau of Investigation (TBI) testified that, on January 11, 2005, she was employed as a violent crimes investigator with the Jackson Police Department. She said she responded to the scene at the TDOT garage and was directed to the crow's nest area where she found Mrs. Jordan lying in a large pool of blood that contained brain matter. Realizing that she could not help Mrs. Jordan, Ferguson assisted with the CPR on Jerry Hopper. Ferguson subsequently recovered evidence found inside the crow's nest and outside the garage,

15

including nine-millimeter and 7.62 shell casings, bullet fragments, and a note on which Grimm had written [the petitioner's] license tag number. She said that fifteen 7.62 shell casings were recovered from the exterior crime scene and four from inside the crow's nest. Nine nine-millimeter shell casings and one live nine-millimeter round were found inside the crow's nest.

TBI Agent Scott Lott testified that he and other agents executed a search warrant at [the petitioner's] house on January 11, 2005. Among the items recovered were: a Thompson Center Firearms .50 caliber muzzle loader, a Montgomery Ward 30/30 rifle, a Remington 20-gauge pump shotgun, a Remington 30.06 rifle, a Remington Caliber .243 rifle, a Ruger .22-caliber rifle, a Savage Firearms .22-caliber rifle, a Ruger .44 magnum rifle, a Springfield .410-gauge shotgun, a Pioneer 750 .22-caliber rifle, a Bauer Firearms .25-caliber automatic handgun, a .38 Special revolver, five live rounds of Winchester .38 Special ammunition, and a trigger group assembly.

TBI Agent Shelly Betts, accepted by the trial court as an expert in ballistics, testified that she examined evidence collected in this matter, including a 12-gauge shotgun, a Norinco SKS rifle, a Star .45-caliber semi-automatic pistol, and an Inter Arms Star nine-millimeter semi-automatic pistol. She said that the safety feature functions on the SKS rifle had been converted to fire in fully automatic mode, rather than the semi-automatic mode, which was how it had been manufactured to function. She explained that several modifications had been made to the rifle's trigger housing assembly, causing the weapon to fire continuously once the trigger was pulled. Agent Betts tested several cartridge cases recovered from the crime scene and determined that they had been fired from the SKS rifle. Additionally, she tested nine-millimeter cartridge cases recovered from the interior crime scene and determined that they had been fired from the Star nine-millimeter pistol. She examined bullet fragments recovered from David Gordon's right thigh and determined that one had "conclusively been fired through the barrel of the SKS rifle." Agent Betts further determined that some of the fragments recovered from Gordon's right hip and abdomen had been fired through the barrel of the SKS rifle. She also examined nine-millimeter projectiles recovered from Jerry Hopper's back and pelvis and determined they had been fired from the Star nine-millimeter pistol. Her examination of the nine-millimeter projectiles recovered from Renee Jordan's leg and uterus revealed they had been fired from the Star nine-millimeter pistol. Agent Betts said that the nine-millimeter projectile

16

recovered from Mrs. Jordan's brain had "probably" been fired from the Star pistol. Fragments recovered from Mrs. Jordan's liver and chest were conclusively identified to the SKS rifle. Agent Betts explained that the 7.62 rounds found in the bodies of Mrs. Jordan and David Gordon were hollow point bullets, meaning that as soon as they struck the skin they fragmented into numerous pieces. She examined the 7.62 magazine found inside [the petitioner's] truck and described it as "an SKS-type detachable magazine that would function in this SKS rifle, and it holds approximately 31 rounds."

Madison County Sheriff's Department Sergeant Chad Lowery testified that, shortly after [the petitioner] was apprehended, he went to [the petitioner's] home to check on the welfare of any children who may have been at the home, but no children were present when he arrived. Sergeant Lowery discovered a loaded pistol on top of the refrigerator and saw several other weapons in the home. On the kitchen counter, Sergeant Lowery observed a handwritten note, which stated: "Renee got what she deserved. Bitch. I'm sorry. I love you. Thanks for being so good to me. Love you Shelby, Sydney, Deanna. Thanks, Mom and Dad. You did all you could." On cross-examination, Sergeant Lowery acknowledged that, during [the petitioner's] apprehension, he "smelled alcohol, or what [he] thought to be alcohol" on [the petitioner].

### Defense Proof

Jackson Police Investigator Tyreece Miller testified that he interviewed [the petitioner] at approximately 3:35 p.m. on the day of the shooting. [The petitioner] waived his right to an attorney and volunteered to speak with Investigator Miller. During their conversation, [the petitioner] asked how many people he had shot and if Mrs. Jordan was dead. [The petitioner] provided a urine sample and consented to give a blood sample which was drawn at approximately 9:50 p.m. [The petitioner] said he had consumed approximately five shots of vodka but "was not under the influence." [The petitioner] also provided the following statement to Investigator Miller:

I've been married to Renee Jordan for five years. She has a son named Tyler Surratt. He is my stepson. She has a daughter named Sydney Jordan. She is my daughter also by Renee. I have three others by two other women who are my former wives. Back in the summer 2002, Renee's son Tyler

17

molested my daughter, Shelby Jordan. He was 10 years old and she was 8 years old at the time. [Department of Children's Services] was involved, and Tyler had to go to counseling. On December the 11th, 2004, Tyler was in Lindsey's bedroom. He was lying on his back and he had something in his hand. He was playing with Lindsey. He was trying to let her get whatever it was out of his hand, but he had a tight grip on it. She was reaching for it. He would let her grab his hand, and then he would pull her across his body. He didn't know it, but I was watching him. It looked like he was pulling her across his penis. I saw him do this three times before I stopped him. I went in the room. I cursed him. I told him that I was going to stick my foot up his ass if he ever touched one of my daughters again. I left and went deer hunting. When I got back, Renee was on the phone with some man. My mother showed up, and Renee left and never came back home. We did spend Christmas Eve, New Year's Eve and this past Sunday night together.

Back in September 2004, Renee started having an affair with Johnny Emerson. He works in a building where she works. He works in the shop and Renee works in the office. . . . I found out about their affair in October. She admitted to it and I forgave her. This morning I woke up and had no intentions of hurting Renee.

She called me from work. I was at home. She was acting like a bitch. I had been begging and bending over backwards to make this work up to this point. She unexpectedly told me that me and my daughters from another marriage have until the first of February to get out of her house. She said that she was going to see her lawyer tomorrow and she was going to have me evicted. . . . Renee hung up on me before I had a chance to say a word. This made my blood boil. I started loading my guns. I loaded my 12-gauge shotgun, a Star .45 caliber semi-automatic handgun and an SKS fully automatic rifle with a folding stock. I put a 33-round clip in it. I left a note on the counter stating that if something happens to me, I love my mother, father and four daughters. I didn't know if I was going to do anything to Renee or not. I was thinking more of killing myself.

18

I got in my 1991 Mazda truck, red, and I was going to Renee's workplace at TDOT. On the way there I broad-sided a green four-door vehicle. I was going down Anglin Lane. I was driving fast and couldn't stop soon enough. I T-boned the green car that was going down Lower Brownsville Road. I didn't stop. I went on up to TDOT. I pulled up to where Renee works. I left the 12-gauge and the SKS in the truck. I had the .45 in a holster on my hip, the nine-millimeter was in my back.

I walked in the office. Renee said, "What the fuck are you doing here?" She was sitting in the chair at her desk. I didn't say a word to her. I pulled out the .45 and I shot her in the leg. I shot her in the leg because I wanted her to look at me. She hollered. The guy that was sitting in the corner got up and came at me. I shot him and he fell to the floor. I think he was James Goff, but I'm not sure. I heard him moaning. Larry Taylor was in the office. I patted him on the back with the pistol and told him that he needed to get out of there. He left. I looked back at Renee, and she was already dead I think. I can't remember if I had shot her more than just in the leg. I remember the last time that I shot her was in the top of the head with the .45. I didn't want to shoot her in the face.

I walked back out to my truck and I saw the guy in the green car that I had hit. He was parked behind me. I got in the truck. He was pointing his finger and coming at me. I grabbed the SKS and I fired it at him. He went to the ground. I don't remember going back to the office with the SKS, but if there was a shell casing there, I must have fired it in the office. I got in my truck and left. I had intentions of killing myself when I got back home, but the police hit me head on.

I have made this statement openly and freely. I have not been promised anything, and I have not been threatened in any way. I am sorry that this happened. Renee didn't deserve to die.

TBI Special Agent John W. Harrison testified that he analyzed the urine and blood samples submitted by [the petitioner]. The result of the

blood sample, taken at 9:50 p.m., was "no alcohol present." Agent Harrison agreed that if a person consumed five shots of vodka in the early morning hours but did not give a blood sample until 9:50 p.m., the alcohol could have metabolized by that time. He explained that if a person consumed five shots rapidly within an hour, the person's blood-alcohol level would be approximately .10%, but about five hours later, the level would be down to 0. The result of the urine sample, taken at 3:35 p.m., was .17%. However, Harrison said not much significance should be attached to that result because it did not indicate how much [the petitioner] had had to drink. He acknowledged that all the urine sample really revealed was that, sometime prior to the collection of the sample, there had been alcohol in [the petitioner's] bloodstream. Pursuant to the TBI's normal operating procedure, the samples were preserved "for a period of time and then destroyed."

TBI Agent Kelly Hopkins testified that she performed a drug screen on the urine and blood samples submitted by [the petitioner]. The urine sample was positive for Citalopram, an antidepressant, and benzodiazepines, which include antidepressant and anti-anxiety medications, such as Xanax. The blood sample was positive for Citalopram but negative for benzodiazepine. Agent Hopkins explained that, after a drug is ingested, it first goes into the person's bloodstream and is later metabolized in the urine. She said that the blood sample was destroyed on January 3, 2006.

Officer Tikal Greer of the Jackson Police Department testified that when he and Officer Anderson transported [the petitioner] to the Criminal Justice Complex, he noticed a strong odor of alcohol on [the petitioner's] person. [The petitioner] told the officers that "his wife was dead, full of holes" and that she had driven him crazy by "fucking around on him." [The petitioner] also said that "he hated [that] people got in the way" and that his wife "got a taste of his .45 and her brother's gun." Once they arrived at the Criminal Justice Complex, [the petitioner] admitted "to killing or hurting four people."

Sergeant Marneina Murphy of the Madison County Sheriff's Department testified that she supervised [the petitioner's] booking process at the jail. She estimated that she was around the [petitioner] for thirty minutes to one hour and described his demeanor as "more confused, maybe not focusing, probably dazed a little bit." She acknowledged that another officer asked [the petitioner] the questions on the intake questionnaire.

20

Dr. Dennis Wilson, a clinical psychologist, testified that he evaluated [the petitioner], meeting with him on four different occasions beginning on October 12, 2005, for a total of eleven hours. He conducted clinical interviews, IQ testing, and some brief personality testing. Dr. Wilson determined that [the petitioner] was competent to stand trial and that a defense of insanity was not available. However, in Dr. Wilson's professional opinion, [the petitioner] "lacked substantial capacity when the crimes were committed," meaning [the petitioner] was "unable to exercise restraint or judgment" and "unable to reflect or premeditate."

In formulating his opinion, Dr. Wilson discovered that [the petitioner] was brought up in a stable family. His parents were good parents and were active in the community. Dr. Wilson opined that [the petitioner] was determined to set up a loving, stable environment for his children whom he clearly loved. Dr. Wilson also noted that [the petitioner] had been divorced twice and suffered from depression and anxiety. He was prescribed Prozac in his early twenties. [The petitioner] began self-medicating with alcohol and drugs, including methamphetamine and crack cocaine. In 1986, [the petitioner] was injured in a car accident. He had a broken back and ribs and injuries to his knee, ankle, and pelvis. He developed chronic headaches and various pains. Beginning in 1996, he was prescribed narcotic medications, including hydrocodone, oxycodone, Vicodin, Lortab, and Darvocet. In 2000, [the petitioner] was prescribed Xanax, an anti-anxiety medication, and Ambien, for insomnia. [The petitioner], at various times, was given other medications for depression and agitation.

At the time of his marriage to Mrs. Jordan in 2000, [the petitioner] had stopped using illegal drugs and "became a regular moderate beer drinker" that "would qualify for a diagnosis of alcoholism." Their daughter Sydney was born in late 2001. At this time, [the petitioner's] previous wife was using drugs and neglecting their two daughters. [The petitioner] and Mrs. Jordan began trying to get custody of Shelby and Lindsey. Their marriage began to deteriorate, however.

The couple attended marriage counseling. In September 2004, they got custody of Shelby and Lindsey. Later, Mrs. Jordan told [the petitioner] that she desired other male companionship and, in October 2004, she started going to bars, staying out late, and coming home intoxicated. Mrs. Jordan also told [the petitioner] about her relationship with a male co-

21

worker and said she wanted to have sex with this co-worker. Divorce was imminent, and [the petitioner's] family structure was crumbling. During this time, Mrs. Jordan continued her intimate relationship with [the petitioner] but also shared the details of her encounters with other men with him. [The petitioner] was confused and upset about her extramarital activities. [The petitioner's] doctor doubled his dose of Xanax on January 4, 2005. Mrs. Jordan then gave [the petitioner] a deadline of February 1 for him and his two daughters to move out of the house. Dr. Wilson opined that this was the end of whatever was left of [the petitioner's] dream of creating a happy home for his children.

Dr. Wilson further testified that on the date of the shooting, [the petitioner] drank alcohol and had not slept for three days. His world had collapsed, and he could no longer control his behavior. [The petitioner] started talking to himself. People observing [the petitioner] after the shooting described him as being "out of it." [The petitioner] expressed remorse over the incident and cooperated with the authorities. Dr. Wilson concluded:

> [The petitioner] has a major depressive disorder, recurrent episodes. It was moderate over his lifespan. He had generalized anxiety disorder, alcohol abuse and a borderline personality disorder. This is by definition someone who has a hard time maintaining interpersonal relationships, dealing with problems, coping with stress. He just never was any good with any of that stuff. At the time of the crime, it is my opinion that he was intoxicated with alcohol, and it is my opinion, I believe, that he was also intoxicated with anxiolytics which was the Xanax. These two drugs, alcohol and the Xanax, potentiate each other, and anything can happen if you take both of those things together. . . . [T]hey sort of multiply each other. They can easily do brain damage.
>
> . . . .
>
> [D]issociative disorder is when . . . [t]here's a disruption in the usually integrated functions of consciousness, memory or perception of the environment. That's from the Diagnostic & Statistical Manual.
>
> . . . .

22

You also have symptoms of what we call derealization. That's as if you're detached and you're an outside observer. It's like you're watching someone else do it.

. . . .

I don't think he was in control of his faculties when all this happened. I don't know if it was from the stress, from the depression, the anxiety, the dissociation, the intoxication, or, most likely a combination of all of the above.

Dr. Wilson opined that [the petitioner] was substantially impaired to the extent that he was unable to form premeditation.

Asked on cross-examination if [the petitioner] was in control at the time of the shooting, Dr. Wilson said that [the petitioner] "was in control sometime before the crime and he became in control again after the crime, but during the crime he was not. I'm not sure. It's a gray area, a gradual change. I just don't know." Dr. Wilson opined that [the petitioner] was not capable of forming intent at the time of the shooting. He said that [the petitioner] "knew the difference between right and wrong. He was not insane. He was just incapacitated." Dr. Wilson explained that [the petitioner's] "behavior was inconsistent and out of control. He was in and out of consciousness there. He knew some things, remembered some things and not others, but I don't think he was at all in control the whole time."

**Rebuttal Proof**

In rebuttal, the State recalled Investigator Tyreece Miller. Miller reiterated that, at the time [the petitioner] gave his statement, [the petitioner] said he had been drinking but was not under the influence of any drugs or alcohol. He said that [the petitioner] walked steadily, was able to answer the questions he asked, and was "very coherent." Miller said that [the petitioner] did not appear to be under the influence of drugs or alcohol. [The petitioner] consented to give a urine sample but initially refused to provide a blood sample because he did not like needles.

Following the department's standard operating procedures, Miller wrote down [the petitioner's] statement as he talked and allowed him to

23

review it before he signed it. Asked if [the petitioner] made any additional comments that were not included in his statement, Miller said [the petitioner] told him, "Today is Renee's father's birthday. I guess I gave him a hell of a birthday present." According to the driver's license belonging to Mrs. Jordan's father, his date of birth was January 11, 1932. Miller asked [the petitioner] if he could include the birthday present comment in the statement, but [the petitioner] said, "I don't want that in there." [The petitioner] also told Miller, "[Mrs. Jordan] was in a pool of blood the last time that [he] shot her."

On cross-examination, Investigator Miller said that [the petitioner] signed a waiver of his rights at 3:50 p.m. and signed his statement at 5:35 p.m. [The petitioner] eventually gave his consent for a blood sample at 9:50 p.m. Miller acknowledged that a Breathalyzer test was not performed on [the petitioner] and that [the petitioner] told him he was taking medication. Miller said that although the police department had video equipment, he did not have it brought to the Criminal Justice Center to videotape [the petitioner's] interview because it was against departmental policy and not standard operating procedure. Miller said he was not aware of the availability of any video equipment in the booking area of the Criminal Justice Center.

Dr. Daryl Matthews, a forensic psychiatrist, testified that he evaluated [the petitioner] on April 24, 2006. Dr. Matthews spent approximately six hours with [the petitioner], during which he conducted a psychiatric interview and a mental status evaluation. As a result of his examination of [the petitioner], Dr. Matthews did not find a severe mental disorder and said, "I don't believe [the petitioner] has ever had a severe mental disorder." Dr. Matthews concluded that [the petitioner] "was able at the time of the offense . . . to act intentionally and to act with premeditation." He added that [the petitioner] was able to conform his behavior to the requirements of the law.

In reaching his determination that [the petitioner] had the capacity to premeditate, Dr. Matthews said he reviewed, among other things, the note [the petitioner] wrote, the recorded messages [the petitioner] left on Mrs. Jordan's cellular telephone, the statements of various witnesses at the scene, and the police reports. The messages [the petitioner] left on Mrs. Jordan's phone included sarcastic comments about her obtaining a restraining order and statements such as: "I hope you go to work tomorrow, bitch, 'cause you'll be there one day. It may not be tomorrow,

24

but I will catch up with your raggedy ass. Your day is coming" and "Your ass is gonna pay." Dr. Matthews disagreed with Dr. Wilson that [the petitioner] was dissociated at the time of the shooting, saying that dissociation is very common, mostly pertains to memory, and has nothing to do with intent or premeditation.

Among the witness statements Dr. Matthews reviewed was that of Paul Forsythe, which Dr. Matthews recited:

> The driver of the red truck told the driver of the green car to get out of here. The driver of the green car said, "No, you hit me." The driver of the red truck folded the seat forward on the truck and he said, "You will." He pulled out a black rifle with a silencer or something on the end of the barrel. He fired at the driver of the green car.

Dr. Matthews also recited from the statement of George W. Bond, Sr.: "The man with the gun was white. He looked up and saw me and shook his head as if to tell me he didn't want me involved." Dr. Matthews said that [the petitioner's] statement to Sergeant Johnny Briley, "Renee fucked me over, Johnny," showed that [the petitioner] recognized Briley and indicated the "intactness of his mental capacity." Dr. Matthews read from the statement of Freddie Ellison: "When I saw [the petitioner], he had a gun and was trying to hide it. I said, 'David, what are you doing?' He said, 'Just go on.' I said, 'What's the matter? He said, 'Just go on.'" Dr. Matthews said that [the petitioner's] ability to recognize someone he knew at the scene, Freddie Ellison, implied that he "had the ability in memory to keep in mind people that he knew, and most importantly . . . he had the ability not to . . . shoot Mr. Ellison." Dr. Matthews concluded that [the petitioner] was making choices and able to control himself at the time of the shooting.

. . . .

**Penalty Phase**

Donald Roberson, Renee Jordan's father, testified that she was the youngest of his three children; his only daughter; and his last living child. One son died of cystic fibrosis when he was seven years old, and the other son died at age thirty-three. Roberson related that Renee's daughter, Sydney, was four years old at the time of her mother's death and that he

25

and his wife currently had custody of her.  He said that Sydney still asks for her mother.  Since Renee's death, Roberson has experienced "attacks, anxiety and depression."  Roberson added that Renee was murdered on his birthday, and he is no longer able to celebrate his birthday.

Robert E. Lee Gordon, Jr., David Gordon's older brother, testified that he and David had two other brothers, both of whom were deceased at the time of David's death.  Gordon, Jr. explained the impact of the death of his last remaining brother on him and his family.  He said that he has difficulty sleeping and that his brother's death is "all I think about, the way he died."  One of David's sons was in college and the other in high school, but both gave up on school as a result of their father's death.  Gordon, Jr. said he had buried two brothers and his mother in the past two years.  He related that David was a hard worker, a good father, and "very well respected . . . a fine man."

Shane Gordon, the eighteen-year-old son of David Gordon, testified that he was a junior in high school when his father was killed.  He said that he thought about his father's death "all the time and it gets me down. . . . It's just something that's hard to deal with."  He said that his father was a hard worker and was kind to everyone.

Renee Dawson testified that David Gordon was her fiancé and best friend.  On the date of his murder, Ms. Dawson and Gordon had a lunch date planned.  The couple had moved into a new home together on Thanksgiving Day, but Ms. Dawson was unable to keep the home after Gordon's death.  Ms. Dawson stated, "I would say that my life is empty and my life ended that day as well."

Emma Hopper, the wife of Jerry Hopper, testified that they had been married twenty-nine years.  She explained that losing her husband was like "losing half of myself."  Mr. Hopper worked for the Tennessee Division of Forestry and had been a state employee for twenty-eight years.  At the time of his murder, Mr. Hopper had been making plans for retirement.  Mrs. Hopper explained that the couple planned on spending more time with their young granddaughter, who was eighteen months old at the time of Mr. Hopper's death.  She said that she had not been able to spend a single night in their home since his death and had been living with her daughter and her family.  Mrs. Hopper testified that her granddaughter still asks, "Where is my papaw?"

26

Misty Ellis, the daughter of Jerry Hopper, testified that she had worked with victims of crimes in the past. She described her experience dealing with her father's death as an "[a]bsolute nightmare." Ellis said that it was "just torture" to know that one day she would have to explain to her daughter why her grandfather was no longer here.

TBI Agent Cathy Ferguson identified photographs of the victims. Exhibit 179 was a photograph of James Goff depicting the bullet wound to his abdomen. Exhibit 180 was a photograph of James Goff depicting the bullet wound to his neck. Exhibits 181 and 182 were photographs of Larry Taylor depicting the gunshot wounds to his legs. The photographs of Goff and Taylor were taken at the emergency room. Exhibit 183 was a photograph depicting Renee Jordan as she was found in the crow's nest at the TDOT garage.

Dr. Amy McMaster testified that Dr. Staci Turner performed the autopsy on Renee Jordan. Identifying exhibit 184 as a photograph depicting a gunshot wound to Mrs. Jordan's forehead, Dr. McMaster stated that the wound was inflicted from a "close range." She explained that it was "a close range wound because there's soot," or burnt gunpowder, on the skin surrounding the wound. She said that the wound to the forehead was a fatal wound. The autopsy further revealed a gunshot wound to the back of Mrs. Jordan's head, which went through her head and exited on her face. Exhibit 185 was a photograph depicting the gunshot wound to the back of the head. Dr. McMaster stated that this wound also would have been fatal. Dr. McMaster also identified nine entrance wounds on Mrs. Jordan's torso. She stated that there was significant injury to the abdominal area, which was a potentially fatal wound. Dr. McMaster said that this wound would have been painful. She explained, "in general terms, the body has about 30 seconds' worth of reserve of oxygen in the brain. So assuming your heart stops immediately, you've got about 30 seconds left of oxygen in your brain that will allow you to remain conscious." She affirmed that, during this time, one could experience pain. She added that, depending on other factors such as adrenaline, this time period could be longer. Dr. McMaster additionally stated that the wounds to Mrs. Jordan's body were from two different caliber bullets and agreed that the wounds were "beyond that which was necessary to inflict death." On cross-examination, she admitted that there was no indication in the autopsy report of post-mortem wounds.

Regarding the autopsy of Jerry Hopper, Dr. McMaster testified that he had two gunshot wounds to his abdomen, which injured segments of bowel and also segments of the aorta. Dr. McMaster stated that these wounds would not have been immediately fatal but would have been painful. Hopper also sustained a gunshot wound to his right wrist. Dr. McMaster was unable to determine the order in which the wounds were inflicted.

Dr. McMaster testified that she performed the autopsy on David Gordon. Gordon had "at least 13 entrance wounds" which were inflicted from the front, the side, and the back of the body. Gordon sustained injury to his bowel area, specifically, the natal cleft. The wounds sustained to the buttocks and natal cleft could be consistent with Gordon being face-down on the pavement. She opined that the number of wounds were more than that necessary to cause death. She added that the wounds would have been painful and that Gordon would have eventually lost consciousness.

In mitigation, [the petitioner] presented the following testimony. Larry Jordan, [the petitioner's] younger brother, testified that, during their childhood, he and [the petitioner] played ball and went fishing and hunting. Their father was their Little League coach. Jordan stated that he would be devastated if his brother was sentenced to death. He added that, if his brother received a sentence of life without parole, he would maintain his relationship with him. Jordan testified that [the petitioner] has a close relationship with his four daughters.

Suzie Silas, a guidance counselor at Malesus Elementary School, testified that [the petitioner] had obtained custody of Shelby and Lindsey, his daughters from a previous marriage. She characterized [the petitioner] as a concerned parent and said that he regularly checked on his children. After [the petitioner] was incarcerated, Lindsey wrote a letter expressing her desire to spend a day with [the petitioner] because "I miss my daddy very much." Ms. Silas also received a letter from [the petitioner] after his incarceration, thanking her for helping his children.

Michael Lee Merriwether testified that he met [the petitioner] while incarcerated at the Criminal Justice Complex. He stated that he and [the petitioner] often read Christian literature. Merriwether added that it was a benefit to him to have this interaction with [the petitioner]. He opined that [the petitioner] has the ability to do some good while in jail, including ministering to others.

28

Cheryl Fisher testified that she dated [the petitioner] before his marriage to Renee Jordan. They remained friends after their romantic relationship ended. She opined that, if [the petitioner] received a sentence of life, his children would benefit. She explained that [the petitioner] was a very good father and that his children idolized him. Ms. Fisher related how [the petitioner's] children were having difficulty rationalizing the potential punishment of death.

Madison County Deputy Andre Denice Hays, a jailer at the Criminal Justice Complex, testified that she had frequent contact with [the petitioner] and described him as quiet and polite. Deputy Hays opined that [the petitioner] would make a good prisoner and would be able to serve a sentence of life without parole without being a risk to any prisoner, guard, or other human being.

Sergeant Neina Murphy, also assigned to the Criminal Justice Complex, testified that she had not had any problems with [the petitioner] since his incarceration. She affirmed that [the petitioner] had not demonstrated to her that he would be a threat to any prisoner, guard, or other human being. She added that she would be disturbed if [the petitioner] received the death penalty.

Madison County Deputy Jason Walker, a jailer at the Criminal Justice Complex, testified that [the petitioner] often mentioned his family. Deputy Walker stated that [the petitioner's] demeanor was pleasant, he never complained, and he did what he was told to do. He described [the petitioner] as one of the better inmates. Deputy Walker opined that [the petitioner] would make a good prisoner in the penitentiary and would not be a threat to other individuals.

Deanna Jordan, [the petitioner's] oldest daughter, testified that she was a junior at Freed–Hardeman University. She said that she had three sisters, Lindsey, Shelby, and Sydney, and that they all loved their father and knew that he loved them. She stated that, while her father will not be able to walk her down the aisle, she would like for him to be able to meet his grandchildren some day. She stated that she wanted [the petitioner] to have a part in their lives, even if it was just visitation.

Dr. Dennis W. Wilson made a PowerPoint presentation to demonstrate the psychological point of view of the mitigating factors. He

29

explained that [the petitioner] started life in a stable and loving family but later suffered from depression, anxiety, and insomnia. He stated that [the petitioner] began using drugs and alcohol. Dr. Wilson spoke of [the petitioner's] two failed marriages before marrying Renee. He mentioned [the petitioner's] four children. He described [the petitioner's] health problems and prescription medications. Dr. Wilson testified regarding the disintegration of [the petitioner's] marriage to Mrs. Jordan. He said [the petitioner] took too much Xanax, drank vodka, lost control, and "fell apart."

Dr. Wilson also described [the petitioner's] remorse expressed very soon after the incident. He verified [the petitioner's] status as a model prisoner. He added that [the petitioner] was fully aware that he will spend the rest of his life in prison. Dr. Wilson opined that the structured setting of incarceration was good for [the petitioner] because the stressors of every day life were gone. [The petitioner] had adjusted well to the environment. Dr. Wilson added that [the petitioner] had been a loving and active father.

Dr. Wilson provided his opinion as a clinical psychologist:

[The petitioner] was under a lot of stress. He has a long history of not being able to deal with stress or change, and he was disturbed at the time of this crime.

And t[o]o, he was impaired also due to that chronic depression and anxiety, plus the intoxication. He just wasn't used to drinking that much. He took the Xanax in an attempt to try to sleep or calm down. He wasn't trying to get intoxicated, but the net effect was that he became impaired.

. . . .

Confinement is -- No one will ever have to worry about him doing something like this ever again, and even inside the prison system, he's likely to have a calming effect. . . . And importantly, he will be punished for what he did.

Gary Morris, the pastor of Bemis United Methodist Church, testified that [the petitioner's] parents were members of his congregation. Since the incident, Morris had visited [the petitioner] at the jail between thirty-five and fifty times. He recalled that, the day after [the petitioner's] arrest, [the

petitioner] appeared dazed and confused. [The petitioner] was very tearful and emotional and asked Morris to attend Mrs. Jordan's funeral. Morris stated that [the petitioner] had expressed his repentance and remorse. He added that it would be devastating to the family if [the petitioner] received a sentence of death.

Jordan, 325 S.W.3d at 16-35 (footnotes omitted).

## POST-CONVICTION PROCEEDINGS

### Petitioner's Proof

Lead counsel testified that he had been the District Public Defender since 1990 and had represented defendants in multiple capital cases prior to representing the petitioner. One case proceeded to the penalty phase, and the defendant in that case received the death penalty.

Lead counsel said he first met the petitioner on January 14, 2005, shortly after he was appointed to the case in Jackson City Court. The petitioner described his actions as "psychotic" and said he was taking Xanax, Celexa, Dolgic, hydrocodone for his knee, and Mobic. He stated that he was seen by Dr. Andy Coy twice and called him complaining of the inability to sleep. Lead counsel noted that the petitioner had not slept in two days and had had issues sleeping in the past thirty to forty days.

Lead counsel represented the petitioner during the preliminary hearing on April 13, 2005, and the petitioner's case was bound over to the grand jury. Lead counsel visited the petitioner at the jail on April 28, during which they discussed the petitioner's health problems and the different medications he had been taking. Lead counsel questioned whether the medications had interacted. The petitioner complained of trouble sleeping during a meeting on July 27.

The petitioner was indicted on August 1, 2005; the death notice was filed on August 8; and lead counsel was appointed by the trial court to represent the petitioner on August 10. On August 9, an assistant public defender, who was acting as co-counsel at the time, filed a motion for discovery in which he requested all tangible and exculpatory evidence in the State's possession. The trial court entered a scheduling order setting the jury selection for May 15, 2006, and the trial for the following day.

Lead counsel testified that based upon his prior experiences, he did not believe that he could seek funding for expert services until he was appointed in the trial court

after the petitioner was indicted. He had requested funding for expert services in a prior case before he was appointed in the trial court, and the Tennessee Administrative Office of the Courts had denied the request. On August 25, 2005, lead counsel filed a motion for funds to retain Glori Shettles, a mitigation specialist with Inquisitor, Incorporated, with whom lead counsel had previously worked on other cases, and funding was subsequently approved. Franklin Rice, a former police officer and an investigator on lead counsel's staff, also was assigned to the petitioner's case. Ms. Shettles interviewed witnesses, obtained records, discovered possible mitigation themes, worked with the petitioner, and investigated all aspects of the case.

Lead counsel testified that on August 25, 2005, he filed a motion seeking the approval of funds to retain Dr. Dennis Wilson, a licensed clinical psychologist. The motion stated that the petitioner had been treated for depression and appeared to have been under extreme mental stress at the time of the shooting. The motion also stated that the petitioner's mental condition needed to be evaluated for the purposes of sanity, diminished capacity, and mitigation-related issues.

Lead counsel recalled that on September 2, 2005, the prosecutor sent him a letter listing discovery materials and requesting that he acknowledge his receipt of the materials by checking off each document listed and returning the letter. The letter listed the petitioner's consent to give a urine sample, his consent to give a blood sample, and his consent to search his home for medication. There was a checkmark acknowledging the receipt of the serology report. Lead counsel said he thought he had to write a letter to the prosecutor requesting the report on "urine and alcohol."

Lead counsel acknowledged that according to Investigator Tyreece Miller's report, Investigator Miller requested that the petitioner submit urine and blood samples following his arrest on January 11, 2005. The petitioner agreed to submit a urine sample but refused to submit a blood sample because he did not want to be stuck with a needle. He signed the consent form for the urine sample at 3:35 p.m. but initially was unable to provide a urine specimen. He provided a urine sample at some point during his interview and signed his statement at 5:35 p.m. Lead counsel noted that the evidence form and property receipt from the Jackson Police Department seemed to indicate that the urine sample was taken at 3:35 p.m. The petitioner signed a form consenting to a blood sample at 9:50 p.m., and four tubes of blood were taken from him at 10:05 p.m.

Lead counsel noted that the TBI's report of the blood and urine analysis was issued to Agent Cathy Ferguson on May 18, 2005, after the preliminary hearing but before lead counsel was appointed in the trial court. Lead counsel explained that, technically, his office's obligation to represent a defendant in the general sessions court ends following the preliminary hearing. Once a defendant is indicted, the trial court

reevaluates the issue of indigency. Lead counsel said that because he knew the State could seek the death penalty against the petitioner, he met with the petitioner on several occasions between the preliminary hearing and the arraignment in the trial court.

Lead counsel stated that his notes of the meeting with the petitioner at the jail on October 11, 2005, reflected that he questioned whether the blood sample was analyzed for alcohol and noted the urine sample was analyzed for alcohol. He questioned whether the intoxication level at the time of the offense could be determined through the urine sample. He acknowledged that in his notes dated November 7, 2005, he questioned whether there were any blood test results for the petitioner.

The petitioner signed a consent form on January 11, 2005, at 5:45 p.m. to search his residence for prescription medication. During the search, officers seized at least four prescription medications. The dosage of the Xanax seized was one milligram.

Lead counsel testified that Ms. Shettles collected pharmacy records of the petitioner's prescription medication. She spoke to Dr. Wilson regarding any issues that arose from a change in the dosage in the petitioner's prescription for Xanax approximately one week prior to the shootings. Ms. Shettles stated in a memorandum that from November 14, 2000, to July 19, 2004, the petitioner's dosage of Xanax was 0.5 milligrams. Three refills were noted at the time of the July 2004 prescription. On January 4, 2005, the petitioner's dosage of Xanax was increased to one milligram after he called his doctor complaining of insomnia. Ms. Shettles indicated that Dr. Wilson was interested in the number of tablets remaining in the January 4 prescription bottle.

Lead counsel stated that on November 16, 2005, Dr. Wilson faxed him a letter requesting that lead counsel consider retaining a psychiatrist. Dr. Wilson stated that a psychiatrist was needed to evaluate the "interaction of physical and psychiatric functioning with the ingestion of the medication and use of alcohol as relates to [the petitioner's] state of mind at the time of the crime." As a result, lead counsel retained Dr. Caruso.

On November 17, 2005, a new scheduling order was filed setting the hearing date on all pending matters for February 13, 2006; the plea deadline and the deadline for disclosing the use of a mental health defense in either phase of the trial for March 6, 2006; and the trial for May 22, 2006. The trial was later continued to September 19, 2006. Lead counsel subsequently filed a Motion for Disclosure of Brady Material and a Motion to Disclose Information Relating to Mitigating Circumstances. He said he considered toxicology reports; blood and urine evidence; witness statements supporting intoxication; and any other physical evidence indicating the presence of alcohol,

prescription medication, nonprescription medication, or other intoxicants in the petitioner's blood or urine to be potentially exculpatory or mitigating.

On February 9, 2006, lead counsel requested the appointment of co-counsel. He explained that the assistant public defender who was assigned to that particular trial court had been serving as co-counsel "by default." The assistant public defender's involvement in the case was limited due to his full caseload and health problems. Lead counsel stated that he and the assistant public defender were the only death qualified attorneys in the office and that he believed he needed another attorney to assist him.

Lead counsel testified that, at some point, he realized he did not have the toxicology report of the urine and blood samples and that TBI Special Agent J.W. Harrison faxed the report to him on March 30, 2006. Lead counsel stated that the report was issued on July 8, 2005, during the "limbo period" following the preliminary hearing but before lead counsel was appointed in the trial court. The report provided that "[p]resumptive testing indicates the possibility of benzodiazepines," that the crime laboratory should be contacted if further testing is necessary, and that the evidence would be destroyed in sixty or eighty days. The TBI agent who issued the report was Special Agent Kelly Hopkins, whom the defense called as a witness at trial. On March 30, 2006, lead counsel spoke to Special Agent Harrison, who stated that converting the petitioner's urine alcohol level to a blood alcohol level would be "pure speculation." Lead counsel asked him if the samples were still available, and Special Agent Harrison said that they "probably" were and that if lead counsel wanted the evidence to be preserved, he should send a written request. On April 7, 2006, lead counsel sent a letter to the TBI Crime Laboratory requesting that the petitioner's blood samples be preserved in the event that additional testing was required. The blood sample, however, had already been destroyed.

Lead counsel testified that he, co-counsel, Ms. Settles, and Dr. Wilson met on multiple occasions. Dr. Wilson assisted counsel in preparing questions for the State's experts at trial. Lead counsel was "fairly positive" that they discussed whether they could make a case that six of the petitioner's one-milligram Xanax tablets were unaccounted for between January 5 and January 11, 2005. Lead counsel researched the effects of Xanax and learned that Xanax can encourage suicidal thoughts or mania and may intensify the effects of alcohol. He also learned that a person should not drink alcohol while taking Xanax.

Lead counsel did not recall whether he received from the State a photograph of a squeeze bottle found on the floor on the passenger side of the petitioner's truck. He said an inventory of the truck's contents may have been provided to him as discovery. He did not believe that he filed a motion to preserve the evidence.

34

Lead counsel recalled that two of the petitioner's daughters were living with him on January 10-11, 2005. The petitioner obtained custody of his daughters following an investigation by the Tennessee Department of Children's Services into allegations of child abuse and neglect while the children were living with their mother. Dr. Wilson attempted to schedule a meeting with the petitioner's daughters and his parents through Ms. Shettles.

Lead counsel testified that in December 2005, he filed a motion seeking a change of venue. He alleged in the motion that The Jackson Sun had carried sensational stories regarding the case. He explained that the newspaper reporters had interviewed people who had not witnessed the shooting and had written stories that included many rumors about the case. He also alleged in the motion that radio and television stations carried news reports at various hours of the day and sent stories regarding the petitioner into practically every home in the county. Lead counsel filed a motion to conduct individual and sequestered voir dire in which he alleged that due to the publicity that the case had received, there was a significant possibility that potential jurors had been exposed to certain information in the case and may have formed an opinion regarding the petitioner's guilt and the appropriateness of the death penalty.

Lead counsel withdrew his motion for change of venue in February 2006 while reserving the right to revisit the issue. He explained that the trial court stated that it would revisit the issue if they were unable to obtain a jury due to the publicity the case had received. He said he met with co-counsel and Ms. Shettles and discussed whether they should pursue the change of venue motion or try the case with a Madison County jury. Lead counsel also discussed the issue with the petitioner and his parents. Lead counsel stated that because the petitioner's family were well-known members of the community with good reputations, trial counsel believed that they would have "just as good a shot at a fair jury" in Madison County as in any other county. Lead counsel said that after speaking to other attorneys, he learned that when the venue is changed and a new jury is brought in to hear the case, those jurors feel that the case has to be very serious or they would not have been brought in for it. He stated, "So we did a good bit of discussion and just made what I call a tactical decision to withdraw" the motion for a change of venue. He explained that he understood that if the parties were unable to obtain a fair and impartial jury during the voir dire process, the trial court would recess and change the venue. Lead counsel did not hire a jury consultant or conduct a venue study in Madison County to determine the level of saturation and preformed beliefs regarding the petitioner's case.

Lead counsel said that trial counsel drafted a proposed jury questionnaire but that the trial court used its own jury questionnaire. The parties conducted individual voir dire addressing the death penalty and pretrial publicity and conducted voir dire of the jurors as

35

a group on the "general questions." The defense did not use all sixteen of its preemptory challenges. Lead counsel identified a newspaper article in which he was quoted regarding his concern that some of the jurors stated that the petitioner had not shown remorse. Lead counsel was further quoted in the article as stating that the petitioner was taking antidepressants, which could have accounted for his lack of expression during the trial.

Lead counsel testified that he and co-counsel worked together in preparing for the cross-examination of each of the State's witnesses. Lead counsel recalled that Barbara Surratt gave a statement regarding her telephone conversation with Renee Jordan on the morning of January 11, 2005. Ms. Surratt stated that Mrs. Jordan told her that the petitioner's mother said the petitioner needed to be committed to a mental health facility and that his mother did not know how to do it. Mrs. Jordan also told Ms. Surratt that she would be home after work and hoped to meet with her attorney. Lead counsel stated that he made a strategic decision not to question Ms. Surratt about these statements. He explained that the statements were "double hearsay," "could open the door to a lot more of that stuff," and were not helpful. He did not recall whether he considered investigating the statements.

On cross-examination, lead counsel testified that he had tried more than 100 jury trials and that at the time of the petitioner's case, he had tried almost twenty murder trials. He acknowledged that the defense at trial was intoxication with alcohol combined with the effects of prescription medications, depression, and other factors listed by Dr. Wilson in his testimony. He explained that a large portion of the defense was that various stressors in the petitioner's life "caused him to snap." Dr. Wilson referenced medical reports of the petitioner's prior injuries, including a broken back and fractured ribs from a car accident, and discussed the stressors placed on the petitioner due to the injuries. Dr. Wilson also discussed the effect of the stress of the petitioner's multiple divorces and pending divorce.

Lead counsel stated that based upon his prior cases, he knew that a person who was abusing cocaine could be violent. He was aware of evidence that the petitioner was abusing cocaine either prior to or during his marriage with Mrs. Jordan and that the petitioner had quit using cocaine sometime prior to the shootings. Lead counsel recalled several occasions during the trial when the State attempted to introduce evidence of violence in the family and he objected. The State had certified copies of the petitioner's prior conviction of domestic assault in which the petitioner received diversion and evidence of another incident witnessed by Kevin Deberry. Following a jury-out hearing on the issue, the trial court excluded the evidence. Lead counsel said that if he had attempted to establish that the shooting was an isolated incident, the State would have attempted to establish that the petitioner had been violent in other situations.

36

Lead counsel acknowledged that the case was highly publicized and said that he, co-counsel, and Ms. Shettles discussed withdrawing the request for a change of venue with the petitioner's family. Lead counsel noted that the petitioner came from a good family, who was well known in the community. The petitioner's father coached little league for a number of years and "did some flea market work." Lead counsel said trial counsel discussed the issue with the petitioner and "bounced that back and forth. We didn't just come to it just, snap, let's let it go. We made a decision as a team." Lead counsel characterized the decision as a trial tactic and explained, "We thought we might have as nearly or even better chance of getting a fair jury in this community as any other under the circumstances. A lot of times, you don't have a family that is well-known or well-liked in the community."

Lead counsel testified that trial counsel utilized the potential jurors' completed questionnaires during voir dire. During the group voir dire, jurors were questioned about intoxication, reasonable doubt, any experiences as victims of crimes, burden of proof, and other general issues. Individual voir dire occurred in the jury room in the presence of the judge, lead counsel, co-counsel, Ms. Shettles, the petitioner, the district attorney general, and his assistants. Lead counsel said he questioned jurors individually about pretrial publicity to avoid the risk of tainting the entire jury pool. He recalled that several potential jurors were excused due to their knowledge of the case. He also recalled that other potential jurors either had not heard a great deal about the case or had not formed an opinion based upon what they had heard. Lead counsel believed potential jurors were remaining in the jury pool once the jury was chosen. He said each juror stated that he or she could base the decision on the law and the evidence presented and be fair and impartial in making his or her decision.

Lead counsel testified that the defense's strategy in choosing jurors who knew the petitioner's family was successful in that they were able to retain a particular juror, whom he identified. The juror previously attended St. Luke's Episcopal Church with co-counsel and lead counsel's wife. Lead counsel recalled that at the time, the church had "qualms" about the death penalty, and he was familiar with statements in the church against the death penalty. Lead counsel noted that the juror also was a special deputy for the Madison County Sheriff's Department and a member of the NRA and that the district attorney general had assisted the juror on a prior occasion.

Lead counsel stated that he represented the petitioner during the preliminary hearing and had the opportunity to cross-examine several of the State's witnesses at that hearing. He later obtained a copy of the transcript of the preliminary hearing. He said the State had an "open file" policy where he could obtain copies of all the files from all of the state agencies.

Lead counsel acknowledged that he first became aware of the TBI reports of the blood and urine analysis "a little bit later in the game" in March 2006 after the evidence was destroyed. He said that the report of the urine analysis was dated May 2005 and that as a result, the urine sample likely had been destroyed by the time he was appointed in the trial court and had discovery. He noted that one report was issued on July 8, 2005. He said when he first learned of the report in March, he contacted Special Agent Harrison. Lead counsel confirmed that he was aware of the blood draw because Investigator Miller testified during the preliminary hearing and the petitioner's statement was read into evidence. Lead counsel explained that TBI laboratory reports could take several months to be issued but that "[t]his one just came back quicker I guess." Upon learning that the evidence might be destroyed, he took immediate action. He raised an issue regarding the destruction of the blood samples in his motion for new trial and on appeal.

Lead counsel stated that he researched the effects of alcohol and Xanax in preparing to present experts on the issue. He also stated that he introduced the blood and urine reports into evidence at trial and asked Special Agent Harrison to conduct a retrograde extrapolation from the urine. Lead counsel said he and co-counsel discussed locating an expert who would say that retrograde extrapolation from urine was an accurate process from a single sample of urine. Special Agent Harrison explained the factors that affected the reliability of retrograde extrapolation from the urine. He testified at trial that alcohol was in the petitioner's bloodstream at some time in the recent past and that the alcohol had gone into the urine. The petitioner did not drink alcohol after the shootings because he was apprehended immediately.

Lead counsel testified that one of the factors in the decision against calling Dr. Caruso as a witness at trial was Dr. Caruso's opinion that the petitioner was able to premeditate at the time of the shootings. Lead counsel said that while Dr. Caruso included helpful mitigating factors in his report, lead counsel believed that he could establish those factors through Dr. Wilson's testimony. Lead counsel discussed the issue of whether to present Dr. Caruso's testimony with co-counsel and Ms. Shettles. Lead counsel recalled that Dr. Caruso discussed the petitioner's ability to premeditate and that the petitioner moved "in his steady progression and decide[d] what to do and that sort of thing." Lead counsel said Dr. Caruso's finding of narcissistic personality disorder "was going to be a real problem." Lead counsel also said Dr. Caruso's opinion was consistent with Dr. Matthews' opinion.

Lead counsel testified that by withdrawing Dr. Caruso as an expert, the State was not entitled to see his report. Lead counsel assumed that had he retained another expert, the State would have attempted to learn about Dr. Caruso's opinions. He noted that many

of Dr. Caruso's findings were supported by the physical evidence and said he was able to use Dr. Wilson as a defense witness. Finally, he explained that if a defense attorney has a client evaluated by multiple experts and uses the expert who gives the most favorable opinion, the jury could think that the attorney was "shopping for experts."

Lead counsel testified that Dr. Nat Winston conducted the initial forensic evaluation of the petitioner as ordered by the city court judge. Lead counsel noted that such evaluations were fairly routine in these types of cases. He was given a copy of Dr. Winston's report and said that according to the report, the petitioner denied having hallucinations and stated that "he took two swigs out of his wife's vodka bottle but he was not drunk and knew what he was doing."

Lead counsel stated that he did not file a motion to suppress the petitioner's statement to the police because he did not believe any grounds for suppression existed. He explained that the petitioner signed a written waiver of his rights and that the statement appeared to be knowingly, voluntarily, and intelligently given. He noted that the petitioner made voluntary statements to the police following his arrest, some of which were more damaging than his formal written statement. Lead counsel said portions of the written statement were needed to support the defense. In the statement, the petitioner expressed some remorse and stated that he had five shots of vodka prior to the shootings. Lead counsel recalled that the defense called Investigator Miller as a witness "to do a little front-loading mitigation on the remorse and put on the evidence of intoxication there with him."

Lead counsel did not file a motion to suppress the search of the petitioner's home. He understood the initial entry involved a welfare check of the petitioner's two daughters who had been living with the petitioner at the time of the shootings. He said that following their initial entry, the police officers backed out of the home and obtained a search warrant.

Lead counsel acknowledged that the petitioner demonstrated in his statement a "ready recollection" of many of the details up to the time of the shootings. The petitioner was able to load multiple weapons and drive to Mrs. Jordan's place of employment. During the trial, evidence was presented establishing that the petitioner walked past several people without harming them. Lead counsel said that the petitioner was unable to remember some details, such as returning to the crow's nest following the initial shooting, and that the defense used the lack of memory as evidence of "some impaired mental state." Lead counsel noted that Dr. Caruso viewed the petitioner as having "selective memory."

Lead counsel testified that he and co-counsel conferred with each other regarding the cross-examination of Dr. Matthews and that co-counsel questioned Dr. Matthews at trial. Lead counsel described Dr. Matthews as a "loose cannon" and said, "If you start asking him too many questions, he will be explaining into the next year. He just keeps on." He said Dr. Matthews was a very experienced witness who knew how to answer a question in such a way that he could discuss as much evidence as possible. Dr. Matthews discussed evidence that the State could not otherwise introduce. Lead counsel stated that trial counsel attempted to show that Dr. Matthews was a "hired gun from Hawaii." Lead counsel also stated, "We were just trying to shut him up and get him out of here." He noted that he and co-counsel did not question Dr. Matthews extensively on the issue of the petitioner's mental state because Dr. Matthews was a damaging witness if not "reign[ed] in." Lead counsel raised an issue on appeal regarding Dr. Matthews' reference to evidence that the State could not otherwise introduce. The court concluded that the trial court's failure to give a curative instruction was harmless error.

Lead counsel stated that while he understood that Mrs. Jordan's statement to Barbara Surratt regarding the statement of the petitioner's mother was "double hearsay," he also did not want to question Ms. Surratt about the conversation due to fear that he could open the door to any other statements made by Mrs. Jordan during the conversation. Lead counsel said that because there was physical abuse in the family history, open-ended questions that might lead to evidence of such abuse needed to be avoided. He did not call the petitioner's mother to testify about the petitioner's need to be committed because his parents wanted to be present in the courtroom for the trial. The trial court ruled that the petitioner's parents could not remain in the courtroom during the trial if they were going to testify. Other family members who testified regarding mitigation evidence were not allowed to remain in the courtroom for the trial. Lead counsel challenged the trial court's ruling on appeal, and the Tennessee Supreme Court held that the trial court erred but that the error did not affect the verdict and the sentence.

Lead counsel said he and co-counsel made every effort to elicit from every witness who came into contact with the petitioner any information that may have supported an intoxication or mental health defense. He believed that they were not surprised by any of the evidence that was presented at trial. He also believed that Ms. Shettles interviewed Kevin Deberry prior to trial and that he discussed giving the bottle of vodka to the petitioner.

Lead counsel testified that he asked Ron Lax with Inquisitor, Incorporated to analyze the crime scene evidence and offer an opinion as to whether the evidence supported the actions of someone who was acting irrationally. Lead counsel asked Mr. Lax to determine whether the shots were random or were "well-targeted." Mr. Lax issued a report in which he concluded, "Based on my review of this material, I could not

40

offer any opinion that the crime scene evidence suggested David Jordan was not fully aware of what he was doing.  This is based on the earlier phone call to TDOT, the amount of ammunition, his comments to others present and the accuracy of the shots fired."

On redirect examination, lead counsel testified that he understood that the petitioner's prior domestic violence charge was a misdemeanor offense.  The petitioner was alone in his backyard firing several gunshots, and someone called 911.

Lead counsel said Dr. Winston likely conducted the initial evaluation without relying upon a social history and the toxicology report from the TBI.  Lead counsel received the toxicology reports on March 30, 2006.  He first interviewed the petitioner on January 14, 2005, and learned early during his representation that blood and urine samples had been taken.  He received discovery from the State referencing the toxicology reports in September 2005 and acknowledged that the samples were not destroyed until January 3, 2006.

Lead counsel acknowledged that funding for Dr. Caruso was approved in January 2006 and that the defense's expert disclosures were due in March 2006.  Lead counsel further acknowledged that Dr. Caruso had a "somewhat limited" amount of time in which to conduct an evaluation.  Unlike Dr. Wilson, Dr. Caruso did not find any evidence of dissociative disorder.  Dr. Caruso indicated that the petitioner had experienced some trauma and discussed "[l]oss or abandonment precipitating violence," including Mrs. Jordan's threat to leave him and force him and his children out of their home.  Dr. Caruso concurred that the petitioner had difficulty controlling himself.  When asked about diminished capacity, Dr. Caruso said, "Maybe, but there's too much organization."  Lead counsel acknowledged that he did not retain a neuropsychologist, neuropharmacologist, toxicologist, or pharmacologist.

Lead counsel testified that Mr. Lax was a licensed private investigator.  He did not know whether Mr. Lax had a degree in the area of forensics or any training in ballistics but said Mr. Lax appeared to be well-qualified in those areas.  He never filed a motion to retain Mr. Lax as an expert, and Mr. Lax agreed to perform the work as part of their hiring of Inquisitor, Incorporated.

Co-counsel testified that he was appointed to represent the petitioner on February 13, 2006.  At that time, co-counsel had a general practice in Henderson, Tennessee.  Prior to representing the petitioner, co-counsel had represented defendants in two capital cases, neither of which entered the penalty phase.

Co-counsel stated that he and lead counsel discussed what motions to file and who would be responsible for filing each motion.  Co-counsel believed that he drafted a

41

proposed jury questionnaire but said that the trial judge drafted his own jury questionnaire. He did not believe that he or lead counsel investigated the possibility of raising a claim of discrimination regarding the race and gender of grand jury forepersons in Madison County. Co-counsel said no strategic reason for their failure to raise the issue existed.

Co-counsel testified that by the time he was appointed to represent the petitioner, lead counsel had retained Ms. Shettles, Dr. Wilson, and Dr. Caruso. Co-counsel identified notes that he had written regarding other possible mental health experts including a pharmacologist and a neuropsychologist. He also noted that alcoholism existed in the petitioner's family and questioned whether the petitioner had "organic brain problems." Trial counsel did not retain a pharmacologist or a neuropsychologist and did not obtain any brain imaging scans.

Co-counsel identified an email that lead counsel sent to Dr. David Stafford on April 7, 2006, in which lead counsel asked Dr. Stafford whether the petitioner's intoxication level at 11:30 a.m. on the day of the shootings could be determined from the results of the urine sample. Lead counsel stated in the email that he might be interested in an expert to address that issue. Co-counsel did not know whether Dr. Stafford received the email. Co-counsel noted that according to his fee claim submitted to the trial court, he had a telephone conference with Dr. Stafford regarding urine and alcohol on May 31. Co-counsel also made a note to call the Tennessee Association of Criminal Defense Lawyers regarding Dr. Stafford or other experts in "urine/alcohol." Co-counsel sent a letter to Dr. Stafford on June 14, in which co-counsel set forth the time in which the urine sample was taken and the time in which the blood sample was taken. Co-counsel questioned whether the petitioner's intoxication level at 11:30 a.m. on the day of the shootings could be determined from the alcohol results of the urine sample. He also questioned whether the results could be used to corroborate the petitioner's testimony regarding the level of intoxication or alcohol intake. Co-counsel did not mention in the letter that the presumptive testing of the urine sample by the TBI suggested the presence of benzodiazepine.

Co-counsel testified that he had not worked with Dr. Wilson prior to the petitioner's case. Co-counsel did not recall the State pointing out on cross-examination that Dr. Wilson was not board certified as a forensic psychologist and that only one or two percent of his practice was comprised of criminal defense work. Co-counsel believed that the State pointed out on cross-examination that Dr. Wilson could not prescribe medication.

Co-counsel conducted the cross-examination of Dr. Matthews at trial. While co-counsel was aware that Dr. Matthews was employed by Park Dietz Company, co-counsel

did not contact anyone in the Tennessee or national capital defense community regarding the methodology used by that company. He did not recall whether Dr. Matthews had testified previously in Tennessee. He did not believe that he obtained transcripts of Dr. Matthews' prior testimony and did not recall if he researched previous testimony of Dr. Matthews in other cases on Westlaw or Lexis.

On cross-examination, co-counsel testified that he had been practicing law for twenty-nine years and had worked on "thousands" of criminal cases, including homicide cases as both a prosecutor and a defense attorney. He and lead counsel consulted each other regarding any motions filed. They reviewed the discovery materials and discussed them at length. Co-counsel stated that the district attorney general's office had an "open file" policy where defense attorneys could copy any materials in the files of the prosecutor and the law enforcement officers. He explained that defense attorneys were allowed to return and review the files on multiple occasions during the course of representing their clients. He said the defense team took full advantage of the "open file" policy while representing the petitioner.

Co-counsel said Ms. Shettles interviewed witnesses, took statements, and discovered mitigation evidence. He recalled difficulty in interviewing some witnesses because officials with TDOT instructed witnesses not to speak with members of the defense team. He said they made every effort to interview witnesses who agreed to be interviewed and to search for mitigation proof. Co-counsel testified that due to Ms. Shettles' investigation and trial counsel's review of the State's files, they were not surprised by any evidence that was introduced at trial. Co-counsel noted that every witness basically testified that the petitioner shot the victims and that as a result, the only defense theory involved mental health. Trial counsel pursued a mental health defense by retaining Dr. Wilson, a psychologist, and Dr. Caruso, a forensic psychiatrist.

Co-counsel stated that he had worked with Dr. Caruso on at least two other occasions and that Dr. Caruso was "well-thought of" by the criminal defense bar. Co-counsel explained that Dr. Caruso was not called as a witness at trial because trial counsel concluded that Dr. Caruso's testimony could have been harmful to the defense. According to co-counsel, Dr. Caruso stated in his report that the petitioner

> was able to appreciate the nature and wrongfulness of his behavior at the time of the offenses. There were no grounds to support an insanity defense in accordance with the criteria in TCA [§] 39-11-501. In addition, while he was intoxicated and suffered from major depression and severe mental disease, neither precluded him from forming the requisite mens rea for his offense in accordance with criteria in State v. Hall.

43

Co-counsel stated that Dr. Caruso shared the same opinion as the State's mental health expert. In an email to Dr. Wilson on April 3, 2006, Dr. Caruso stated:

> While the precise levels of benzodiazepine, opiates, and alcohol are not unimportant, the larger issue is what effect that had on his mental state, specifically the capacity to premeditate. I just did not see evidence from the discovery that [the petitioner] was unable to plan or that he was in such a state of passion and excitement that he couldn't premeditate his actions. He apparently moved in a steady progression to achieve his intended actions. He even had the capacity to converse and decide that he did not wish to kill one victim and did not want to engage police. He was apparently exercising some degree of reflection and judgment over his actions.

Dr. Caruso stated in his report that the petitioner had told him that he loaded several guns and thought that "he had to stop [Mrs. Jordan] from doing this to the kids. He guessed he'd have to shoot her, like going to war." The petitioner informed Dr. Caruso that he had threatened Mrs. Jordan with a knife in 2002, and Dr. Caruso referenced other instances involving the use of a knife. Co-counsel testified that during trial, the State attempted to introduce evidence of these prior instances, but the trial court excluded the evidence. He explained that in cases involving alcohol and a family history of abuse, presenting mitigation evidence without opening the door to other aspects of family life "can be like negotiating a minefield." Co-counsel agreed that the more evidence the defense presented about the petitioner's family history, the more likely the State could have presented evidence of prior domestic abuse and assault and the petitioner's prior threat involving a knife, all of which the trial court excluded.

Co-counsel stated that the defense team obtained the records from Dr. Nat Winston from Pathways, who evaluated the petitioner while the case was in city court. Dr. Winston evaluated the petitioner on the issues of insanity and his ability to assist counsel and found that an insanity defense could not be supported. During the evaluation, the petitioner told Dr. Winston that he was not intoxicated at the time of the shootings.

Co-counsel testified that the defense at trial involved a combination of alcohol intoxication, the use of Xanax, or alprazolam, depression, and lack of sleep. He said trial counsel presented evidence of intoxication at every opportunity in an effort to obtain a jury instruction on intoxication. The trial court instructed the jury on intoxication during both phases of the trial.

44

Co-counsel said trial counsel presented testimony from two TBI Crime Laboratory technicians regarding the results of the State's testing of the petitioner's blood and urine specimens. The specialist testified that a reliable extrapolation could not be made from the urine alcohol results. Trial counsel presented evidence that the petitioner's blood tested positive for Xanax and Citalopram. Co-counsel stated that trial counsel did not present Dr. Stafford as a witness at trial because he would have testified that the only inference that could be drawn from the results of the urine alcohol test was the petitioner had consumed alcohol.

Co-counsel acknowledged that Investigator Miller testified that when the petitioner gave his statement at 3:35 p.m. on the afternoon of the shootings, he was not intoxicated. In his statement, the petitioner also denied taking Xanax. Dr. Wilson testified that the petitioner was able to premeditate before and after the offenses but not during the offenses.

On redirect examination, co-counsel acknowledged that Dr. Caruso determined in his report that the petitioner was intoxicated at the time of the offenses. Dr. Caruso mentioned that the effects of alcohol are increased by the concomitant use of Xanax, hydrocodone, and Dolgic, all of which the petitioner was taking. Dr. Caruso diagnosed the petitioner under Axis II with alcohol and benzodiazepine intoxication at the time of the offenses, major depression, and alcohol and polysubstance dependence. Dr. Caruso found as a mitigating circumstance that the offenses were committed while the petitioner "was under the influence of mental and emotional disturbance, major depression, and in a state of intoxication." Dr. Caruso also found that the petitioner's capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired by his major depression and alcohol and benzodiazepine intoxication." Co-counsel did not know that in 2006, the criminal defense bar was aware of problems with Dr. Caruso's credibility in that he had falsified data while in medical school.

On recross-examination, co-counsel stated that Dr. Wilson testified at trial regarding the petitioner's dependence on various substances, including alcohol, benzodiazepine, and opiates. Co-counsel noted that Dr. Caruso expressed concern that the petitioner complained of "memory deficits in such a convenient fashion."

Glori Shettles, a mitigation specialist with the capital defense team of the Shelby County Public Defender's Office, testified that in 2005 and 2006, she was a mitigation specialist with Inquisitor, Incorporated, which had been formed by Ron Lax who was deceased. Ms. Shettles worked for Inquisitor, Incorporated as a mitigation investigator for twenty and one-half years and was retained as a mitigation specialist for the petitioner's case.

45

Ms. Shettles testified that the only issue in the petitioner's case was his mental state at the time of the shootings. She said the petitioner was concerned about the combination of the drugs and alcohol he had consumed and asked about the results of the blood and urine tests from the beginning of the case. Ms. Shettles collected the petitioner's pharmacy data and researched an issue concerning the increase in the dosage of Xanax prescribed to the petitioner approximately one week prior to the shootings. She discovered fewer pills in the bottle of Xanax than she would have expected.

Ms. Shettles and lead counsel discussed retaining a psychiatrist or a medical doctor. She contacted Dr. Caruso about his willingness to work on the case. She did not recall whether she contacted Dr. Murray Smith, a medical doctor who specialized in addiction. She had worked with Dr. Smith in prior cases involving addiction and substance abuse.

Ms. Shettles testified that she assisted trial counsel in preparing a defense based in part on intoxication. She saw intoxication as a central issue in the case. She recalled evidence that Kevin Deberry, a neighbor, brought a bottle of vodka to the petitioner's house and placed it in the freezer at approximately 1:00 a.m. on January 11, 2005. Ms. Shettles interviewed the Naylors, the maternal grandparents of the petitioner's two daughters, about what the children saw and heard on January 10 and 11, 2005, while with the petitioner. Ms. Shettles did not recall speaking directly to the children. Her notes reflected "big bottle, asleep in recliner, turned coffee on, came back and leave, had a bottle, after drink coffee." Ms. Shettles was unsure whether the "bottle" was a bottle of liquor or a bottle of pills.

Ms. Shettles said she interviewed Larry Jordan, the petitioner's brother, who described the petitioner as a "straight beer drinker." She learned that the petitioner's truck was released to Mr. Jordan months following the shootings. Mr. Jordan told Ms. Shettles that he found a cup in the truck that still smelled of alcohol, which led him to believe the petitioner had been drinking heavily around the time of the shootings.

Ms. Shettles believed trial counsel did not actively pursue an intoxication defense after receiving the toxicology report. She recalled lead counsel informing her that he would not be using Dr. Caruso in the case. She had a conversation with lead counsel on May 5, 2006, during which lead counsel informed her that he expected to receive a report from the State's mental health expert soon and that he was considering retaining a neuropsychologist. Lead counsel also said he was considering asking Dr. Wilson to delete from his report the information relayed to him by the petitioner about the shootings. Ms. Shettles assisted Dr. Wilson in preparing a PowerPoint presentation to use during his testimony at trial, and the presentation referenced the missing Xanax pills.

46

On cross-examination, Ms. Shettles testified that according to her notes, the petitioner was "bad on drugs" when he was married to his former wife, Lisa Naylor. The petitioner beat Ms. Naylor while she was pregnant with their first daughter. Ms. Naylor began abusing drugs and left the petitioner when their daughter was one or two years old. They later reconciled, and Ms. Naylor became pregnant with their second daughter. The petitioner and Ms. Naylor had a fight when their youngest daughter was three weeks old, during which the petitioner beat Ms. Naylor who was jailed after someone called 911. Ms. Shettles noted that the petitioner hated his daughter with Mrs. Jordan because she looked like Mrs. Jordan. The petitioner was abusing crack cocaine at one point. Ms. Shettles also noted that even after the petitioner stopped using drugs, he never financially supported his daughters with Ms. Naylor. The petitioner was taken to court on numerous occasions for failure to pay child support. According to Betty Naylor, Ms. Naylor's mother, "[The petitioner] would quit a job just to not pay child support."

On redirect examination, Ms. Shettles testified that she was aware of an association between substance abuse and domestic violence. She noted that the petitioner had been married three times. His first marriage was to Denise when they were both very young. They had a daughter named Deanna, who testified during the penalty phase. The petitioner's second marriage was to Lisa Naylor, who had severe addiction issues. Ms. Shettles said she did not interview Ms. Naylor because Ms. Naylor was undergoing treatment at a rehabilitation facility at the time. Ms. Shettles said that during a violent incident between the petitioner and Ms. Naylor, Ms. Naylor was jailed, which Ms. Shettles assumed meant that Ms. Naylor was the assaulter. The petitioner and Ms. Naylor had two children, both of whom were living with the petitioner on January 10 and 11, 2005. Ms. Shettles said she met the children but did not recall directly speaking with them about the case. She believed that their grandparents objected to her interviewing the children, and, as a result, the information she received was from the grandparents. Ms. Shettles stated that Ms. Naylor's parents, who had custody of the two children, expressed "very negative" feelings about the petitioner. The petitioner and Mrs. Jordan obtained custody of the children prior to the shootings because Ms. Naylor could not care for them.

Ms. Shettles did not recall the petitioner's ever indicating that he did not want his child with Mrs. Jordan. She said the information she obtained from Betty Naylor appeared to have been second or third-hand information. Betty Naylor did not state that she witnessed certain events but that she heard about the events.

Joby Emerson, the wife of Johnny Emerson, testified that she spoke to the petitioner approximately ten times in December 2004. She said that the petitioner was very nice to her and that she never heard the petitioner threaten to harm anyone. She stated that the petitioner called her and asked whether she was aware of the affair

47

between Mrs. Jordan and her husband. The petitioner told Mrs. Emerson that he and Mrs. Jordan had a house together and that he had given Mrs. Jordan the proceeds from the sale of his home to go toward their house. He said that Mrs. Jordan told him if their marriage ended, he could have the house because they had recently received custody of his two children. Mrs. Emerson stated that the petitioner did not want himself or his children to be homeless.

Mrs. Emerson testified that one night in December 2004, her husband received a telephone call from the petitioner and that she listened to the conversation on another telephone. The petitioner asked Mr. Emerson what was going on between him and Mrs. Jordan. Mrs. Emerson said the petitioner was "[v]ery calm."

Gary Morse testified that in 2004 and 2005, he was the pastor at Bemis United Methodist Church where the petitioner's parents were parishioners. The petitioner had grown up in the church but was not active in the church when Reverend Morse was the pastor. Reverend Morse stated that he visited the petitioner at the jail within twenty-four hours of his arrest on January 11, 2005. He described the petitioner as "disheveled," "wired," and "discombobulated" and said the petitioner was distraught and appeared to have been crying. The petitioner told Reverend Morse that he had not slept. Reverend Morse visited the petitioner two or three times per month over the next twenty months while the petitioner was housed at the local jail. They discussed the petitioner's use of alcohol and prescription drugs. On cross-examination, Reverend Morse acknowledged that he testified at trial and described the petitioner as "dazed," "[r]emorseful," and "tearful."

Kippi Jordan, the petitioner's former sister-in-law, testified that the petitioner's family moved into her neighborhood when she was in the fifth grade. She had known the petitioner for thirty-five years and was married to his brother, Larry, for twenty-two years. At the time of the post-conviction hearing, she was the principal at Nova Elementary School.

Kippi Jordan stated that when she and the petitioner were growing up, the petitioner was very friendly and like a brother to her. She was friends with the petitioner's first wife but did not have as much contact with him during his second marriage. The petitioner and Larry Jordan were close and hunted together. The petitioner was very involved with his children.

Kippi Jordan testified that the petitioner had an uncle who exhibited "strange behaviors" and was treated at Western State Mental Institute in Bolivar, Tennessee. The petitioner's paternal grandfather was known to be an alcoholic and had a bad relationship with the petitioner's father. She recalled a period of time during which the petitioner was

48

hallucinating. The petitioner called Larry Jordan on three occasions claiming to see cats in the petitioner's trees. Larry Jordan told the petitioner that nothing was in the trees, but the petitioner insisted otherwise.

Kippi Jordan stated that she saw the petitioner drink alcohol in junior high school and throughout his adulthood. She said it was "common" for the petitioner to be seen holding a beer. She had observed him drink ten or twelve beers without appearing to be intoxicated. The petitioner did not stagger, fall, or slur his speech. He was a mechanic in his spare time and had a race car. She previously observed the petitioner in his shop working on a vehicle and drinking a beer.

Kippi Jordan testified that in January 2005, she was a consulting teacher at the school where one of the petitioner's daughters attended. On January 10, 2005, the petitioner was late bringing his daughter to school. The petitioner told her that he had not been able to sleep and that when he finally fell asleep, he overslept. She said the petitioner appeared very tired as if he had something on his mind.

On cross-examination, Kippi Jordan acknowledged that if the petitioner drank ten beers, he would not have slurred speech, could perform mechanic work, could walk without stumbling, and could communicate. She did not know what drugs the petitioner was taking when he was hallucinating.

Kippi Jordan stated that she had a lengthy conversation with Ms. Shettles during which they discussed the petitioner's daughter being late to school. Ms. Shettles asked her how long she had known the petitioner's family and questioned her about the petitioner's childhood.

Special Agent Kelly Hopkins, a forensic scientist in the toxicology section of the TBI, testified that prior to the petitioner's trial she met with trial counsel at the crime laboratory to review her testimony regarding her alcohol and drug testing. She said she provided trial counsel with a "litigation packet," which included information pertaining to her testing of the petitioner's blood and urine samples.

Special Agent Hopkins said that while the TBI had similar testing procedures that were employed when the testing was completed in the petitioner's case in 2005, the TBI had added additional procedures since 2005. She explained that a calibration is used in the field to determine the concentration of the drug within the sample. Whether a concentration of a drug is too small to appear in a drug screen is dependent upon the calibration range and the instrumentation used. Special Agent Hopkins stated that in 2005, the TBI's Crime Laboratory was not calibrated to reliably measure therapeutic concentrations of Xanax.

49

Special Agent Hopkins said the enzyme multiplied immunoassay technique (EMIT) is the initial drug screen that tests five categories of drugs: barbiturates, benzodiazepines such as alprazolam, cocaine and its metabolites, marijuana and its metabolites, and opiates. Any negative tests are recorded in the toxicology report as being negative for that category, and any positive results from the initial screen must be confirmed through additional testing. The petitioner's urine sample was positive for benzodiazepines, while his blood sample was negative for benzodiazepines. Special Agent Hopkins stated that in 2005, the laboratory did not test for alpha hydroxy alprazolam, a metabolite of alprazolam, but that the lab currently tested for this metabolite.

Special Agent Hopkins testified that gas chromatography is used in the field of toxicology to separate drugs from a sample to determine the amount of the drug that was present. A gas chromatograph mass spectrometer is a selected detector that separates the drugs in a sample by a fingerprint of known standards of those drugs. In order for the laboratory to report the presence of a drug, its existence must be registered under both the gas chromatograph and the mass spectrometer. The gas chromatograph reading must be within a calibration curve to report an actual amount of the drug's concentration. If the amount is below the lowest calibration point, the amount of the drug must be reported "at less than." Special Agent Hopkins stated that the policy of the laboratory is to report drugs found in a urine sample as positive without assigning a quantity. She could not confirm the presence of alprazolam in the petitioner's urine or blood sample in the mass spectrometer data.

Special Agent Hopkins acknowledged that the toxicology report issued on July 8, 2005, provided that "[p]resumptive testing indicates the possibility of benzodiazepines. Contact the crime lab if further testing is needed." She explained, "[W]hile I couldn't confirm presence of a benzodiazepine, we're just giving information to the customer if they want to independently test it or further test it with a more sensitive instrument." She stated that the records did not indicate that additional testing was requested and that the testing would have been done had trial counsel requested it. She also stated that the petitioner's urine and blood samples were destroyed on January 3, 2006, pursuant to the policy of the crime laboratory. On cross-examination, she testified that her results were consistent with a statement that the person had not taken Xanax in approximately three days.

Dr. Murray Smith, a medical doctor and addiction specialist, was accepted by the post-conviction court as an expert in the area of addiction. He was asked to evaluate the petitioner's medical circumstances, addiction and treatment, and mental status at the time of the shootings. He reviewed the petitioner's records from Pathways, his medical

50

records from the Jackson Clinic, the transcripts of the testimonies of Dr. Wilson and Dr. Matthews at trial, and the reports of Dr. Jonathan Lipman and Dr. Peter Brown. He also interviewed the petitioner for three hours on February 28, 2012. Dr. Smith opined that the petitioner "was a far-advanced, severe chemically-dependent addict who at the time of the offense[s] was severely intoxicated and unable to recognize what was going on fully in terms of the events and the circumstances or to conform his behavior to the requirements of the law."

Dr. Smith testified that addiction is a medical illness that exists as an entity to itself and can be influenced by other illnesses, medical conditions, society, environment, and the particular circumstances. The three diagnostic criteria for addiction are (1) preoccupation with obtaining and using the substance; (2) loss of control with the use of the substance; and (3) the continued use of the substance even though it has caused problems in the user's life. Dr. Smith concluded that the petitioner met the criteria for addiction. Dr. Smith explained that addiction can take control of the brain chemistry so that the user's behavior is controlled by the substance. He described the petitioner as a "slave to the chemistry."

Dr. Smith stated that the use of alcohol inflames the emotion of anger and magnifies depression. Intoxication interferes with the process of the brain so that the ability to perceive, judge, analyze, discern, and reflect is impaired. Dr. Smith defined "blackouts" as amnesia caused by chemicals interfering with the brain's ability to record the events that are occurring. According to Dr. Smith, although the event occurs, the "recorder is not on."

Dr. Smith testified that the petitioner began smoking marijuana and drinking alcohol at the age of fourteen. By the age of seventeen, the petitioner was smoking marijuana and drinking alcohol more than half the time and began experiencing blackouts. At the age of nineteen, he began snorting cocaine intermittently. By 1995, when the petitioner was thirty-one years old, he did not use marijuana and cocaine as often. Dr. Smith explained that the company where the petitioner was employed conducted random drug screens and that the petitioner was afraid that any positive drug screen would adversely affect his job. Rather, the petitioner primarily consumed alcohol. The petitioner lost his job in 1995 and attempted to manage a garage and convenience store. At that time, he began using crack cocaine and methamphetamine, along with marijuana and alcohol. From 1995 to 2000, the petitioner regularly used alcohol, marijuana, methamphetamine, and crack cocaine. He was unable to maintain his employment because he was losing weight and experiencing auditory and visual hallucinations. Dr. Smith noted that the side effects of cocaine and methamphetamine included sleep deprivation and paranoia.

51

Dr. Smith testified that the petitioner and Mrs. Jordan married in 2000. The petitioner told Dr. Smith that Mrs. Jordan insisted that he stop using crack cocaine and methamphetamine and that he complied. The petitioner increased his alcohol intake and began taking Xanax and hydrocodone. Dr. Smith stated that Xanax essentially has the same effect on brain chemistry as alcohol.

Dr. Smith noted that the petitioner had suffered multiple injuries during his life, including a 1996 accident where he drove his truck into a field, sustained a severe concussion, and spent four hours lying in the field while in and out of consciousness. As a result of the accident, the petitioner injured his back and left knee and broke three ribs on his left side. In 2000, the petitioner fell and hit his head, requiring a CT scan.

Dr. Smith testified that he reviewed the records of Dr. Coy, a licensed medical doctor with a doctorate of osteopathy. Dr. Smith said that in prescribing medication, a doctor must learn about the patient by taking a history and conducting a physical. The doctor also must understand the disease that is being treated. If the doctor does not understand the disease, the doctor must either order additional testing or consult other doctors. Once the doctor understands the disease, he or she then must construct a treatment plan that may or may not include prescription medication. The doctor must review the status of the patient periodically to determine whether the treatment plan is working. Dr. Smith said Dr. Coy failed to take these steps.

Dr. Smith stated that in February 2002, blood tests revealed that the petitioner had abnormal liver function. Dr. Coy recorded in his notes that the petitioner told him that he was a heavy drinker. Dr. Smith said Dr. Coy failed to take any action to evaluate or follow up with the petitioner based upon that statement. On the same day, Dr. Coy prescribed the petitioner a large quantity of Xanax, which, according to Dr. Smith, should not have been prescribed. Dr. Smith explained that Xanax is an addictive medication and if combined with alcohol, it increased intoxication and the potential for blackouts. The combination of Xanax and alcohol can cause an increase in confusion and impair judgment and perception. Dr. Smith said that on January 4, 2005, one week before the shootings, Dr. Coy prescribed the petitioner 240 Xanax pills without seeing the petitioner or noting whether he had spoken to the petitioner. Dr. Smith also said that "at a very critical time when some measure of intervention could have been done in a very inflamed dangerous situation, Dr. Coy did not see or intervene, but, in fact, prescribed things that could, to my opinion, worsen the situation."

The petitioner told Dr. Smith that on the Friday night prior to the shootings, he was up all night with his sick daughter. His daughter was better the next day, and the petitioner believed that he would be able to catch up on his sleep that night. Mrs. Jordan asked the petitioner to care for their youngest daughter that Saturday night. The

petitioner reported that he was awake most of the night while waiting for Mrs. Jordan to return from "partying." He said he slept for a couple of hours that night. On Sunday, the petitioner was with Mrs. Jordan and his daughters all day. The petitioner said that on Sunday night, he slept only a few hours. The petitioner spent that Monday caring for his daughters. Dr. Smith stated that by that evening, the petitioner was severely sleep deprived.

Dr. Smith testified that the metabolites or oxidants collect in the brain due to sleep deprivation and serve as another chemical intoxicant. He stated that as a result, the petitioner had the intoxicants of alcohol, Xanax, and sleep deprivation on the day of the shootings. Dr. Smith further stated that the petitioner's behavior on the day of and the day prior to the shootings was consistent with intoxication. The petitioner reported that during the time leading up to the shootings, he had been drinking six to eight beers each day. He reported that on January 10, 2005, he ingested Xanax and alcohol. Dr. Smith said that by 6:00 p.m., the petitioner began blacking out and did not know the amount of pills or alcohol that he ingested after 6:00 p.m. Dr. Smith concluded:

> In the presence of the intoxication, [the petitioner] not only had the amnesia, but the fact that he would have the amnesia reflected that there was generalized toxicity of his brain such that his ability to accurately observe what was happening, perceive what was happening, his ability to make good judgments, his impulsivity was markedly increased, his overall brain functioning was severely impaired and he had difficulty with his ability to control his emotions. The emotions were greatly magnified, both depression and anger.

On cross-examination, Dr. Smith testified that in reaching his opinion, he did not review two boxes of mitigation evidence compiled by the defense, Dr. Winston's report, Dr. Caruso's report, the statements of witnesses at trial, or the petitioner's statement to the police. Dr. Smith stated that although the petitioner told Dr. Winston that he was not intoxicated at the time of the shootings, an intoxicated person generally believes, "I'm not as intoxicated as people would think I was."

Dr. Smith said that on March 6, 2002, Dr. Coy encouraged the petitioner to refrain from using alcohol while using Xanax. On May 22, 2002, testing revealed elevated liver function, and Dr. Coy stopped the petitioner's Celexa. At that time, the petitioner told Dr. Coy that he was no longer drinking alcohol. Dr. Smith acknowledged that the petitioner lied to Dr. Coy and stated that he expected the petitioner to lie "because the job description of addiction is to lie."

Dr. Smith acknowledged that the petitioner underwent two prior CT scans of his head, both of which revealed normal results. The petitioner told Dr. Smith that he did not use any drugs or alcohol prior to the 1996 accident. According to the hospital records from the accident, however, the petitioner lay in the field for four hours to avoid being charged with driving under the influence. The report from the emergency room stated that the petitioner had consumed three beers. The petitioner told Dr. Lipman that prior to the accident, he had been taking powder cocaine and drinking alcohol. Dr. Smith did not believe that the hospital records and the petitioner's statement to Dr. Lipman contradicted the petitioner's statement to him because the petitioner told him that he was not "doing heavy alcohol or drugs."

Dr. Smith testified that the petitioner informed him of a history of physical and sexual abuse as a child that resulted in "shame issues." The petitioner said that a fourteen-year-old relative physically abused him and that his father was physically and emotionally abusive. Dr. Smith read the transcript of the petitioner's testimony in 2008 of custody proceedings involving his daughter with Mrs. Jordan. During the deposition, the petitioner testified that his parents were "exceptional" and denied that they abused him or their foster children in any way. The petitioner further testified, "My parents did all anybody could ask them to humanly possibly do raising me. There's no connection between what I've done and what they've done." Dr. Smith acknowledged that the petitioner's deposition testimony was inconsistent with the petitioner's statements to him. Dr. Smith stated that the petitioner was motivated to offer the testimony in 2008 to prevent his daughter from being adopted by his in-laws. Dr. Smith acknowledged that the petitioner may have been motivated to lie to him to receive some benefit related to the criminal proceedings. Dr. Smith noted that the petitioner's statements to him, Dr. Lipman, and Dr. Brown were consistent.

Dr. Smith stated in his report that an accurate determination of the petitioner's blood alcohol on January 11, 2005, at 11:30 a.m. was not possible based upon the TBI laboratory report. He said that while he would have considered the petitioner's statement to Investigator Miller that he had not taken Xanax for two or three days, the petitioner could not have known this information because he was intoxicated and experiencing blackouts. Dr. Smith stated that based upon his experience, he believed that the petitioner provided an accurate account of a blackout. He explained that the petitioner "remembered spotlighted incidents, kind of like little snippets of a preview of a movie, and that is a typical type of amnesia where certain things are spotlighted." Dr. Smith said the petitioner did not state that he remembered waking up and having no intentions of hurting Mrs. Jordan. The petitioner said Mrs. Jordan told him that he and his daughters had until the beginning of February to leave the home. The petitioner informed Dr. Smith that on the day of the shootings, he recalled having weapons and ammunition on the bed and talking to someone who was not there. The petitioner said he loaded his

weapons but did not tell Dr. Smith about writing the note. The petitioner did not tell Dr. Smith that he did not know whether he was going to hurt Mrs. Jordan. At some point, the petitioner said he considered committing suicide, but Dr. Smith was unsure at what point the petitioner contemplated suicide.

Dr. Smith testified that any discrepancy between the petitioner's statements to him and the petitioner's statements to Investigator Miller was due to the petitioner's intoxication and the amount of time that had passed between the two statements. Dr. Smith did not know why the petitioner provided more detail of the events to Investigator Miller and said the petitioner provided the details to Investigator Miller regardless of whether the details were accurate. Dr. Smith stated that the petitioner's recollection of some details following his arrest was due to "spotlighted amnesia."

In rendering his opinion, Dr. Smith did not consider the note that the petitioner had written prior to the shootings. He stated that "automatic activity," such as writing while severely intoxicated and in a blackout, was possible. Dr. Smith testified that the petitioner's blood alcohol level could have been as high as .40. Dr. Smith could not determine exactly how high the petitioner's blood alcohol level was but stated that it was higher than the legal limit.

On redirect examination, Dr. Smith testified that he understood that the physical abuse referenced by the petitioner involved beatings with a belt. Dr. Smith stated that Dr. Caruso's report supported his opinion and explained that Dr. Caruso found that because of the petitioner's intoxication, he was unable to appreciate the "criminality" of his conduct or conform his conduct to the requirements of the law. Dr. Smith said Dr. Winston's report did not change his opinion.

In response to questioning by the post-conviction court, Dr. Smith said he determined that while the petitioner was intoxicated at the time of the shootings, the petitioner also had "dreamlike amnesia with brief snippets of disconnected memory." Dr. Smith explained that those who experience such "dreamlike amnesia" describe the events as if they are watching them from a distance. The petitioner told Dr. Smith that he watched himself drive through the stop sign on Highway 70. Dr. Smith said, "It's like somebody else is in control of his actions, and what's in control of his actions is the drugs and alcohol." The "snippets" were the spotlights of the events that the petitioner could remember but were not always in sequence.

Dr. Malcolm Spica, a clinical neuropsychologist, was accepted by the post-conviction court as an expert in neuropsychology. He was asked to assess the petitioner's information processing capabilities. He administered the Wechsler Adult Intelligence

Scale and determined that the petitioner's I.Q. score was 95, which fell within the 37th percentile.

Dr. Spica tested the petitioner's executive functioning or mental organization. He determined that the petitioner had a cognitive disorder in that he had organizational deficits that led to inconsistent performances on various tests. Dr. Spica found that the petitioner had inconsistent and deficient executive control, which led to issues involving problem-solving and learning new information. Dr. Spica determined that when the information became complex and the petitioner was required to track different pieces of information, he became confused and inefficient in the way he solved a problem. Dr. Spica stated that the petitioner's problems with executive control were exacerbated by various forms of stress. He explained that time pressure, sleep deprivation, and metabolic disruption, such as an illness or substance abuse, were factors that could have exacerbated the petitioner's deficits and issues with information processing.

Dr. Spica diagnosed the petitioner with depression not otherwise specified based upon the results of four standardized tests of mood. He deferred to the forensic psychiatrist for a more detailed assessment of the petitioner's mood. He acknowledged the petitioner's history of substance abuse and diagnosed him with alcohol/substance abuse in remission.

On cross-examination, Dr. Spica testified that the petitioner had a cognitive disorder in mental organization. He acknowledged that a person who abuses cocaine, methamphetamine, and alcohol could exhibit the same characteristics of mental disorganization while the substances are active in the body. The substances can lead to a cognitive disorder through brain damage. Dr. Spica said the petitioner was of average intelligence and had the capability to plan to kill someone in the condition he was in at the time of the post-conviction hearing.

Dr. Spica acknowledged that the petitioner was able to repair automobiles and vending machines. Dr. Spica said that as long as the petitioner was not intoxicated, sleep deprived, or under duress, he could complete the tasks required for a building a race car. Dr. Spica was not sure that "a relative's observations would precisely enough measure whether or not [the petitioner] was affected by alcohol."

Dr. Spica did not know if he had reviewed the information gathered by Ms. Shettles and did not recall whether he had reviewed the transcript of Dr. Wilson's testimony at trial. Dr. Spica stated that the petitioner had cognitive deficits that were likely to influence his capacity to premeditate and were likely to be exacerbated by the circumstances surrounding the shootings. Dr. Spica explained that sleep deprivation, intoxication, and stress would exacerbate the petitioner's cognitive impairments and

56

lower his capacity to develop a plan of action. He was unable to determine whether the petitioner could premeditate if he was not intoxicated and said other factors could interfere with the petitioner's ability to premeditate. He did not know the petitioner's level of intoxication at the time of the shootings and said he had to "defer that to the experts."

Dr. Spica acknowledged that while the petitioner had a history of multiple head injuries, he had CT scans in 2000 and 2002, both of which were clear. He explained that a CT scan might not be the most appropriate way to assess a brain injury because the scan only shows structural damage and does not measure brain tissue functioning. He said a neuropsychological examination is needed to measure brain tissue functioning.

On redirect examination, Dr. Spica testified that he tested the petitioner for malingering, but no malingering was shown. On recross examination, he acknowledged that the testing for malingering did not indicate whether the patient was lying to the mental health expert.

In response to questioning by the post-conviction court, Dr. Spica testified that the petitioner reported that he drank alcohol heavily from October 2003 to June 2004 and that he used cocaine and methamphetamine in the 1990s. Dr. Spica did not mention prescription drug abuse in his report. He explained that he did not ask the petitioner whether he abused prescription drugs because "it's not quite my world." He stated that prescription drug abuse and alcohol abuse would have had a similar effect on the petitioner's cognitive functioning. Dr. Spica noted that the petitioner fell within the second percentile in mental organization, which meant that ninety-eight percent of the population performed better than him.

Dr. Jonathan Lipman, a neuropharmacologist specializing in forensic neuropharmacology, was accepted by the post-conviction court as an expert in pharmacology and neuropharmacology. Dr. Lipman assessed the petitioner's state of mind from a neuropharmacological perspective at the time of the offenses on January 11, 2005. He reviewed a timeline of the petitioner's life, the petitioner's medical and pharmacological records, materials from the trial, the Tennessee Supreme Court's opinion from the direct appeal, documents from the TBI and the Jackson Police Department, the transcript of Investigator Miller's testimony at trial, the petitioner's statement to the police, and various psychological and psychiatric reports. In addition to the TBI reports of the petitioner's blood and alcohol analysis, he reviewed the TBI's files and the standard operating manuals for the crime laboratory.

Dr. Lipman opined that at the time of the shootings, the petitioner was heavily intoxicated on Xanax and alcohol. He said the petitioner also had clinical depression,

57

protracted sleeplessness, and brain dysfunction and was "under conditions of extremely highly emotional milieu." He stated that the petitioner's history of drug use related to his conditions at the time of the shootings. He explained that in the past, the petitioner had used stimulant drugs, which had a lasting effect on his personality. He also opined that the petitioner was impaired in his ability to think and conform his behavior to the law because he was in a "state of drug-influenced emotionality."

Dr. Lipman testified that the effect of alcohol on the brain is dependent upon the amount of alcohol used and the duration of its use. Alcohol inhibits the frontal lobes of the brain. When used chronically, alcohol damages the brain, and the damage can be permanent, particularly in "continuous drinkers." Dr. Lipman said the petitioner was not a "continuous drinker" but was a "binge drinker."

Dr. Lipman stated that Xanax is a benzodiazepine with a half-life of between six and twenty-four hours and an average half-life of eleven hours. He said the petitioner had been prescribed Xanax for many years but took less than the prescribed amount. He stated that when taken regularly every day, the drug was not cleared from the person's system by the time he or she took the next dose. He also stated that a person should not drink alcohol while taking benzodiazepines.

Dr. Lipman testified that both cocaine and methamphetamine cause excessive dopamine stimulation in the brain. As a result, the drugs produce elation and a sensation of joy, power, and increased strength. Dr. Lipman stated that the "shadows" of the petitioner's prior use of cocaine and methamphetamine were reflected in his current character traits and that the petitioner used the drugs to the point that he was paranoid, delusional, and hallucinating. Dr. Lipman said his research indicated that those who have used the drugs persistently to the point they experience hallucinations "remain vulnerable to the provocation of psychosis in the future." He explained that even when the person is not using the drugs, the character logical structure is changed as a result. The person becomes more jealous, superstitious, anxious, and vulnerable to depression.

Dr. Lipman understood that during a period in the 1990s, the petitioner used cocaine and methamphetamine excessively and began having irrational fears, hallucinations, and paranoia. The petitioner told Dr. Lipman that he would sit all night with a pistol in his hand while looking out the window. The petitioner reported hearing "threatening noises" and voices coming from the crawl space underneath his house. He said he saw people in his trees and called his brother to check the trees. He once called his parents to report that he saw people on the roof and underneath the floor, and his parents tried to take him to Western State Mental Health Institute. Dr. Lipman stated that, according to records from the petitioner's automobile accident in August 1996, the petitioner weighed 143 pounds at that time and that those who use excessive amounts of

58

cocaine or methamphetamine commonly lose weight. The petitioner stopped using cocaine and methamphetamine in 1999 or 2000 by the time that he met Mrs. Jordan.

Dr. Lipman testified that the petitioner's parents were "totally abstemious" of alcohol and would not take the family to events where alcohol was served. The petitioner's paternal and maternal grandparents and one of his uncles were alcoholics. Dr. Lipman said that as a result, the "genetic determinants of alcoholism certainly run through his line." He believed that the petitioner's upbringing in a total "abstemious" family may have added to his problems because he did not see any examples of the responsible use of alcohol. The petitioner began using alcohol and marijuana at the age of fourteen and also had trouble sleeping. At the age of eighteen, the petitioner was introduced to cocaine and methamphetamine.

Dr. Lipman noted that the petitioner was first diagnosed with depression in 1991 at the age of twenty-seven. At that time, the petitioner's first marriage was ending, and he had a four-year-old child. The petitioner began using methamphetamine "seriously" in 1995. He was married to Lisa Avent,[1] who also had substance abuse issues. The petitioner was using methamphetamine while working at a "garage convenience place," and the drug "took over his life." He abandoned his employment and remained unemployed for some time. It was during this time that the petitioner was paranoid and hallucinating. Ms. Avent left the petitioner in January 1996.

Dr. Lipman testified that in 1996, the petitioner was involved in a cocaine-related automobile accident. The petitioner broke his pelvis and ribs and had compression fractures of the Lumbar 4 and 5 vertebra. To address the pain from his injuries, the petitioner was prescribed hydrocodone and a muscle relaxant. In November 2000, the petitioner was prescribed Xanax for anxiety.

The petitioner met Mrs. Jordan in July 1999, they married in May 2000, and their daughter was born in November 2000. Dr. Lipman stated that the petitioner had stopped using stimulants at that point but was drinking alcohol excessively. The petitioner described an incident during which he "poked [Mrs. Jordan] in the chest and then let off steam by firing a weapon." Someone called 911, and the police responded. The petitioner was required to attend anger management classes. He reported that he was drinking six to eight twelve-ounce cans of beer five nights a week. On some days, he drank twelve beers between noon and midnight.

---

[1] Although Dr. Lipman referred to the petitioner's second wife as Lisa Avent, Ms. Shettles testified that her name was Lisa Naylor.

Dr. Lipman noted that the petitioner had arthroscopic surgery in October 2003, which was unsuccessful.  He had knee surgery again in March 2004.  He had ongoing issues with pain from his fractured vertebra and pelvis.  Ms. Avent was not caring for the petitioner's two daughters and was continuing to abuse drugs.  Dr. Lipman said that because the petitioner was no longer abusing drugs, the petitioner and Mrs. Jordan decided that it was a good time to seek custody of his daughters.  The petitioner had an appendectomy in 2004 and was prescribed hydrocodone as a result.  Dr. Lipman stated that most of the addicts he had dealt with were addicted to hydrocodone and would take as much as they could get.  The petitioner, however, was taking less hydrocodone than prescribed, which Dr. Lipman found to be unusual.  While in the hospital for the appendectomy, the petitioner suffered a rare hallucinogenic effect of meperidine, the pain medication that he was given.  Dr. Lipman considered this effect to be "potentially relevant" due to the petitioner's history of "prior psychotic-like behavior under stimulant abuse."  In late 2004, the petitioner continued to suffer from anxiety and was prescribed alprazolam.  He began taking Celexa for depression in November 2004.

The petitioner told Dr. Lipman that in September 2004, after he obtained custody of his two daughters, he found Mrs. Jordan's son in a "compromising" position with one of his daughters.  Dr. Lipman said that, at that time, the petitioner and Mrs. Jordan's marriage was "fragile" and that the petitioner did not want her son in the home.  Mrs. Jordan had "outside interests" and was behaving in a way that made the petitioner "jealous and suspicious."  They were separated, and Mrs. Jordan wanted a divorce.

Dr. Lipman testified that he was concerned about Dr. Coy's prescribing the petitioner Xanax because the petitioner was drinking alcohol excessively and had been prescribed Xanax since 2000.  In 2000, the petitioner was prescribed one-quarter of a milligram of Xanax to be taken twice daily.  Dr. Lipman said that based upon the pharmacy records, the petitioner was taking less than the prescribed amount.  The dosage later was increased to one-half of a milligram, and this dosage remained in place until shortly before the shootings.  On January 4, 2005, Dr. Coy increased the petitioner's dosage to one milligram twice daily due to increased anxiety.  The petitioner also was taking Citalopram to treat depression.  Dr. Lipman stated that Xanax and alcohol can worsen depression and that alcohol disrupts the sleep rhythm in that it makes it more difficult to fall asleep and remain asleep.

Dr. Lipman noted that the shootings occurred at approximately 11:30 a.m. and that the petitioner was arrested shortly thereafter.  The petitioner signed the consent to provide a urine sample at 3:35 p.m. but was not able to produce a sample at that time.  He produced a urine sample before the end of the statement at 5:35 p.m.  The blood sample was taken at 9:50 p.m.  The TBI analyzed both samples.  Agents identified .17 gram

60

percent alcohol in the urine sample, and the urine sample also was positive for benzodiazepine.

Dr. Lipman said that considering "certain reasonable assumptions," he used the results of the urine analysis to calculate the petitioner's blood alcohol level at the time of the urine sample and then used the data to extrapolate the petitioner's blood alcohol concentration at the time of the shootings. Dr. Lipman stated that blood alcohol concentration cannot be directly estimated from a urine concentration. He explained that when alcohol is consumed and absorbed in the body, blood alcohol levels rise, and urine alcohol levels are lower than blood alcohol levels. The urine would have considerably less alcohol than the blood. In the post-absorptive state, the blood alcohol level falls, and the urine alcohol concentration begins to rise. Dr. Lipman noted that during the post-absorptive state, the relationship between the blood alcohol concentration and the urine alcohol concentration falls within a certain range. When the urine concentration is below the blood concentration, the ratio could be 1 to .07. Dr. Lipman stated that measuring the blood alcohol concentration when the level in the blood is rising would be "hopelessly unreliable." As a result, extrapolation can only occur in the post-absorptive phase. Dr. Lipman said most textbooks recommend multiple urine samples be taken in order to ensure that the post-absorptive phase is occurring. He also said urine alcohol is at its highest point at 1.3 times the amount of alcohol found in the blood.

Dr. Lipman testified that the most important assumption was that the petitioner was in the post-absorptive stage when he provided a urine sample. He said several hours had passed since the petitioner's arrest when he provided the urine sample. Dr. Lipman believed that the petitioner was not drinking alcohol while in police custody. Dr. Lipman stated that since the petitioner was in the post-absorptive phase when the urine sample was collected, the ratio of the blood alcohol level and the urine alcohol level was "clearly" 1 to 1.3. The petitioner's urine contained alcohol that was excreted when the ratio was lower than 1 to 1.3, and as a result, a mixture of ratios existed. Dr. Lipman stated that in interpreting what the blood alcohol level would have been, he had to allow for the fact that there was an average of the relationship between blood and urine over the post-absorptive phase. He also stated that when the blood and the urine levels are the same, the ratio is 1 to 1. He did not know at what point that this 1-to-1 ratio occurred.

Dr. Lipman testified that assuming a ratio of 1 at the turnover of the absorption phase to 1.3 at the extreme time of the post-absorption phase enabled him to interpret the petitioner's range of blood alcohol concentration at the time of the collection of the urine sample to be 170 milligrams per deciliter. Dr. Lipman said the petitioner likely was producing urine containing the blood alcohol equivalent of between 130 and 170 milligrams per deciliter at the time the urine was collected. He stated that as a result, the petitioner's blood alcohol level could have been up to twice the legal limit for driving at

61

the time that the urine sample was collected. He explained that the ratio is not dependent upon how often the person drinks alcohol; rather, the ratio "is simply the solubility of alcohol in the tissues over time as it's being cleared from the body."

Dr. Lipman next considered the rate of metabolization of alcohol in calculating the petitioner's blood alcohol level at the time of the shootings. Alcohol metabolizes when it is converted into acetone and then carbon dioxide and water. The clearance rate is the rate at which the alcohol disappears from the blood. Dr. Lipman noted that alcohol in an experienced adult can metabolize at a rate of sixteen to twenty milligrams per deciliter per hour and that the clearance rate in a chronic alcoholic is between thirty and forty milligrams per deciliter per hour. He assumed that the petitioner had a clearance rate of thirty milligrams per deciliter each hour and that five hours had passed between the time of the shootings and the time of the urine collection. Based upon these figures, Dr. Lipman determined that the petitioner's blood alcohol concentration at the time of the shootings would have been .28 to .32 grams percent or 280 to 320 milligrams per deciliter. He stated that if he assumed that the petitioner had a clearance rate of forty milligrams per deciliter, his blood alcohol level at the time of the shootings could have been as high as 330 to 370 milligrams per deciliter. He also stated that the assumption of a clearance rate of forty milligrams per deciliter was not unreasonable given the petitioner's history of chronic alcohol abuse.

Dr. Lipman testified that the gas chromatography conducted by the TBI identified alprazolam and quantitated the alprazolam present at .101 microgram per milligram. He said that according to the laboratory's protocol, the agents should have calibrated the machine to a point lower than the amount of alprazolam found but failed to do so. As a result, the amount of alprazolam that the gas chromatogram actually identified was outside the range of calibration and, therefore, not reportable.

Dr. Lipman stated that based on the data, it was difficult for him to determine whether the petitioner's defects were caused by alcohol, drug use, or head injuries. He opined that the petitioner was suffering from extreme emotional distress and cognitive confusion and distortions and was "unable to properly regulate his emotions or to control his behavior to the requirements of the law at the time of the offenses." Dr. Lipman noted in the jail records an entry on January 12, 2005, that one of the jailers was unable to wake the petitioner and that the petitioner appeared to be sleeping heavily. He said the incident was the result of "post-excitement culmination of many, many days of lack of sleep, a huge dose of alcohol in combination with alprazolam."

Dr. Lipman said there were six or seven fewer pills of alprazolam in the petitioner's pill bottle than he would have expected based on the prescribed dosage. He

stated that the amount of alprazolam in the petitioner's blood corresponded to approximately six more pills than his prescribed dosage.

Dr. Lipman testified that the ability to smell alcohol varied among people and that he was not surprised that some people smelled alcohol on the petitioner following the shootings while others did not. He noted studies indicating that trained individuals were deficient in identifying intoxication in chronic alcoholics except at the highest concentration of alcohol. He explained that chronic alcoholics were more difficult to detect by their behavior. They can walk, talk, and behave normally with a blood alcohol concentration of between 300 and 400 milligrams per deciliter. They have issues with mental flexibility in that they become confused if diverted.

On cross-examination, Dr. Lipman testified that he was unaware of the Jackson Police Department's protocol for collecting urine samples and that as a result, he was unaware of whether there were any issues with the collection of the petitioner's urine sample. He assumed that the sample was collected in the proper way. He stated that glycosuria, or blood sugar, may be released in the urine of a diabetic or an alcoholic. Bacteria may feed on the sugar, and the sugar can produce excess alcohol when the person has a urinary tract infection or the vessel into which the sample was collected was not clean. A preservative typically is placed in the urine sample to ensure that any bacteria does not affect the sample. Dr. Lipman did not know whether a preservative was added to the petitioner's urine sample. If the urine is not refrigerated, the bacterial activity in the urine sample can increase if bacteria is in the sample and no preservative is added. Dr. Lipman did not know whether the petitioner's urine sample was left unrefrigerated or how long.

Dr. Lipman stated that a timed urine analysis ensures that the alcohol collected in the urine is in the post-absorptive phase. Multiple urine samples are taken over time, and the post-absorptive phase is determined to be in place once the alcohol concentration in the urine rises. Dr. Lipman said the petitioner was clearly in the post-absorptive phase when his urine sample was collected. He explained that the petitioner had last consumed alcohol hours before the sample was collected.

Dr. Lipman did not know the exact time that the petitioner began drinking alcohol on the day of the shootings. The petitioner told Dr. Lipman that he drank from a bottle of vodka. Dr. Lipman recalled that the petitioner told Investigator Miller that he drank five shots of vodka on the day of the shootings but said he did not consider the petitioner's statement to Investigator Miller in his analysis.

Dr. Lipman acknowledged that he stated in his report, "The variations in urine to blood concentration ratio for individuals in the post-absorptive phase can be so large that

it is generally considered unacceptable to estimate a blood ethanol concentration from the ethanol concentration of a randomly collected urine specimen." He also acknowledged that this type of estimation was not done in the scientific community for purposes of driving under the influence. He said the estimation can be done for autopsy purposes and other forensic purposes. He stated that while a single urine analysis is generally unreliable, "under circumstances in which you are certain that you are dealing with the post-absorptive phase, certain assumptions can be made that are reasonable and accepted in the field." When asked about whether the sources cited in Dr. Lipman's report allowed him to use a single urine sample to calculate blood alcohol and then extrapolate the blood alcohol back to the time of the shootings, Dr. Lipman responded, "I did it because I'm a pharmacologist and I know what I'm doing."

Dr. Lipman disagreed that he had to know when the petitioner's bladder had been last emptied before providing the urine sample in order to make an estimation and said he accounted for this by using the ratio of 1.0 to 1.3. He acknowledged that "ideally" urine should be collected for analysis approximately one hour after an initial void. He said that if the period during which the alcohol is being absorbed is included in the calculation, the ratio falls below 1.0 and rises to 1.7. He acknowledged that blood alcohol extrapolation is more reliable than urine extrapolation.

Dr. Lipman did not know how long the .17 gram percent of urine alcohol had been in the petitioner's system or when it entered his system. He assumed that the alcohol entered the petitioner's system over several hours. Dr. Lipman testified that it was possible that, before the petitioner left his house, he consumed an unknown quantity of alcohol and that the alcohol would not have been in his blood when he was at TDOT. The alcohol that the petitioner consumed prior to leaving his home would not have been excreted into the urine before the shootings. Dr. Lipman said if it were assumed that the petitioner stopped absorbing alcohol at a time before the alcohol was actually absorbed that "you will mistakenly back-calculate it to a higher level than it actually was." He acknowledged that if the petitioner consumed alcohol prior to leaving his home, he would have had alcohol in his stomach or intestine that was not affecting his ability at the time of the shootings and "would be confounding the calculation [Dr. Lipman] did." He did not know how much alcohol was in the petitioner's stomach at the time of the shootings or whether there was any alcohol in his stomach. He said, "I assumed post-absorptive assumptions and that the alcohol was being cleared from his blood into his urine after his arrest. That's the limit of my calculation."

Dr. Lipman disagreed that the petitioner's statement to Investigator Miller that he had not taken his medication for two or three days was consistent with the results of the TBI's analysis. He acknowledged that according to the jail records on January 12, 2005, the petitioner did not appear to be under the influence of alcohol or drugs and that there

were no signs of alcohol withdrawal. According to the jail records, the petitioner was asked whether he used "alcohol/drugs," and the petitioner responded, "Twice a week." Dr. Lipman stated that when asked about drugs, people generally assume that the question involves illegal drugs. He did not expect that the petitioner would refer to alprazolam as a drug. He said that while he considered the petitioner's statements reflected in the jail records and his statement to Investigator Miller that he only consumed five shots of vodka and had not taken his medication in two or three days, Dr. Lipman could not "overcome the fact that [the petitioner] clearly ha[d] alprazolam in his body." Dr. Lipman could not "reliably" quantify the amount of alprazolam that was in the petitioner's system.

Dr. Lipman stated in his report that sleep deprivation is cognitively disabling and disorienting. He explained that people who are sleep deprived can acquire targets but that the targets acquired are often the wrong ones.

On redirect examination, Dr. Lipman testified that according to the property receipt for the petitioner's urine sample, the petitioner provided the sample to Investigator Miller on January 11, 2005, at 3:35 p.m.; Investigator Miller gave the sample to Investigator Ferguson on January 11 at 11:25 p.m.; and Investigator Ferguson delivered the sample to the TBI laboratory on January 12. Dr. Lipman said police departments generally used sterile cleaned jars with labels placed over the openings to seal them. If a preservative is required, it generally is added. He did not recall seeing any data from the TBI screening for contamination.

Dr. Lipman identified a summary of an interview in September 2006 of the petitioner's parents and his two daughters who were with the petitioner on the evening of January 10, 2005, and until the next morning before they went to school. One daughter reported that on the morning of the shootings, the petitioner was drinking from an opaque glass which she believed contained alcohol. Both of his daughters reported that on the evening of January 10 and the morning of January 11, the petitioner was looking at the television, which was not turned on, and staring out the window. The petitioner also was talking to himself and responding to himself.

Dr. Peter Brown, a psychiatrist, was accepted by the post-conviction court as an expert in the field of psychiatry. Dr. Brown conducted a psychiatric forensic evaluation of the petitioner. He diagnosed the petitioner with cognitive disorder not otherwise specified; acute alcohol and benzodiazepine intoxication; benzodiazepine abuse; depressive disorder not otherwise specified; opiate dependence; alcohol dependence; adjustment disorder with anxious and depressed mood; and a past history of stimulant-induced psychosis and polysubstance dependence, including both methamphetamine and cocaine which were in sustained remission at the time of the shootings.

65

Dr. Brown testified that upon reviewing the petitioner's family neuropsychiatric history, he found strong evidence of a genetic component for substance abuse. He found a significant history of mental disorder and alcohol abuse in three of the petitioner's male relatives. He noted that those with a family history of psychiatric illness are more likely to have a psychiatric illness.

Dr. Brown reviewed the petitioner's records from Pathways and noted a longstanding issue with polysubstance abuse. He said the petitioner had a history of regular consumption of alcohol since middle to early adolescence and consumption of other substances throughout his life. The petitioner was admitted to Pathways after using crack cocaine for four to six months and exhibiting paranoid delusions and hallucinations. Dr. Brown stated the petitioner's psychotic symptoms indicated a predisposition to losing touch with reality and exhibiting such symptoms when under stress.

Dr. Brown reviewed the petitioner's record from the Jackson Clinic and noted a longstanding history of progressive and continuing use of opiates or narcotics for chronic pain dating back to approximately 1999. He said the petitioner was using narcotics for a prolonged period for symptoms that were not clearly identified by the physician. He stated that the records also showed that the petitioner had a recurrent history of depressive symptoms and longstanding sleep disturbance problems for which he was being prescribed small doses of antidepressants. The petitioner was prescribed sedatives or benzodiazepines to help him with his sleep problems and emotional distress. Dr. Brown said the medication was being prescribed for longer than required for the symptoms that the petitioner was presenting at any one time without a referral to a behavioral health specialist or consideration of another diagnosis or treatment. He stated that the petitioner's symptoms and complaints were never addressed in a systematic way but were treated more on an intermittent and episodic form.

Dr. Brown testified that in making a psychiatric diagnosis, such as cognitive disorder not otherwise specified, he first was required to eliminate the possibility that the disorder or symptoms were being caused by a substance. He found that the petitioner had a significant impairment but was not able to conclude that the petitioner had a freestanding psychiatric condition as a result of substance abuse because the petitioner's symptoms were appearing concurrently with his substance abuse. He was next required to determine whether a medical condition could be the possible cause of the disorder or symptoms. He found that the petitioner's impairments were not caused by a medical condition and, as a result, labeled the petitioner's impairment as "not otherwise specified."

66

Dr. Brown found that the petitioner's cognitive disorder was the result of impairments in executive functioning, which involved integrating information, making a decision after careful consideration, making a plan, and following through on the plan. He stated that sleep deprivation, intoxication, and emotional distress had a greater effect on executive functioning in a vulnerable brain. A "vulnerable brain" is one that has been damaged by head injuries, various substances, or medical conditions. Dr. Brown noted that the petitioner had a history of head injuries and said the petitioner's history and test results revealed that he had a vulnerable brain. He said the petitioner demonstrated a defect in "neutral situations that would predispose him to having the increased risk of the catastrophic failure under the . . . wrong conditions." He defined "catastrophic failure" as the "complete inability to use appropriate executive functions in making decisions and thinking about possible consequences of weighing actions and options." He found that the petitioner's executive functions were impaired during the shootings and the time leading up to the shootings.

Dr. Brown testified that the petitioner was acutely intoxicated at the time of the shootings. He stated that the petitioner was arrested with an open container of alcohol, noting that a squeeze bottle with a top on it was found in the petitioner's truck. Family members observed the petitioner drinking throughout the day, mumbling to himself, and appearing disorganized. Dr. Brown found the petitioner's report of the evidence to be typical of someone who had been intoxicated. He explained that the petitioner had "spotlight memory" in that he recalled one particular fragment in the middle of his perceptual field but did not recall the details. The petitioner told Dr. Brown that he turned the corner after running a stop sign and saw the back quarter of a green car in front of him. The petitioner did not have a memory of the entire car. Dr. Brown noted that the petitioner was unable to safely operate a motor vehicle. The petitioner ran stop signs, was involved in a collision, and narrowly missed a second collision. Dr. Brown found that the petitioner was drifting in and out of internal reality. The petitioner reported having an imaginary conversation with Mrs. Jordan's deceased brother, whom he had never met, while the petitioner also was deceased. Dr. Brown stated that the petitioner was "drunk dialing," meaning a "ceaseless attempt to get in touch with somebody who either is clearly not there or not wanting to return the call, all the while becoming more and more disorganized and disinhibited by the very act of calling."

Dr. Brown testified that people who are intoxicated can perform a variety of well-learned or over-learned tasks without difficulty and are cable of carrying on a conversation. He said that as a person's tolerance of alcohol grows over time, he or she becomes less likely to demonstrate overt slurring or motor problems. The person's reaction time to reflex tasks returns to normal. Dr. Brown stated that experienced drinkers continue to be impaired in their ability to recognize mistakes and refrain from making them.

Dr. Brown found that the petitioner continued to be impaired for a period of time following his arrest and that his condition affected his behavior during that time. He also found that the petitioner experienced a period of withdrawal. He explained that the detoxification from alcohol and the return to a baseline function could take up to one year or eighteen months depending on the level of damage. With regard to the petitioner's condition at the time of the trial, Dr. Brown concluded, "It's more likely than not, because of the absence both of narcotics after prolonged use and alcohol after prolonged use, that he would have had impairment both in emotional regulation which typically means an absence of feelings and a decrease of depression."

On cross-examination, Dr. Brown acknowledged that he stated in his report that "it's more likely than not that under circumstances, extended restricted confinement, loss of excess, habitual coping patterns, including heavy polysubstance abuse as well as ongoing stressors and chemical changes and a trial while attempting to come to some realization what had occurred, he is unable to cope constructively." Dr. Brown said this statement was based upon a "more likely than not" standard and not a "reasonable degree of medical certainty" standard. He also said this statement did not appear in the same section of his report as his conclusions.

Dr. Brown agreed with Dr. Wilson's opinion that the petitioner was not able to premeditate and suffered from anxiety and depression. Dr. Brown also agreed that he and Dr. Wilson addressed many of the same issues regarding the petitioner's social history. Dr. Brown did not agree with Dr. Wilson that the petitioner had major depressive disorder; rather, Dr. Brown diagnosed the petitioner with depressive disorder. He explained that because the petitioner was having symptoms of depression while using alcohol and drugs known to produce depressive disorders, major depressive disorder was not the correct diagnosis. He agreed that the petitioner was suffering from some type of depression and with Dr. Wilson's finding of alcohol abuse. Unlike Dr. Wilson, Dr. Brown did not make a finding of borderline personality disorder. He agreed with Dr. Wilson that the combination of prescription drugs and alcohol could easily cause brain damage and that based upon the petitioner's state of anxiety and prior drug use, the effects of the alcohol were cumulative.

Dr. Brown noted in his report that the petitioner's relationship with his father was "distant" and that his father demonstrated "recurrent disapproval" and "disappointment." He further stated in his report that the "combination of paternal withdrawal, disapproval, maternal collusion resulted in a character marked by low self-esteem." He learned of this information through a mitigation report provided to him by post-conviction counsel and denied that the petitioner provided him with the information. Dr. Brown did not recall

reviewing a copy of a deposition given by the petitioner in 2008 during which he testified to having an excellent childhood.

Dr. Brown testified that he considered the petitioner's statement to the police, and the State questioned him about the details that the petitioner provided in the statement. He acknowledged that Investigator Miller said the petitioner was not intoxicated at the time of the interview and that the petitioner stated on the waiver of rights form that he was not intoxicated. Dr. Brown stated that police officers do not have a consistent way of establishing intoxication and that there are a number of factors that lead to both overestimating and underestimating intoxication.

Dr. Brown said that the petitioner was contemplating suicide on the morning of the shootings and understood the consequences of killing himself. He also stated there was no reason that the petitioner was unable to understand that he could use the guns to hurt Mrs. Jordan. Dr. Brown did not know whether the petitioner's statement was an accurate representation of what he was thinking up to and at the time of the shootings. He acknowledged that the petitioner was thinking about shooting Mrs. Jordan when he entered the TDOT office with two guns. Dr. Brown stated that the note written by the petitioner prior to the shootings did not significantly change his opinion. He said the note could be interpreted as a suicide note or a note about "something that [the petitioner had] accomplished" after the fact.

Dr. Brown acknowledged that when the petitioner arrived at the TDOT facility, he was going to enter the office and shoot Mrs. Jordan and that there was no reason to believe that the petitioner did not have the same thought process while at his home. Dr. Brown explained that "people can have plans or desires or intend to do things but not with the requisite level or forethought or ability to consider their opinions." He expressed concern about the use of the word "'intention' to distinguish between what [the petitioner] had planned to do versus whether he could form the intention of doing that by using his own judgment and considered premeditation." He acknowledged that the petitioner was able to control his actions about shooting himself while thinking about shooting Mrs. Jordan first.

Dr. Brown testified that most of a person's actions and thoughts do not involve an executive function and premeditation because the person has learned to complete these actions and thoughts automatically. He said this also applies to the use of firearms or any other activities with which the person is familiar. He also said there was never a period prior to the shootings where the petitioner was not under the influence of alcohol or other substances, emotional distress, and his other longstanding issues so that he could "rehearse and plan in a careful and methodical way." Dr. Brown stated that he based the estimate of the petitioner's blood alcohol level on Dr. Lipman's report. He also stated

69

that, based upon the history he obtained, the petitioner "clearly" had been drinking alcohol for some period of time before he left his home to go to the TDOT facility. He stated the petitioner told Dr. Winston and Investigator Miller that he was not intoxicated and told Investigator Miller that he had not taken his medication for two or three days.

Dr. Brown acknowledged that the petitioner wrote a note in advance of the shootings and anticipated the consequences, such as never seeing his children again. He further acknowledged that when the petitioner wrote, "she got what she deserved," he was able to associate negative connotations with Mrs. Jordan's behavior and that his retribution was shooting her. In response to questioning by the post-conviction court, Dr. Brown agreed that the petitioner's actions in writing the note, loading the guns, going to Mrs. Jordan's workplace, and shooting her were more than just "automatic" reflexes. He said people can commit crimes of passion.

Dr. Brown acknowledged that the petitioner determined that he was going to shoot his wife and that he needed a loaded gun. The petitioner called Mrs. Jordan's place of employment, and Dr. Brown stated that it could be assumed that the petitioner did so to ensure that Mrs. Jordan was there. While driving to the TDOT facility, the petitioner ran a stop sign and failed to remain at the scene. Dr. Brown acknowledged that it could be assumed that the petitioner knew that the police would arrive at the scene of the accident if he did not flee. Mrs. Jordan's vehicle was not in the parking lot of the TDOT facility, and the petitioner hid his guns while entering the building. Dr. Brown stated that the petitioner was aware that people would see the guns if he displayed them and possibly believed that people would try to stop him if they saw the guns. The petitioner passed three people while walking to the building and did not shoot them. The petitioner knew where Mrs. Jordan would be, shot her in the leg to get her attention, and then shot her two more times. When he left the building, the petitioner saw the man whose car he had hit and told him to leave. Dr. Brown acknowledged that the petitioner went through the thought process of deciding to warn the man. He said the petitioner thought if the man heeded the warning, he would not shoot him, but if the man did not do so, he would shoot him. He also said that when the man did not heed the warning, the petitioner walked back to his car and retrieved a SKS rifle with the purpose of carrying out his warning. Dr. Brown acknowledged that the petitioner made the conscious decision to shoot the man in spite of the man's pleas for his life. The petitioner drove away from the scene smiling, and law enforcement officers began their pursuit. The petitioner was able to respond to the officers' movements and control his vehicle in response to their movements. Officers eventually were able to stop the petitioner and ordered him out of his vehicle. Dr. Brown acknowledged that the petitioner went through the mental process of choosing whether to come out shooting and was able to conform his actions to the officers' demands. He also acknowledged that the petitioner understood that he would be

shot if he did not obey the officers. The petitioner recognized Trooper Briley and told him he had shot Mrs. Jordan for "revenge."

On redirect examination, Dr. Brown testified that people who are intoxicated commonly lie about it or otherwise minimize their usage. He said that intoxicated people are not good judges of whether they are intoxicated.

Dr. Brown defined a "fixed action pattern" as "any learned pattern of behavior that involves a sequence of things that a person has learned to coordinate over time." He stated that a person can learn motor patterns over the course of his or her life that involve a conscious effort while being learned but then become an automatic procedure once they are learned. He also stated that there are automatic fixed action patterns that do not require reflection.

In response to questioning by the post-conviction court, Dr. Brown testified that the petitioner's actions were closer to fixed action patterns. He said fixed action patterns are preserved when a person is intoxicated and while the executive function of the brain is turned off. They are overlearned social behaviors and simply involve reactions. Dr. Brown stated that the petitioner had experience with guns and target shooting games and that his use of the guns was a "default position." He was aware that the petitioner reportedly carried a gun on his back as a normal manner of practice.

The petitioner presented the deposition testimony of Dr. Kenneth Ferslew, a professor in the biomedical science department at the James H. Quillen College of Medicine and a toxicologist in the school's forensic department. Dr. Ferslew testified that he was contacted by the State in 2012 in connection with the petitioner's post-conviction case and was asked to review the toxicology reports and offer an opinion on impairment. He reviewed the toxicology reports; a report from post-conviction counsel; the reports of Dr. Spica, Dr. Lipman, Dr. Smith, and Dr. Brown; the appellate opinions from the petitioner's direct appeal; the petitioner's amended post-conviction petition; police statements and trial testimony from various witnesses; the testimony of Dr. Wilson and Investigator Miller at trial; and an interview of TBI Special Agent Hopkins conducted by post-conviction counsel.

Dr. Ferslew testified that he informed the State that he did not wish to form an opinion in the case due to reservations regarding the sampling and the specimen. He noted that because of the lack of sodium fluoride in the urine sample, the potential for fermentation existed. He stated that in order to use the urine alcohol level to extrapolate to a blood alcohol level, the urine sample must have been sterile and collected properly without any post-collection fermentation or production of alcohol. Dr. Ferslew stated that there was no way to establish that sodium fluoride had been added to the petitioner's

71

urine sample. Because of the "time lag" between the collection of the sample and the analysis and the potential for bacterial contamination, Dr. Ferslew expressed concerns regarding the legitimacy of the urine sample to the State. He informed that State that due to these issues, he did not wish to be involved.

Dr. Ferslew testified that he did not disagree with some of Dr. Lipman's calculations "[a]ssuming no contamination of the urine sample, assuming that this was a valid specimen and proper extrapolation could be made to the blood." He did not know whether he could take issue with Dr. Lipman's calculations in the toxicology portion of his report. He stated that assuming that the urine was a valid sample, the urine alcohol concentration was .17 gram percent, and the alcohol had completely distributed to body water, the petitioner's blood alcohol concentration at some point was .1307 gram percent. He noted that 3.95 hours had elapsed between the crimes and the collection of the petitioner's urine. He stated that based upon the average standard elimination rate of .017 gram percent per hour, the petitioner would have eliminated up to .06715 gram percent in 3.95 hours. Taking the blood alcohol extrapolated from the urine and adding the amount eliminated over time, Dr. Ferslew stated that the petitioner's maximum blood alcohol level at the time of the shootings, based on various assumptions, would have been .19785 gram percent.

Dr. Ferslew noted that 10.2 hours had elapsed between the shootings and the petitioner's blood draw. He said that based on an average elimination rate of .017 gram percent per hour, the petitioner could have eliminated .1734 gram percent of alcohol from his blood by the time a blood sample was taken. Dr. Ferslew stated this calculation explained why the petitioner's blood sample was negative for alcohol. He also stated that while his estimation of a blood alcohol level of .19785 gram percent at the time of the shootings and his estimation of an elimination of .1734 gram percent of alcohol from the blood at the time of the taking of the blood sample did not match, "this is not CSI. All that stuff you watch on TV, when they say they can do something exact to six decimal places, they're out of their minds."

Dr. Ferslew testified that based upon the petitioner's body weight, if he drank five shots of vodka, his estimated blood alcohol level would have been .11 gram percent. Dr. Ferslew estimated the petitioner's blood alcohol to be between .13 and .197 gram percent at the time of the shootings. He stated that a person with that blood alcohol level would exhibit loss of inhibition, expansion of personality, psychomotor impairment, and ataxia, a certain degree of incoordination. The degree of tolerance and experience with alcohol could increase or decrease the effects depending upon the person's history and degree of impairment. Dr. Ferslew said the combination of alcohol and Xanax impairs motor function and cognitive skills.

72

The petitioner also presented the deposition testimony of Dr. Edward J. Bronson, whom the post-conviction court later accepted as an expert in the fields of venue and jury selection. Dr. Bronson testified that in determining whether a request for a change of venue is warranted, the attorney first must examine the pretrial publicity and gather as much information as possible about prejudice in the community. He stated that the use of surveys to gather information was standard practice and that when conducting a survey, the attorney must examine case recognition, prejudgment of guilt and the penalty, and knowledge of harmful evidence. He said that while an expert jury consultant need not be retained in every case, most attorneys do not seek a change of venue and that a consultant is necessary due to his or her specialized training.

Dr. Bronson testified that in preparing to seek a change of venue, trial counsel only collected newspaper articles. He said trial counsel should have retained an expert consultant or taken more actions to "assure themselves that a change of venue is ill-advised." He noted that the shootings were a major incident in a small community and received publicity around the country. He stated that trial counsel did not conduct a survey of the community, perform a content analysis of the media, or consult an expert.

Dr. Bronson stated that trial counsel filed a motion for a change of venue but later withdrew the motion. He noted that trial counsel's decision was based on the fact that the petitioner's father had been a longtime Little League coach to many children in the community. He stated that trial counsel should have called the petitioner's father as a witness. He said a juror provided a written statement after the trial indicating that the deciding factor in her decision to vote for the death penalty was that the petitioner's father did not testify. Dr. Bronson maintained that once trial counsel learned that the petitioner's father intended to attend the trial and, therefore, could not testify based upon the trial court's order, trial counsel should have renewed the motion for a change of venue.

Dr. Bronson identified fifty-eight newspaper articles about the petitioner's case leading up to the trial, which was a large number in a relatively small community. Thirty or thirty-one newspaper articles were published during and after the trial. Dr. Bronson said many of the articles did not focus on the facts of the case but on collateral issues, such as spousal abuse and guns. Twelve articles were on the front page of the newspaper, and Dr. Bronson stated that as a result, the articles were more likely to have been read. He noted that sixty-five photographs, which took up more space and got the readers' attention, accompanied the articles and that more than forty "side bars," or short articles, accompanied the primary articles. He did not review the television, radio, or online coverage. He stated that while the amount of publicity was great, it was not "a super amount as you would get in some of the really famous cases." He did not see any inadmissible or erroneous coverage.

73

Dr. Bronson testified that, in determining whether a change of venue is warranted, the extent to which the media coverage portrayed the defendant as guilty must be examined. He said the media generally does not publish the defense's argument regarding mental state or other issues. He stated that potential jurors who read articles about a case may develop a "story model" of what they believe occurred. As a result, the jurors accept evidence during the trial that is consistent with their "story model" and reject evidence that is inconsistent with the "story model."

Dr. Bronson said the gravity of the offense is a major factor that must be examined in determining whether to see a change of venue. He identified several references in the newspapers articles regarding the death penalty. He also examined the victims' portrayal in the media and stated that the victims were "entirely blameless" and were at a location in which many people in the county could identify and see themselves being in a similar position. Dr. Bronson stated that the petitioner was portrayed in the media as a "mean person with a domestic violence history, almost maniacal behavior at the crime scene, including an escape attempt." He explained that trial counsel were required to attempt to humanize the petitioner and make every possible argument in an attempt to save his life. Dr. Bronson stated that based upon his review of interviews of various jurors, trial counsel failed to do so. Some of the jurors stated that once they knew he was guilty of first degree murder, they imposed the death penalty.

Dr. Bronson testified that during voir dire, "conclusionary" questions were asked in which the answer was simply "yes" or "no." He stated that a question to a potential juror regarding whether he or she will follow the law is essentially a cue to respond "yes." He also stated that trial counsel never asked questions during voir dire that would have provided them with useful information. Dr. Bronson also faulted trial counsel for failing to exercise all of their preemptory challenges and said trial counsel had sufficient information to excuse some of the jurors. He said that as a result, "fairly automatic death penalty jurors" remained on the jury. Dr. Bronson did not see any attempt by trial counsel to change the trial court's practice of conducting voir dire. He stated that trial counsel could have asked the appropriate questions themselves during voir dire or in the jury questionnaire. He noted that the jury questionnaire only included two questions addressing the death penalty and did not address whether intoxication could result in a sentence of life.

Dr. Bronson stated that a number of potential jurors knew witnesses or were related to someone on the police department. He also stated that in a smaller community, a sentence of life or life without parole would be more explosive and that jurors would feel pressured to explain such a verdict.

74

On cross-examination, Dr. Bronson stated that the existence of a confession would weigh in favor of a change of venue. He explained that if the potential jurors have learned from the media that a defendant confessed, the burden of proof shifts to the defendant to establish that he is not guilty. He said the confession should not be a topic of voir dire but should be addressed in the community survey. Dr. Bronson was unaware of any Tennessee case mandating a jury survey. He generally agreed that the State's evidence of guilt was overwhelming and that the penalty phase was "the only issue in this case."

Dr. Bronson did not speak to the petitioner, trial counsel, or Ms. Shettles in reaching his opinion. He did not believe that he was aware that trial counsel submitted a jury questionnaire to the trial court but that the trial court chose to use its own jury questionnaire. He did not review the jury questionnaire submitted by trial counsel and the State but only reviewed the questionnaire that the trial court submitted to the jury.

## State's Proof

The State presented the testimony of Dr. Glen Farr, a licensed pharmacist and a professor of clinical pharmacy and associate dean at the University of Tennessee College of Pharmacy, who was accepted by the post-conviction court as an expert in pharmacology and toxicology. Dr. Farr testified that he was asked to examine the effects of alcohol and Xanax and the differences between urine levels and blood levels. He reviewed Dr. Lipman's report and a case summary provided to him by the State.

Dr. Farr stated that when alcohol is consumed, it goes through an absorption phase, which generally takes thirty to sixty minutes depending upon the amount of food that the person has eaten and the gastrointestinal motility. Once the alcohol starts to be absorbed, the body treats it as a foreign substance and immediately attempts to get rid of it. The metabolic process where the liver breaks down alcohol into a product begins. The alcohol is excreted in the urine, and the body gets rid of it. Alcohol also is excreted from the lungs, and a breathalyzer may show the presence of alcohol and an estimate of blood alcohol level.

Dr. Farr said the urine alcohol level is a qualitative measure and not a quantitative measure of the alcohol level. He explained that while some estimations can be made regarding the blood alcohol, the urine alcohol level is "not a measure of the amount of alcohol in the blood at any point." He stated that the amount of alcohol in the urine is proportional depending upon several factors, including the amount of water and other fluids in the urine, whether the bladder has been emptied prior to the sample, and when it was emptied. He said that as a result, "a one-time calculation based on a one-time urine reading is, at best, a very, very rough prediction of what the blood alcohol would be." He

75

also said that while multiple urine samples would provide a more accurate estimate, "[Y]ou still can't be totally accurate. There's no way to predict exactly how much was in the blood at that time." Dr. Farr noted that <u>Clark's Analytical Forensic Toxicology</u> recommends that the bladder be voided, an hour pass to allow for the urine to build back up in the body, and then the urine be tested at least one more time. He stated that this method is not "totally reliable" and is less reliable than blood testing.

Dr. Farr testified that the testing of the urine involved a screen to determine whether alcohol or drugs were present in the person's body. The testing did not indicate when the substance was taken or its effect on the person's body. Dr. Farr said that predictions could be made regarding how much of the substance would have been in the blood or its effect but that the predictions could not be made with scientific certainty. He agreed with TBI Special Agent Harrison's testimony at trial that the results of the urine analysis indicated that the petitioner had consumed alcohol in the past but that no further conclusions could be reached. Based upon the results of the analysis of the petitioner's urine sample, Dr. Farr concluded that the petitioner had "consumed alcohol at some point in time. I can't say when, I can't say how much, and I can't say what [e]ffect, if any, it had at the time of the incident, and that's really about all you can say."

Dr. Farr testified that Xanax is a calming agent that is metabolized in the liver at a much slower rate than alcohol or many other drugs. The half-life of Xanax is sixteen to seventeen hours with an average half-life of eleven hours. Dr. Farr said it takes an estimated three to five half-lives for the effects to no longer be noticeable or reportable. He also said that over a period of roughly eighteen hours, there should be some detectable level of Xanax in the blood, depending upon the sensitivity of the testing. He stated that after eighteen to thirty-six hours, Xanax probably would not be detectable in the blood. In the petitioner's case, Xanax was reported in the urine at 3:35 p.m. but was not reported in the blood analysis at 9:50 p.m. Dr. Farr said that based upon the analysis, the petitioner had taken a Xanax tablet at some point where it was still present in his urine when he provided the sample. He also said the Xanax would have excreted at mid-afternoon and was not at a detectable level at 9:50 p.m. He concluded that the level of Xanax in the petitioner's system at the time of the shootings "would have been very low or subtherapeutic and would not have been a factor in this matter."

In response to questioning by the post-conviction court, Dr. Farr testified that the ratio used by Dr. Lipman was "the best that we can do scientifically" and was only an estimate. Dr. Farr stated that the problems with the estimation included there was only one urine collection and the volume of the urine, the length of time the urine had been in the petitioner's system, and the petitioner's rate of metabolism were unknown. He also stated that a person's genetic makeup is likely more important than the rate of

metabolism and that the petitioner's genetic makeup was not known. He said Dr. Lipman's method of "back calculations" was

> the best that we can do with the science that we have. But then, once you get that level, then you bring in the concept of tolerance which we don't know, and different people respond different at different levels. So, I'm questioning the ability to make those back calculations. In fact, that's about all we can do in these cases.

On cross-examination, Dr. Farr testified that he did not recall any statements from witnesses that the petitioner smelled of alcohol on the morning of January 11. He said that while he may not have reviewed the actual toxicology report from the TBI, the information in the report was included in either a summary provided to him by the State or in Dr. Lipman's report. Dr. Farr did not review the TBI protocols regarding levels of calibrations for the panels of drugs tested in January 2005 prior to rendering his report but reviewed Dr. Lipman's report, which referenced the protocols. Dr. Farr reviewed the petitioner's medical and pharmaceutical records to the extent that they were included in Dr. Lipman's report.

Dr. Farr stated that he based his calculations on a urine collection time of 3:35 p.m. on January 11, 2005. He also considered the time of the offenses as occurring between 9:30 a.m. and 11:30 a.m. He noted that Dr. Lipman's report stated that the petitioner's urine sample was collected between four hours and twenty-four minutes and six hours and nine minutes after the offenses. Dr. Farr subsequently learned that multiple witnesses testified that the shootings occurred at approximately 11:30 a.m. He acknowledged that based on the telephone records from the petitioner's home which provided that the last call occurred at 11:00 a.m. and lasted four minutes, the shootings did not occur before 11:04 a.m.

Dr. Farr said those arrested for driving under the influence often report their intake of alcohol inaccurately or incorrectly assess their own state of intoxication. With regard to Investigator Miller's testimony that the petitioner did not appear to be under the influence of drugs or alcohol, Dr. Farr stated that "any subjective analysis is just that, it's very subjective."

Dr. Farr agreed with Dr. Lipman that the petitioner was in the post-absorptive phase of ethanol metabolism, based on the information that Dr. Farr had. Dr. Lipman's report also detailed the petitioner's long history of taking Xanax and using alcohol, but Dr. Farr said that it is difficult to determine whether a person is taking medication as prescribed. Dr. Farr reviewed information that the pill bottle of Xanax collected by the Jackson Police Department was missing a quantity of pills and addressed this information

77

in his report. He recalled reviewing information regarding the petitioner's obtaining custody of his daughters, his marital problems leading up to the shootings, and his employment history but said the information did not affect his opinion "on the interpretation of the data." He also recalled reviewing information that the petitioner had been prescribed hydrocodone, was sleep deprived, and had a prior history of crack cocaine use that resulted in hallucinations.

On redirect examination, Dr. Farr testified that he was retained by the State to analyze the accuracy of the urine analysis. He said the petitioner's family history was relevant to estimate some degree of tolerance, but "all the other stuff would be irrelevant to [his] opinion." He stated that while the urine analysis to calculate blood alcohol was the "best we can do" in this case, it was an estimation based on several factors and was not the desired method to determine blood alcohol levels. He also stated that the urine analysis based upon a single sample only established that the petitioner consumed alcohol. The results did not establish the amount of alcohol consumed or the period of time during which it was consumed.

Dr. Farr stated in his report that, although Dr. Lipman stated that the TBI Crime Laboratory was capable of measuring only very large quantities of alprazolam, since their calibration standards were higher than the concentration detected in the petitioner's blood and urine, Dr. Farr opined that even with a high calibration standard, "[I]f there was a clinically significant level of alprazolam in the blood in the morning of the offenses, there would have been a detectable level of alprazolam in the blood at 9:50 p.m." Dr. Farr noted that the TBI laboratory report did not quantify the amount of alprazolam in the petitioner's urine. He said the report stating that the petitioner's urine was positive for alprazolam was not consistent with the petitioner's claim that he had not taken his medication for two or three days. He explained that due to the long half-life of alprazolam, the petitioner would have had to have taken his medication within one to two days for it to have shown up in the urine analysis. He stated that the fact that the blood and urine samples were destroyed did not affect his calculation.

Dr. Daniel Martell, a psychologist, was accepted by the post-conviction court as an expert in forensic psychology. He was retained by the State to address the petitioner's mental state at the time of the shootings. He evaluated the petitioner for approximately five hours at the prison where the petitioner was housed. He administered a battery of neuropsychological tests and interviewed the petitioner. He reviewed the opinions of Drs. Lipman, Smith, Spica, Brown, and Matthews; the trial transcript; eyewitness statements; and relevant Tennessee law. He tested the areas of deficiency identified by Dr. Spica to determine whether the deficits were reproducible and whether they became better or worse over time.

78

Dr. Martell testified that he found the petitioner to be polite and cooperative. The petitioner's speech was normal, and his thoughts were logical. He was not psychotic in that he was in touch with reality and knew who he was, where he was, and the purpose of the meeting. The petitioner stated that he was stressed in part because the prison had changed the staff to twelve-hour shifts, resulting in changes to the petitioner's daily routine. The petitioner also described issues with short-term memory due to stress about his case.

Dr. Martell administered a battery of tests to determine whether the petitioner was malingering and concluded that the petitioner was trying hard and being honest and that the results were valid and interpretable. Dr. Martell stated that based on the results of psychodiagnostic testing, he found no evidence of an Axis I psychiatric diagnosis. He found evidence of an Axis II diagnosis due to the petitioner's personality style. He explained that those who have the petitioner's personality "tend to be quiet and withdrawn but can be prone to sudden outbursts that may come as a surprise to others. They are typically passive/aggressive in their relationships with other people. They are very sensitive to rejection and tend to get hostile when they are criticized." Dr. Martell believed that the petitioner's personality style was reflected in what transpired during the offenses.

Dr. Martell testified that the petitioner's test scores on neuropsychological testing indicated that the petitioner's brain was not functioning normally and that his brain functioning might have affected his behavior. Dr. Martell found that the petitioner had a "normal IQ, normal memory functioning, intact problem solving and good impulse control." He noted that while the petitioner's motor skills were generally within normal limits, he demonstrated mild impairment in both hands in placing steel pegs into a pegboard. Dr. Martell found a "mixed pattern" in testing the petitioner's executive functioning. The petitioner performed some tests normally or well and demonstrated mild or moderate impairment in other areas. In the tests of speed of processing information, the petitioner performed within the low average range and demonstrated mild impairment on another test. Dr. Martell noted that these results were often seen in patients with depression and that the petitioner had a history of depression. The results of some of the petitioner's tests on divided attention, such as multitasking, problem solving, impulse control, and the ability to affectively switch between competing stimuli, fell within the normal range. The petitioner had a moderate level of impairment in a test of verbal fluency.

Dr. Martell testified that the petitioner had impairments in fine motor dexterity, impairments in some tests of speed of information processing but not others, and moderate impairment in verbal fluency. He stated that Dr. Spica also found all three deficits but that Dr. Spica "over-interpreted his results." Dr. Martell explained that the

79

sixteenth percentile, or one standard deviation below the mean, is considered normal or average. He said Dr. Spica repeatedly interpreted scores that fell within the twenty-fifth or thirty-seventh percentile as indicative of cognitive impairment when such results fell within normal limits. Dr. Spica also found that the petitioner's scores on the pegboard test fell within the first percentile when they actually fell within the fourteenth percentile, in the mild range of impairment.

Dr. Martell concluded that the petitioner retained the capacity for reflection and judgment at the time of the shootings. He reached his conclusion by examining the petitioner's behavior before, during, and after the shootings. Dr. Martell examined evidence that the petitioner was engaging in periods where he would stop and reflect on the situation and then use judgment to determine his course of action. Dr. Martell found evidence of planning and the petitioner's ability to reflect and alter his actions. He based this conclusion on the petitioner's writings and note that he left at his home, his threatening voicemail messages, his selection and loading of various firearms, his decision to shoot Mrs. Jordan in the leg so that she would look at him, his decision to not shoot Mrs. Jordan in the face, his decision to shoot some people but not others, his concealment of his firearm while entering the crow's nest, his statement of intent to return home and commit suicide, his statement to Sergeant Briley regarding why he shot Mrs. Jordan, and his statement to police regarding remorse and questions about possible punishment.

Dr. Martell concluded that the petitioner's behavior indicated that his capacity to exercise reflection and judgment was intact and that his capacity to conform his conduct to the requirements of the law was not substantially impaired. Dr. Martell stated that the petitioner was not suffering from an extreme mental or emotional disturbance and that while he was angry at Mrs. Jordan, he was not extremely intoxicated, cognitively impaired, or psychiatrically ill. He considered the evidence of intoxication and reviewed Dr. Lipman's report. He concluded that any intoxication did not affect the petitioner's ability to premeditate. He explained, "It's clear that despite whatever intoxication he might have been experiencing, whatever mental illness, whatever cognitive impairment, the combination of all those things, he was still able to use reflection and judgment as he went through the commission of the offense."

In response to questioning by the post-conviction court, Dr. Martell testified that he believed the petitioner ran the stop sign "as a matter of haste" and hit Mr. Gordon's car as a result. He stated that the petitioner's striking Mr. Gordon's car was an accident but that the petitioner made the decision to flee the scene.

On cross-examination, Dr. Martell testified that he and Dr. Matthews utilized the "forensic behavioral analysis," which provided that the petitioner's capacity was best

80

assessed through an analysis of his actual behavior at the time of the offenses. The analysis involved a detailed reconstruction of the petitioner's behavior before, during, and after the offenses. Dr. Martell believed the method was standard forensic practice.

Dr. Martell believed that in conducting tests, the standard practice is to compare the patient with others of the same age, education, and gender. He was critical of Dr. Spica's failure to utilize published norms. Dr. Martell did not find impairments in the petitioner's memory but found impairments in motor skills and executive functioning. He did not question the validity of Dr. Spica's neuropsychological data. Dr. Martell agreed that the petitioner had mild to moderate neuropsychological deficits. He said he did not include a psychological or psychiatric diagnosis in his report because he did not conclude that one existed. He did not review the petitioner's medical records, pharmacy records, or jail records but noted that they were cited in the reports of other experts, which he had reviewed.

The petitioner presented as a rebuttal witnesses Dr. Gordon Logan, whom the post-conviction court accepted as an expert in experimental psychology. Dr. Logan testified that he was asked to review the reports of Dr. Martell and Dr. Matthews and the transcript of Dr. Matthews' testimony at trial to determine whether any scientific basis existed for their conclusions. Dr. Logan said Dr. Martell and Dr. Matthews interpreted the facts of the case and drew inferences about the petitioner's intentions at the time he committed the offenses. Dr. Logan stated that based on his experience, "[T]here isn't a scientific way of determining whether a person has a specific intention."

Dr. Logan testified that inferring a particular mental state by observing a person's behavior was not possible. Rather, sophisticated experiments were required. Dr. Logan explained that people often attribute beliefs, desires, and rationality to things that do not have them. He stated, "So the fact that we can see intentions as people is important to our social interaction, to our social institutions and the world, but it's not science, . . . it's the beliefs that people carry in their head."

Dr. Logan stated that Dr. Matthews and Dr. Martell were not asked to "do science" but to give an opinion about a person's behavior. Dr. Logan said some things could be ruled out solely by observing a person's behavior, but it was difficult to eliminate the necessary alternatives. He saw a chain of inferences built around the event. He stated that the petitioner could have been loading the guns for purposes other than shooting his wife, but Dr. Matthews and Dr. Martell failed to consider alternative hypotheses.

In response to questioning by the post-conviction court about the petitioner's note which stated, "She's going to get what she deserves," Dr. Logan testified that the note

could have meant many different things.  He said the petitioner could have wanted to go to Mrs. Jordan's office and commit suicide in front of her.  He explained, "Science isn't about proving one thing, it's proving that one thing is more likely to be the explanation than another.  So there should have been perhaps consideration of alternative possibilities."

On cross-examination, Dr. Logan acknowledged that he was not qualified as an expert in the field of forensic psychology.  He said that while jurors can infer intentions based on actions, "there is no scientific basis for inferring intentions from specific behaviors."  He explained that while some mental states and intoxication can be inferred through actions, intent is a "special mental state[]."  He testified that even if a person tells someone that he is going to shoot the person in the leg and then does so, a scientist cannot reach any conclusions about the shooter's mental state.  He said that while a lay person can reach a conclusion, "people think about things that science hasn't managed to think about yet."

Following the hearing, the post-conviction court entered an order denying the petitioner's post-conviction petition.  This appeal followed.

## ANALYSIS

On appeal, the petitioner contends that (1) he received ineffective assistance of counsel during both the guilt and penalty phases of the trial; (2) the venue of the trial in Madison County violated his rights to a fair trial and due process; (3) the State committed prosecutorial misconduct by suppressing evidence; (4) the selection and impaneling of the grand jury was unconstitutional; (5) the post-conviction court erred in denying his motion to continue the evidentiary hearing; (6) the post-conviction court erred in allowing trial counsel to assist the State during the evidentiary hearing; (7) the post-conviction court erred in excluding an expert witness; (8) Tennessee's death penalty scheme is unconstitutional; (9) his death sentence is disproportionate; and (10) cumulative error warrants a new trial.

Tennessee's Post-Conviction Procedure Act affords post-conviction relief to a petitioner who is "in custody" and whose "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States."  Tenn. Code Ann. §§ 40-30-102, -103.  The petitioner seeking relief has "the burden of proving the allegations of fact by clear and convincing evidence."  Tenn. Code Ann. § 40-30-110(f); see Nesbit v. State, 452 S.W.3d 779, 786 (Tenn. 2014).  We review a post-conviction court's "conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness."  Kendrick v. State, 454

82

S.W.3d 450, 457 (Tenn. 2015). We are bound by the post-conviction court's findings of fact unless the evidence preponderates against the findings, and we may not reweigh or reevaluate the evidence or substitute our own inferences for those drawn by the post-conviction court. Id. Generally, we must defer to a post-conviction court's findings regarding "witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." Id.

## I. Ineffective Assistance of Counsel

The petitioner asserts that trial counsel were ineffective during both the guilt and penalty phases of the trial. In pertinent part, the Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "'so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the states by the Fourteenth Amendment.'" See Gideon v. Wainwright, 372 U.S. 335, 340 (1963) (quoting Betts v. Brady, 316 U.S. 455, 465 (1942)). Inherent in the right to counsel is the right to the effective assistance of counsel. Cuyler v. Sullivan, 446 U.S. 335, 344 (1980). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984).

The United States Supreme Court adopted a two-prong test to evaluate a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687. The performance prong of the Strickland test requires a showing that counsel's representation fell below an objective standard of reasonableness, or "outside the wide range of professionally competent assistance." Id. at 690. "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Combs v. Coyle, 205 F.3d 269, 278 (6th Cir. 2000) (quoting Strickland, 466 U.S. at 689).

In reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, we note that criminal defendants are "not entitled to perfect representation, only constitutionally adequate representation." Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987) (quoting United States v. Cronic, 466 U.S. 648, 655 n.38 (1984)). Notwithstanding, we recognize that "[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." Id. at 785.

If the petitioner shows that counsel's representation fell below a reasonable standard, then he must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. The reasonable probability standard "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." Cullen v. Pinholster, 563 U.S. 170, 189 (2011). In evaluating whether a petitioner satisfied the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (citing Strickland, 466 U.S. at 687). In other words, "a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the [petitioner] of a fair trial and called into question the reliability of the outcome." Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002). That is, "the evidence stemming from the failure to prepare a sound defense or [to] present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal." State v. Zimmerman, 823 S.W.2d 220, 224 (Tenn. Crim. App. 1991). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in Strickland." Id. at 225. When challenging a death sentence, the petitioner must show that "'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." Henley v. State, 960 S.W.2d 572, 579-80 (Tenn. 1997) (quoting Strickland, 466 U.S. at 695); see Cullen, 563 U.S. at 189.

## A. Failure to Adequately Investigate and Pursue a Change of Venue

The petitioner asserts that trial counsel were ineffective in failing to adequately investigate and pursue a change of venue. According to the petitioner, trial counsel "acted unreasonably" in (1) withdrawing the motion for a change of venue; (2) failing to retain an expert to assist in evaluating the need for a change of venue; (3) failing to conduct a public opinion poll; (4) failing to investigate whether the favorable reputation of the petitioner's family would affect the jury's sentencing decision; and (5) failing to seek a change of venue during jury selection.

Tennessee Rule of Criminal Procedure 21(a) provides that venue may be changed "when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." "The ultimate test is whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity." State v. Kyger, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989) (citing State v. Garland, 617 S.W.2d 176, 187 (Tenn. Crim. App. 1981)). "Prejudice will not be presumed by a mere showing that there was considerable pretrial publicity." Keith Whited v. State, No. M2012-02294-CCA-R3-PC, 2014 WL 1832962, at *12 (Tenn. Crim. App. May 7, 2014), perm. app. denied (Tenn. Sept. 18, 2014) (citing Dobbert v. Florida, 432 U.S. 282, 303 (1977); Kyger, 787 S.W.2d at 19).

The post-conviction court did not specifically address this issue in its order denying post-conviction relief. Rather, the post-conviction court stated in a footnote that "[a]ny claim not specifically addressed in this order has been found by this court to be without merit." Nevertheless, we conclude that the petitioner has failed to establish that any deficiency resulted in prejudice. While the petitioner argues that the jurors were exposed to pretrial publicity, he failed to establish that the jurors were prejudiced by the pretrial publicity. "'Qualified jurors need not . . . be totally ignorant of the facts and issues involved.'" State v. Bates, 804 S.W.2d 868, 877 (Tenn. 1991) (quoting Murphy v. Florida, 421 U.S. 794, 799-800 (1975)). The majority of the jurors stated during individual voir dire that while they heard about the offenses as a result of publicity, they could not recall details of the offenses. As the post-conviction court later found in its order, "All jurors who had heard or seen some of the pretrial publicity stated they could set aside what they had heard or read and follow the law. Petitioner has presented no evidence to contradict their assertions." The petitioner is not entitled to relief regarding this issue.

## B. Voir Dire

The petitioner contends that trial counsel were ineffective during voir dire in failing to inquire into crucial topics of the defense, failing to object to the prosecutor's inappropriate comments to the jury, and in failing to "life qualify" the jurors.

### 1. Failure to Inquire into Crucial Topics of the Defense

The petitioner maintains that trial counsel failed to properly inquire into the jurors' exposure to pretrial publicity, question them about their attitudes toward mental disorders and intoxication, expose them to "facts not in dispute," or question them "in a manner that would reveal bias or grounds for disqualification." The ultimate goal of voir dire is to ensure that jurors are competent, unbiased, and impartial. State v. Mann, 959 S.W.2d 503, 533 (Tenn. 1997). A defendant does not have a constitutional right to pose questions to prospective jurors that involve matters that conceivably might prejudice the jurors against him. Ristaino v. Ross, 424 U.S. 589, 594 (1976) (citing Ham v. South Carolina, 409 U.S. 524, 527-28 (1973)). "The failure to make certain inquiries to determine how receptive the jury would be to specific mitigation factors during voir dire does not necessarily constitute ineffective assistance of counsel." Steven Ray Thacker v. State, No. W2010-01637-CCA-R3-PD, 2012 WL 1020227, at *53 (Tenn. Crim. App. Mar. 23, 2012), perm. app. denied (Tenn. Aug. 16, 2012) (citing State v. Goodwin, 703 N.E.2d 1251, 1257 (Ohio 1999)). The scope of voir dire is a tactical decision, and it is not within the province of this court to second-guess tactical choices made by trial counsel. Id. (citing Butler v. State, 789 S.W.2d 898, 901 (Tenn. 1990)).

We note that the petitioner fails to identify in his brief the undisputed facts to which he claims that the jurors should have been exposed or the manner in which trial counsel should have questioned prospective jurors in order to reveal bias or grounds for disqualification. The prospective jurors were asked about their exposure to pretrial publicity both in the juror questionnaire and during individual voir dire. As the post-conviction court found, the jurors who had been exposed to pretrial publicity stated that they could set aside anything they had heard or read and base their decision on the evidence presented at trial and the law as instructed by the trial court. During the trial, the trial court instructed the jury on the applicable legal burdens and mitigating circumstances. There is no evidence establishing that the jury ultimately empaneled was biased or unfair. The petitioner is not entitled to relief based on this issue.

In a footnote in his brief, the petitioner asserts that trial counsel were ineffective in failing to object to the jury questionnaire utilized by the trial court. We caution the petitioner and other appellants against the practice of raising issues on appeal in footnotes of their appellate briefs. Rather, any issues should be raised in the body of the argument

86

section or risk waiver of the issue. Moreover, we conclude that this issue is without merit. The questions posed to the prospective jurors in the jury questionnaire and during voir dire were adequate to ensure that the jurors would base their decision on the evidence presented at trial and the law as instructed by the trial court. There is no evidence establishing that the jury ultimately empaneled was biased or unfair.

### 2. Failure to "Life Qualify" Jurors

The petitioner next avers that trial counsel were ineffective in failing to "life qualify" the jurors. In capital murder trials where the jury must choose between life and death, the failure to question whether a prospective juror can fairly consider a life sentence does not necessarily constitute deficient performance. Hartman v. State, 896 S.W.2d 94, 105 (Tenn. 1995); Steven Ray Thacker, 2012 WL 1020227, at *52. The jury questionnaire included questions about the prospective jurors' views of the death penalty. Moreover, the post-conviction court found that during individual voir dire:

> [T]he issue of death qualification was controlled by the court and the court thoroughly explained the law to each juror and informed each juror they must be able to consider all three forms of punishment. With regard to nearly every juror, in addition to the court's extensive questioning, the defense team reiterated the death penalty was not automatic and each juror must be able to consider all forms of punishment.

The evidence does not preponderate against the findings of the post-conviction court. Moreover, each juror asserted that he or she could be fair and impartial, and no evidence was presented establishing that the jurors were anything but fair and impartial. Accordingly, trial counsel were not deficient, and any deficiency did not result in prejudice.

### 3. Failure to Object to the Prosecutor's Inappropriate Comments to Jurors

The petitioner maintains that trial counsel were ineffective in failing to object to the following statement made by the prosecutor to a juror during individual voir dire:

> I'm Jerry Woodall. I'm the Attorney General, and I'm the individual who has responsibility for making the determination as to whether the State should seek the death penalty or not, and we've made that decision in this case.

The petitioner asserts that trial counsel also should have objected to the following statement made by the prosecutor to another juror during individual voir dire:

87

I'm the Attorney General, and it fell upon me and is my responsibility to make the determination as to whether or not, if there's a finding of guilt of murder in the first degree, that the State should seek the death penalty, and I've made that decision.

The petitioner characterizes these statements as improper personal opinions.

This court has recognized that it is "unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citations omitted). The prosecutor's statements in the present case do not constitute personal opinions but are correct statements of the law. See, e.g., State v. Hester, 324 S.W.3d 1, 18-19 (Tenn. 2010) (discussing the discretion of the district attorney general in deciding to seek the death penalty). Furthermore, the petitioner has failed to present evidence establishing that the prosecutor's statements to two jurors resulted in a biased or unfair jury or otherwise affected the verdict or sentence. The petitioner is not entitled to relief regarding this issue.

### C. Failure to Seek Expert Assistance

The petitioner contends that trial counsel were ineffective in failing to investigate and seek expert assistance to present evidence of diminished capacity and intoxication during the guilt and penalty phases. The petitioner specifically contends that trial counsel were ineffective in failing to retain a neuropharmacologist, a neuropsychologist, a psychiatrist, and an addiction specialist.

Although trial counsel does not have an absolute duty to investigate particular facts or a certain line of defense, counsel has a duty to conduct a reasonable investigation or make a reasonable decision rendering a particular investigation unnecessary. Strickland, 466 U.S. at 691. Furthermore,

no particular set of detailed rules of counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted).

88

While there may be some cases where the only reasonable defense strategy involves consultation with experts or introduction of expert testimony, there are "'countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'" Harrington v. Richter, 562 U.S. 86, 106-07 (2011) (quoting Strickland, 466 U.S. at 689). Cases rarely exist in which the "'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." Id. (quoting Strickland, 466 U.S. at 689). The Tennessee Supreme Court recently recognized that in most cases, "the decision to select an expert, or which expert to select, constitutes one of the 'strategic' defense decisions that Strickland v. Washington shields from scrutiny." Kendrick, 454 S.W.3d at 475. "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" Hinton v. Alabama, 571 U.S. __, 134 S. Ct. 1081, 1089 (2014) (quoting Strickland, 466 U.S. at 690); see Kendrick, 454 S.W.3d at 474.

In determining whether trial counsel were deficient in failing to retain these experts, we must examine trial counsel's investigation of issues of intoxication and diminished capacity. Trial counsel met with the petitioner on numerous occasions and were aware of the petitioner's health issues, use of alcohol and prescription drugs, sleep deprivation, depression, and claims of extreme mental stress at the time of the shootings. Trial counsel received the petitioner's statement to the police in which the petitioner stated that he had five shots of vodka prior to the shootings, had not taken Xanax for days prior to the shootings, and was not intoxicated. Trial counsel were aware that the petitioner had submitted blood and urine samples following his arrest and obtained the various reports detailing the test results of the samples. They received documentation showing that police officers searched the petitioner's residence and seized multiple prescription bottles. They also obtained the report of Dr. Winston's evaluation of the petitioner, during which the petitioner denied that he was intoxicated at the time of the shootings.

Trial counsel retained Ms. Shettles as a mitigation specialist. Ms. Shettles gathered numerous records, including the petitioner's medical and pharmacy records. She interviewed witnesses regarding the petitioner's prior drug and alcohol use, his social history, and both his alcohol use and behavior before the shootings. Trial counsel also obtained information from witnesses regarding the petitioner's behavior and the odor of alcohol following the shootings and presented that evidence at the trial. Ms. Shettles learned that the petitioner's prescribed dosage of Xanax had been increased approximately one week prior to the shootings and discovered there were fewer Xanax pills in the petitioner's prescription bottle than she would have expected. Trial counsel also requested that Mr. Lax analyze the crime scene. Mr. Lax issued a report in which he

concluded that "based on the earlier phone call to TDOT, the amount of ammunition, [the petitioner's] comments to others present and the accuracy of the shots fired," Mr. Lax "could not offer any opinion that the crime scene evidence suggested that [the petitioner] was not fully aware of what he was doing."

Trial counsel retained Dr. Wilson, a clinical psychologist, to evaluate the petitioner. According to Dr. Wilson's testimony at trial, he met with the petitioner on four occasions for approximately eleven hours, during which time he conducted an interview and administered testing. Dr. Wilson reviewed police records; statements of witnesses; the petitioner's medical, education, employment, and social history; and his parents' social history. Dr. Wilson also met with the petitioner's children and parents. Dr. Wilson and lead counsel exchanged emails discussing the results of the toxicology report. Dr. Wilson issued a report in which he discussed the petitioner's history of use of alcohol, illegal drugs, and prescription drugs; his employment history; his history of accidents and injuries; his social history; the marital issues between the petitioner and Mrs. Jordan; the petitioner's problems with sleeping; and his recollection of the events prior, during, and after the shootings.

Dr. Wilson concluded in his report that the petitioner was significantly impaired at the time of the shootings, was not capable of conforming his behavior to the requirements of the law, and was not able to exercise reflection and judgment in order to premeditate. Dr. Wilson stated that the petitioner's inability to conform his conduct was the result of "a substantial impairment related to emotional disturbance, lack of sleep, and intoxication." He believed the petitioner's "level of intoxication was due to his drinking much more than was customary for him as well as his consuming an unknown amount of anxiolytic and narcotic analgesic medication." Dr. Wilson said that prior to the shootings, the petitioner was experiencing intense emotional distress and opined that the petitioner was substantially impaired due to the extreme emotional distress. Dr. Wilson opined:

> [The petitioner] has demonstrated a long history of ineptness in dealing with emotional and relationship problems. The culmination of his life-time experiences and the stormy relationship in which he was involved served to further impair his judgment, reasoning, reality testing and impulse control. His antianxiety medication had been increased and he was drinking heavily. I believe that he was experiencing episodes of dissociation and derealization during this time.

Dr. Wilson diagnosed the petitioner under Axis I with dissociative disorder not otherwise specified, major depressive disorder, generalized anxiety disorder, and alcohol abuse concurrent with anxiolytic and analgesic use and under Axis II with borderline

90

personality disorder. He further diagnosed the petitioner with alcohol intoxication and possible opioid and anxiolytic intoxication at the time of the offenses. Dr. Wilson testified at trial regarding the effects of alcohol and Xanax when combined.

Trial counsel also retained Dr. Caruso, a forensic psychiatrist, who evaluated the petitioner and concluded that although the petitioner was intoxicated and suffered from major depression at the time of the offenses, he was able to appreciate the nature and wrongfulness of his behavior and form the requisite mens rea at the time of the offenses. Dr. Caruso also diagnosed the petitioner with narcissistic personality disorder and sent an email to lead counsel characterizing the petitioner's complaints of memory deficits as "convenient." Dr. Caruso also found that the petitioner had a "BAL of 0.17 gm% approximately 5 hours after the offense[s]. Extrapolating from this point, [the petitioner's] BAL would be estimated to be between 0.24 and 0.27 gm% at the time of the various offenses." Dr. Caruso noted that the effects of alcohol are increased by the use of Xanax, hydrocodone, and Dolgic. Based upon Dr. Caruso's conclusions, trial counsel decided against calling him as a witness at trial.

Trial counsel interviewed Special Agents Harrison and Hopkins regarding their testing of the petitioner's blood and urine samples. Special Agent Harrison informed lead counsel that converting the petitioner's urine alcohol level to blood alcohol would involve "pure speculation." Special Agent Harrison testified at trial that the results of the urine sample only revealed that alcohol had been in the petitioner's bloodstream prior to the collection of the sample. He also testified that if a person consumed five shots of alcohol rapidly within an hour, the person's blood alcohol level would be approximately .10%.

Trial counsel discussed the issue of whether a reliable extrapolation could be made from the urine alcohol level with Dr. David Stafford, a toxicologist. Co-counsel testified that Dr. Stafford stated that the only inference that could be drawn from the alcohol level in the petitioner's urine was that the petitioner consumed alcohol at some point.

## 1. Addiction Specialist

The petitioner states in his brief that the post-conviction court did not make any findings addressing his claim that trial counsel were ineffective in failing to retain an addiction specialist. The petitioner, however, did not specifically raise trial counsel's omission as an issue in his petition for post-conviction relief or in any of his amended or supplemental petitions. The petitioner alleged in his amended petition that trial counsel were ineffective in failing to retain "a properly qualified and informed psychiatrist and/or other medical expertise [sic]." Even if this court interprets this claim as raising an issue regarding trial counsel's failure to retain an addiction specialist, the petitioner is not

entitled to relief. Although post-conviction counsel questioned Ms. Shettles regarding her notes in which she referenced Dr. Smith, post-conviction counsel failed to question lead counsel or co-counsel regarding whether they considered retaining an addiction specialist or why they did not do so. The petitioner failed to overcome the presumption that trial counsel's performance was the result of a strategic or tactical decision and, therefore, failed to establish deficient performance. See William Glenn Rogers v. State, No. M2010-01987-CCA-R3-CD, 2012 WL 3776675, at *58 (Tenn. Crim. App. Aug. 30, 2012), perm. app. denied (Tenn. Dec. 11, 2012) (holding that the petitioner failed to overcome the presumption that trial counsel's performance was the result of a strategic or tactical decision when the petitioner did not question trial counsel regarding the claims during the evidentiary hearing).

## 2. Psychiatrist

The post-conviction court found that trial counsel made a tactical decision to not retain an additional psychiatrist. Trial counsel retained Dr. Caruso, a forensic psychiatrist who evaluated the petitioner and opined that he was able to appreciate the nature and wrongfulness of his behavior and form the requisite mens rea at the time of the offenses. A defense attorney "is not required to question a diagnosis put forth by a professional expert in the field." Christa Gail Pike v. State, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at *54 (Tenn. Crim. App. Apr. 25, 2011), perm. app. denied (Tenn. Nov. 15, 2011).

Lead counsel testified that because he withdrew Dr. Caruso as an expert witness, the State was no longer entitled to see Dr. Caruso's report. Lead counsel believed that had he retained another mental health expert, the State, through cross-examination of the new expert, would have attempted to learn of Dr. Caruso's opinions and the new expert's reliance on Dr. Caruso's opinions. Lead counsel feared that once the jury learned that the petitioner had been evaluated by multiple experts, the jury would believe that the defense was "shopping for experts." While Dr. Caruso included mitigating factors in his report, lead counsel determined that he could establish the factors though Dr. Wilson's testimony. We agree with the post-conviction court that trial counsel made a tactical decision to not retain another psychiatrist. Trial counsel were not deficient in this regard.

We also conclude that even if trial counsel had decided to seek to retain an additional psychiatrist, they would have been unable to establish particularized need in order to obtain the funds. The trial court's obligation to afford an indigent defendant with the benefit of expert assistance does not arise unless the defendant makes a threshold showing of a "particularized need" for the expert assistance. See Tenn. Sup. Ct. R. 13, § 5(c)(1); State v. Barnett, 909 S.W.2d 423, 430-31 (Tenn. 1995). Particularized need is established:

92

when a defendant shows by reference to the particular facts and circumstances that the requested services relate to a matter that, considering the inculpatory evidence, is likely to be a significant issue in the defense at trial and that the requested services are necessary to protect the defendant's right to a fair trial.

Tenn. Sup. Ct. R. 13, § 5(c)(2).

Particularized need cannot be established and the trial court should deny requests for funding when the motion for funding includes only:

(A) undeveloped or conclusory assertions that such services would be beneficial;

(B) assertions establishing only the mere hope or suspicion that favorable evidence may be obtained;

(C) information indicating that the requested services relate to factual issues or matters within the province or understanding of the jury; or

(D) information indicating that the requested services fall within the capability and expertise of appointed counsel.

Id. at (c)(4). Unsupported assertions that an expert is necessary to counter proof offered by the State is not sufficient to establish particularized need. Barnett, 909 S.W.2d at 431. The defendant must reference facts and circumstances of the particular case and demonstrate that the appointment of the expert is necessary to ensure a fair trial. Id. The issue of whether a defendant has made the threshold showing is to be determined on a case-by-case basis. Id. We conclude that a request for funds to retain a second psychiatrist based upon the mere hope of a more favorable opinion is insufficient to establish particularized need.

To the extent that the petitioner alleges that Dr. Caruso was not properly qualified, we note that the United States Supreme Court has rejected a claim of ineffective assistance of counsel consisting of "the hiring of an expert who, though qualified, was not qualified enough." Hinton, 571 U.S. at __, 134 S. Ct. at 1089. The Court declined to "launch federal courts into examination of the relative qualifications of experts hired and experts that might have been hired." Id. Accordingly, the petitioner is not entitled to relief regarding this issue.

93

### 3. Neuropsychologist

The post-conviction court found that trial counsel considered retaining a neuropsychologist but made a tactical decision not to seek additional expert assistance. Co-counsel identified a document from his file listing other possible experts, including a neuropsychologist and a pharmacologist. Trial counsel, however, retained Dr. Wilson, who was able to discuss the petitioner's history of alcohol and drug abuse, his history of prescription drug usage, the various stressors in the petitioner's life, sleep deprivation, depression, and other mental difficulties. Trial counsel also retained Dr. Caruso, whose opinions were not favorable to the defense. In an effort to ensure that the State did not discover Dr. Caruso's opinions, trial counsel amended their notice to remove him as a witness and did not seek to retain any other mental health experts. Lead counsel explained that the State would have attempted to learn about Dr. Caruso's opinion through cross-examination of any other mental health expert retained after Dr. Caruso. Moreover, neither Dr. Wilson nor Dr. Caruso recommended that the petitioner be evaluated by a neuropsychologist. The post-conviction court found that while there was some evidence of head trauma in the petitioner's past, such evidence did not place an affirmative duty on trial counsel to retain a neuropsychologist. We agree and conclude that trial counsel made a reasonable, tactical decision against retaining a neuropsychologist. Trial counsel were not deficient in this regard.

### 4. Neuropharmacologist

The post-conviction court initially stated that trial counsel made a tactical decision not to retain a neuropharmacologist based upon a thorough investigation into the petitioner's past and the issues presented in the case. The post-conviction court later found that trial counsel were deficient in failing to retain a neuropharmacologist. The court specifically found that

> given the decision by trial counsel to present a defense based partially on intoxication and diminished capacity, trial counsel should have sought the services of a pharmacologist or neuro-pharmacologist to assist them in understanding the interactions between the prescription drugs taken by petitioner and petitioner's use of alcohol. Based upon the breadth of information possessed by trial counsel relating to petitioner's use of illegal drugs, anti-depressants, and abuse of prescription drugs along with evidence of petitioner's alcohol use, this court finds trial counsel were remiss in failing to recognize the need for such assistance.

The evidence presented at the post-conviction hearing establishes that while trial counsel considered retaining a pharmacologist, their decision not to retain a

94

pharmacologist or neuropharmacologist was a reasonable, tactical decision based on trial counsel's thorough investigation into the issues of intoxication and diminished capacity. Trial counsel obtained the petitioner's medical and pharmacy records and interviewed numerous witnesses regarding the petitioner's behavior before and after the shootings. They retained Dr. Wilson, who evaluated the petitioner and discussed the petitioner's history of alcohol and drug abuse, his prescription drug use, the interaction between alcohol and the prescription drugs, the various stressors experienced by the petitioner, his sleep deprivation, his mental difficulties, and the effects of these factors upon the petitioner's ability to premeditate during the shootings.

Trial counsel met with the TBI agents who tested the petitioner's urine and blood samples regarding the results. The defense sought opinions from two toxicologists regarding whether the petitioner's blood alcohol level at the time of the offenses could be determined based upon the petitioner's urine alcohol level. Both toxicologists stated that the petitioner's urine alcohol level only indicated that he had consumed alcohol at some point prior to providing the sample. Special Agent Harrison was able to provide an opinion regarding the petitioner's blood alcohol level after consuming five shots of vodka. While Dr. Caruso offered an opinion regarding an extrapolation of the petitioner's blood alcohol level, he incorrectly stated that the petitioner had a "BAL of 0.17 gm% approximately 5 hours after the offense[s]" and did not base his calculation on the petitioner's urine alcohol level. Dr. Caruso also opined that the petitioner's level of intoxication did not affect his ability to premeditate.

In light of the fact that Dr. Wilson was able to discuss the effects of various factors on the petitioner's ability to premeditate and two experts had told trial counsel that the petitioner's blood alcohol level at the time of the offenses could not be determined from his urine alcohol level, we conclude that trial counsel made a tactical decision against retaining an expert in the area of pharmacology based upon a thorough investigation into the issues of intoxication and diminished capacity. Once trial counsel obtained opinions from two experts on the ability to calculate the petitioner's blood alcohol level, they were not required to seek an opinion from a third expert. We conclude that trial counsel were not deficient in this regard and that the petitioner is not entitled to relief regarding this issue.

### D.  Failure to Investigate and Present Mitigating Evidence

The petitioner asserts that trial counsel were ineffective during the penalty phase of the trial in failing to investigate and present evidence of his prior head injuries, his cognitive impairment, and his family's history of alcoholism and mental illness. Counsel does not have a constitutional duty to present mitigating evidence at the penalty phase of a capital trial but has a duty to investigate and prepare for both the guilt and penalty

phases. See Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996). Counsel does not have an absolute duty to investigate particular facts or a certain line of defense; however, counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. Strickland, 466 U.S. at 691. In determining whether counsel breached this duty, this court reviews counsel's performance for reasonableness under prevailing professional norms, which include a context-dependent consideration of the challenged conduct as viewed from counsel's perspective at that time. Wiggins v. Smith, 539 U.S. 510, 523 (2003) (citations omitted).

Counsel is not required to investigate every conceivable line of mitigation evidence regardless of how unlikely the effort would be to assist the defendant at sentencing. Id. at 533. Likewise, counsel is not required to interview every conceivable witness. Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). This court will not conclude that counsel's performance was deficient for failing to discover all mitigating evidence, if, after a reasonable investigation, counsel has not been put on notice that such evidence exists. See Babbitt v. Calderon, 151 F.3d 1170, 1174 (9th Cir. 1998) (citation omitted).

We review the following factors in determining whether trial counsel were ineffective in failing to present mitigating evidence: (1) the nature and extent of the mitigating evidence that was available but not presented by trial counsel; (2) whether trial counsel presented substantially similar mitigation evidence to the jury in either the guilt or penalty phase of the proceedings; and (3) whether the evidence of applicable aggravating factors was so strong that mitigating evidence would not have affected the jury's determination. Goad, 938 S.W.2d at 371 (citations omitted).

We have concluded that trial counsel were not deficient for not retaining a neuropsychologist to evaluate the petitioner for cognitive impairments. With regard to the petitioner's family history, the post-conviction court found that while his family may have had some dysfunction, trial counsel testified that the petitioner's parents were highly respected in the community and that trial counsel determined that the parents' status could be viewed favorably to the jury. The post-conviction court found that trial counsel's strategy was informed and that "given the limited evidence indicating dysfunction within the petitioner's family unit and the high level of regard the community felt for petitioner's father, it appears counsel made an appropriate strategic choice." Nevertheless, the post-conviction court found that trial counsel were deficient in failing to present evidence of the family's history of alcoholism and mental illness but that the deficiency did not result in prejudice.

We likewise conclude that any deficiency did not result in prejudice. Evidence was presented at trial regarding the petitioner's illegal drug and alcohol abuse, his

96

prescription drug use, his mental health issues, his consumption of alcohol leading up to the shootings, and his sleep deprivation.  The evidence presented at trial to support those aggravating circumstances which the Tennessee Supreme Court held to be valid was "exceptionally strong."  See Jordan, 325 S.W.3d at 75.  Based upon the mitigating evidence presented and the strong evidence supporting the aggravating circumstances, the petitioner has failed to demonstrate a reasonable probability that the presentation of evidence of his family's history of alcoholism and mental illness would have resulted in a different sentence.

### E.  Failure to Ensure Preservation and Independent Testing of Blood and Urine

The petitioner maintains that trial counsel were ineffective in both phases of the trial by failing to ensure that the petitioner's blood and urine samples were preserved and independently tested.  The post-conviction court found that trial counsel were deficient but that the deficiency did not result in prejudice.  We agree with the post-conviction court's findings.

As the post-conviction court correctly found, any prejudice relates to the petitioner's lost ability to conduct further testing of the samples.  Although Dr. Lipman testified that the TBI Crime Laboratory did not accurately detect the level of Xanax in the petitioner's blood due to the limited calibration standards, the post-conviction court found that additional testing only would have demonstrated that the petitioner had a low therapeutic dose of the drug in his system at the time of the collection.  Dr. Farr testified that even with a high calibration standard, "if there was a clinically significant level of alprazolam in the blood [o]n the morning of the offenses, there would have been a detectable level of alprazolam in the blood at 9:50 p.m."  The petitioner failed to establish a reasonable probability that had this evidence been presented during the guilt phase, the verdict would have been different.  In light of the mitigating evidence and strong evidence support the aggravating circumstances presented during the penalty phase, the petitioner also failed to establish a reasonable probability that the jury would have returned a verdict other than death had the evidence been presented during the penalty phase.  See Goad, 938 S.W.2d at 371.

### F.  Failure to Challenge the Indictment
### Based Upon Race and Gender of the Grand Jury Foreperson

The petitioner contends that trial counsel were ineffective in failing to investigate discrimination in the race and gender of the grand jury foreperson and in failing to challenge the indictment on this basis prior to trial and on appeal.  The grand jury foreperson's role is "ministerial and administrative."  State v. Bondurant, 4 S.W.3d 662, 675 (Tenn. 1999).  "[T]he method of selection of the grand jury foreperson is relevant

only to the extent that it affects the racial composition of the entire grand jury." Id. The post-conviction court found that while evidence was presented indicating that women and African-Americans have not served as the grand jury foreperson of the Madison County Grand Jury in proportion to the population of Madison County, the petitioner failed to present any evidence establishing the composition of the grand jury as a whole or the systematic exclusion of minorities or other cognizable groups. The evidence presented during the evidentiary hearing does not preponderate against the post-conviction court's findings. The petitioner has failed to demonstrate that any deficiency resulted in prejudice and, therefore, is not entitled to relief regarding this issue.

### G. Denial of Assistance of Counsel after the Preliminary Hearing

The petitioner maintains that he was denied the assistance of counsel for four months between the preliminary hearing and the return of the indictment in violation of the Sixth and Eighth Amendments of the United States Constitution. This claim was not raised in the petitioner's petition for post-conviction relief or in any of his amended and supplemental petitions. "As a general rule, this court will not address post-conviction issues that were not raised in the petition or addressed in the trial court." Brown v. State, 928 S.W.2d 453, 457 (Tenn. Crim. App. 1996). Therefore, this issue is waived.

### H. Failure to Object to the Prosecutor's Opening Statements and Closing Argument

The petitioner maintains that trial counsel were ineffective in failing to object to the following statements made by the prosecutor during his opening statement in the guilt phase:

> There's going to be proof that will show you that there's no question that the [petitioner] had consumed alcoholic beverages. Now, we're not sure exactly when these were consumed, how much before or how much after. And the [petitioner] is going to rely upon a defense that as a result of consumption of alcohol, as well as depression that . . . he was significantly impaired by his emotional distress at the time of the crime[s] and, therefore, not capable of conforming his behavior to the law. That will be what the [petitioner], it's anticipated, will present in the sixth section of this case. . . .

> The State asks you to look at each and every witness. The State has the burden of proof to prove the [petitioner] is guilty beyond a reasonable doubt, to a moral certainty. I ask you to hold the State to that obligation. Just because a crime or a terrible crime has occurred, the State still has that responsibility and it should.

I know that the defense team has worked hard, and they will not waste your time any more than the government will. But as your hear this defense, I want you -- and remember that it's impaired by emotional distress, alcohol, and at the time of the crime[s], not capable of conforming his behavior to the law, and the Court will instruct you at the proper time on what the law is as to this, but as you go through these previous five sections, keeping in mind as this proof comes in, you need to look at each and every witness, their opportunity to observe this [petitioner], what the facts present which will demonstrate the [petitioner's] ability to conform his conduct to the requirements of the law.

Trial counsel's decisions of whether to object to the arguments of opposing counsel "'are often primarily tactical decisions.'" Lemar Brooks v. State, No. M2010-02451-CCA-R3-PC, 2012 WL 112554, at *14 (Tenn. Crim. App. Jan. 11, 2012), perm. app. denied (Tenn. May 16, 2012) (quoting Derek T. Payne v. State, No. W2008-02784-CCA-R3-PC, 2010 WL 161493, at *15 (Tenn. Crim. App. Jan. 15, 2010), perm. app. denied (Tenn. May 11, 2010)). Trial counsel could refrain from objecting for several valid tactical reasons, including not wanting to emphasize unfavorable evidence. Derek T. Payne, 2010 WL 161493, at *15. As a result, "testimony from trial counsel as to why he or she did not object to the allegedly prejudicial remarks is essential to determine whether trial counsel was ineffective." Lemar Brooks, 2012 WL 112554, at *14. Absent testimony from trial counsel or any other evidence indicating that counsel's decision was not tactical, "we cannot determine that trial counsel provided anything other than effective assistance of counsel." State v. Leroy Sexton, No. M2004-03076-CCA-R3-CD, 2007 WL 92352, at *5 (Tenn. Crim. App. Jan. 12, 2007), perm. app. denied (Tenn. May 14, 2007).

The petitioner did not present any evidence at the post-conviction hearing to indicate that trial counsel's failure to object to the prosecutor's statements was anything but a tactical decision. Trial counsel were not questioned at the evidentiary hearing about why they did not object to the statements. Accordingly, the petitioner has failed to establish that trial counsel were ineffective.

Even if trial counsel were deficient in failing to object to the prosecutor's statements, the deficiency did not result in prejudice. The post-conviction court found that the trial court instructed the jury that the statements of counsel were not evidence and that the court also properly instructed the jury on the law relating to premeditation, intoxication, and diminished capacity. We agree with the post-conviction court's findings and conclude that the petitioner is not entitled to relief with regard to this issue.

99

The petitioner submits that trial counsel were ineffective in failing to object to the prosecutor's comments during his closing arguments in the guilt phase, which the petitioner claims were based upon facts not in evidence and the misrepresentation of facts in evidence. The petitioner specifically challenges the prosecutor's statements that the petitioner drove around looking for his wife the night prior to the shootings; that the trigger assembly for the SKS rifle was found in the cabinet in the petitioner's kitchen and that he switched the assembly to make the rifle fully automatic on the morning of the shootings; that the petitioner completed a note to his family by 9:30 a.m. on the morning of the shootings; that the petitioner was intentionally concealing weapons when he was observed with his hands in his pockets during the shootings; and that the petitioner left the SKS rifle in his truck because he did not see his wife's car in the parking lot and was uncertain that she was at work. The petitioner failed to question trial counsel about not objecting to these statements at the evidentiary hearing and did not present any other evidence indicating that the decision not to object was anything but tactical. Accordingly, the petitioner has failed to establish that trial counsel were ineffective.

Furthermore, the post-conviction court found that most of the statements were not objectionable. The post-conviction court also found that while trial counsel should have objected to the State's rebuttal argument claiming that the petitioner drove around searching for Mrs. Jordan on the night before the shootings, there was not a reasonable likelihood that the jury would have reached a different verdict had the statements been excluded "given the trial court's instruction [that] the lawyers['] arguments are not evidence and considering the entirety of the proof submitted at trial." We likewise agree that any deficiency did not result in prejudice. The petitioner is not entitled to relief with regard to this issue.

Lastly, the petitioner contends that trial counsel were ineffective in failing to object to the prosecutor's comments during the closing arguments of the penalty phase in which he referred to the petitioner as the "angel of death," "belittle[ed]" mitigation evidence, and made "burden shifting" statements. Trial counsel raised the prosecutor's statements as issues on direct appeal.

With regard to the petitioner's claims regarding "burden shifting comments," the Tennessee Supreme Court held that the prosecutor's comments were not improper. Jordan, 325 S.W.3d at 59-60. The court also concluded that "the trial court corrected any improper impression made by the prosecutor's comments." Id. at 60. Accordingly, trial counsel were not deficient in failing to object to the comments, and any deficiency did not result in prejudice.

Although the petitioner asserts that the prosecutor improperly "belittled" the mitigating circumstances, the Tennessee Supreme Court concluded that "for the most

part, the prosecutor's remarks were aimed simply at the weight to be given the mitigating circumstances." Id. at 61. The court concluded that one of the prosecutor's comments was improper. Id. However, as the court noted, trial counsel did object to the comments, and the trial court issued a curative instruction. Id. The petitioner is not entitled to relief regarding this issue.

The Tennessee Supreme Court concluded that the prosecutor's statements regarding the "angel of death" during the rebuttal closing argument in the penalty phase was improper. Id. at 61-65. Therefore, trial counsel were deficient in failing to object to the prosecutor's remarks. Our supreme court, however, concluded that "[c]onsidering the parties' arguments as a whole, the trial court's instructions, and the evidence adduced during the sentencing proceeding of both aggravating and mitigating factors, we hold that the prosecution's references to the 'angel of death' did not affect the jury's verdicts." Id. at 66. We likewise conclude that there is no reasonable probability that, absent the errors, the jury would have imposed sentences other than death.

## I. Closing Arguments During Both Phases of the Trial

The petitioner submits that trial counsel were ineffective during closing arguments in both phases of the trial by failing to accurately represent his life history, assert a theory of defense, educate the jury on premeditation, expose the jury to facts not in dispute, and articulate the mitigation proof. The United States Supreme Court has observed that "[j]udicial review of a defense attorney's summation is . . . highly deferential." Yarbrough v. Gentry, 540 U.S. 1, 6 (2003). Although the right to effective assistance of counsel extends to closing arguments, counsel "has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." Id. at 5-6. The petitioner failed to question trial counsel regarding these claims at the evidentiary hearing. As a result, the petitioner has not established that trial counsel's performance during closing arguments was anything but the result of a tactical decision. See William Glenn Rogers, 2012 WL 3776675, at *58. Furthermore, given the strength of the evidence of guilt and of the aggravating circumstances, we conclude that there is not a reasonable probability that any additional emphasis on these factors during closing arguments would have affected the jury's verdicts in either phase of the trial.

## J. Improper Handling of Witnesses

The petitioner raises several issues of ineffective assistance of counsel claiming that trial counsel did not elicit crucial testimony or challenge improper testimony from several witnesses. He specifically claims that trial counsel failed to (1) elicit testimony regarding attempts to commit him to a mental institution; (2) challenge protected,

101

privileged testimony; (3) object to "conflated legal concepts"; (4) object to improper testimony from numerous witnesses; and (5) properly cross-examine witnesses.

### 1. Failure to Elicit Testimony Regarding Attempts to Commit Petitioner to a Mental Institution

The petitioner contends that trial counsel were ineffective in failing to question Barbara Surratt on cross-examination regarding her conversation with Mrs. Jordan during which Mrs. Jordan informed her that the petitioner's mother stated that the petitioner needed to be involuntarily committed to a mental institution. Lead counsel testified that he did not question Ms. Surratt about the statement because he believed that the statement constituted "double hearsay." Lead counsel also explained that any questions about the conversation could have opened the door to any other statements made by Mrs. Jordan during the conversation. The petitioner does not challenge lead counsel's assertion that the statement constituted "double hearsay." The petitioner also does not allege that each statement fell within an exception to the hearsay rule. See Tenn. R. Evid. 805 ("Hearsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule[.]"). The petitioner is not entitled to relief regarding this issue.

### 2. Failure to Challenge Protected, Privileged Testimony

The petitioner maintains that trial counsel were ineffective in failing to file a motion in limine or otherwise challenge the testimony of Linda Sesson Taylor, who was Mrs. Jordan's attorney. He asserts that Ms. Taylor's testimony violated attorney-client privilege. The petitioner, however, failed to question trial counsel at the evidentiary hearing regarding the claim and failed to present any evidence during the hearing to support this claim. Furthermore, this court has recognized that the purpose of the attorney-client privilege is to "'protect the client and to foster full communication with the attorney. Because the privilege exists to protect the client, it belongs only to the client and thus may not be asserted by a third party.'" State v. Jeffrey Scott, No. W2009-00707-CCA-R3-CD, 2011 WL 2420384, at *24 (Tenn. Crim. App. June 14, 2011), perm. app. denied (Tenn. Oct. 18, 2011) (quoting State v. Tracy F. Leonard, No. M2001-00368-CCA-R3-CD, 2002 WL 1987963, at *8 (Tenn. Crim. App. Aug. 28, 2002)). The petitioner does not have standing to assert Mrs. Jordan's privilege, and trial counsel were not deficient in failing to challenge Ms. Taylor's testimony on this basis.

### 3. Failure to Object to "Conflated Legal Concepts"

The petitioner argues that the State "conflated legal concepts" while questioning Dr. Wilson and Dr. Matthews regarding whether the petitioner understood and

102

appreciated the wrongfulness of his conduct when no insanity defense was asserted. The petitioner further argues that trial counsel were ineffective in failing to object to the State's line of questioning. The petitioner, however, did not question trial counsel at the evidentiary hearing about their failure to object to this line of questioning. Furthermore, the post-conviction court found that while the State appeared to have misstated the standard for diminished capacity and conflated it with the standard for insanity, the State's actions did not constitute an intentional attempt to mislead the jury. The post-conviction court also found that trial counsel attempted to clear up any ambiguities during cross-examination; that the State did not misstate the law during its closing argument but focused on the petitioner's ability to premeditate; and that the trial court provided the jury with a proper instruction of the law on diminished capacity. We agree with the post-conviction court's findings and conclude that the petitioner is not entitled to relief regarding this issue.

### 4. Failure to Object to Improper Testimony

#### a. Hearsay

In a footnote in his brief, the petitioner challenges TBI Agent Scott Lott's testimony at trial that he was told that a gun he saw on the kitchen bar had been on top of the refrigerator as inadmissible hearsay. The petitioner asserts that trial counsel were ineffective in failing to object to the testimony. The petitioner, however, failed to question trial counsel at the post-conviction hearing regarding their failure to object to the testimony or otherwise establish deficient performance. See William Glenn Rogers, 2012 WL 3776675, at *58. Furthermore, we conclude that any deficiency did not result in prejudice.

#### b. Rebuttal Testimony

As part of the defense at trial, trial counsel called as the first witness Investigator Miller, who testified regarding the petitioner's statement and the collection of the blood and urine samples. Trial counsel then presented an additional seven witnesses to support the defense of intoxication. The following day, the State recalled Investigator Miller in rebuttal to testify regarding his belief that the petitioner was not intoxicated and the additional statements made by the petitioner. The petitioner contends that Investigator Miller's rebuttal testimony violated the witness sequestration rule provided in Tennessee Rule of Evidence 615 and that trial counsel were ineffective in failing to challenge the testimony on that basis.

Rule 615 of the Tennessee Rules of Evidence provides in pertinent part that "[a]t the request of a party the court shall order witnesses, including rebuttal witnesses,

excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements." The purpose of the rule of sequestration is to "prevent one witness from hearing the testimony of another and adjusting his testimony accordingly." State v. Harris, 839 S.W.2d 54, 68 (Tenn. 1992). The petitioner does not allege that Investigator Miller remained in the courtroom after testifying for the defense and failed to otherwise establish that Investigator Miller's testimony violated Rule 615.

It appears that the petitioner challenges Investigator Miller's testimony as improper rebuttal testimony. The petitioner, however, did not question trial counsel at the evidentiary hearing regarding their failure to object to Investigator Miller's testimony as improper rebuttal testimony or otherwise present evidence that trial counsel were deficient. Investigator Miller's observations, the petitioner's additional statements, and his ability to provide details were relevant to rebut the petitioner's intoxication defense. Furthermore, even if trial counsel were deficient, such deficiency did not result in prejudice. The petitioner is not entitled to relief regarding this issue.

### c. Irrelevant and Prejudicial Testimony

The petitioner contends that trial counsel were ineffective in failing to challenge the following testimony as irrelevant and prejudicial: (1) Larry Taylor's testimony regarding his state of mind at the time of the shootings; (2) Sergeant Mike Thomas' testimony regarding his speed and state of mind while traveling to the scene and his testimony that the term "machine gun" "gets your attention really quick"; (3) Officer Ted Maxwell's testimony comparing the caliber of his firearms to the petitioner's firearms; (4) Officer Rodney Anderson's response to the State's question, "Eye-opening day for you?"; (5) Ricky Simpson's testimony that the petitioner appeared to have been laughing; (6) EMT Trent Harris' testimony regarding his transportation of Mr. Gordon to the hospital and his description of the insertion of breathing tubes; (7) Paramedic Eric Leath's testimony about "blood tissue lying all around, pooled around [Mrs. Jordan's] head" and about Mr. Hopper's "gasping-type breaths" and his description of the intubation procedure involving Mr. Hopper; (8) the testimony of Dr. Herbert Sutton and Dr. David James regarding the extraordinary lifesaving measures performed on Mr. Hopper; and (9) TBI Agent Cathy Ferguson's testimony regarding her speed while responding to the scene and her observations of "carnage," a large pool of blood, and "brain matter or tissue in the pool of blood."

We note that the petitioner failed to question trial counsel at the evidentiary hearing about their failure to object to the testimony. As noted by the post-conviction court, trial counsel objected to the State's repeatedly summarizing Sergeant Thomas' testimony and referencing his speed in response to the radio dispatch of the shootings.

104

With regard to Ricky Simpson's testimony, he clarified on cross-examination that he only glimpsed at the petitioner briefly and that what he interpreted as laughing could have been some other facial expression. The post-conviction court found that the testimony of EMT Harris and Paramedic Leath was "probative" to show the extent of the injuries to Mr. Gordon and Mr. Hopper and to establish that their deaths were the result of the injuries and not intervening medical care. The post-conviction court also found that although the testimony of Dr. James and Dr. Sutton was "gruesome," the testimony was relevant to establish the cause of death and the extent of Mr. Hopper's injuries. With regard to Agent Ferguson's testimony, the post-conviction court found that her statements were not improperly inflammatory or prejudicial given the severity of the injuries and the number of casualties. The evidence does not preponderate against the post-conviction court's findings. The petitioner has failed to establish that trial counsel were deficient or that any deficiency resulted in prejudice.

### d. Prejudicial, Cumulative Testimony

The petitioner submits that trial counsel were ineffective in failing to object to cumulative testimony regarding the scene of the crow's nest following the shootings, the victims' injuries, and the descriptions of the shootings over police radio dispatch. The petitioner, however, failed to specify in his brief the testimony that he claims was objectionable. He also failed to question trial counsel at the evidentiary hearing about their failure to object to the testimony. In denying the claim, the post-conviction court found:

> The state was entitled to present evidence from each of the eye-witnesses and first responders. The observations of the witnesses were critical to the state's case and probative of the issues of identity and state of mind. Additionally, . . . testimony regarding the injuries sustained by the victims was relevant to establishing cause of death or the elements of the offense. Finally, the description of the offense as received from police dispatch was relevant to demonstrate why each of the responding officers took certain actions. Thus, even if counsel were somehow deficient in this regard, the court finds petitioner has failed to demonstrate he was prejudiced by counsel['s] alleged deficiencies and finds petitioner is not entitled to relief based upon this claim.

We conclude that trial counsel were not deficient in failing to object to the testimony and that any deficiency did not result in prejudice.

105

### e. Improper Ballistics Testimony

The petitioner maintains that trial counsel were ineffective in failing to object to testimony from Dr. Staci Turner and Dr. Amy McMaster regarding ballistics. He argues that Dr. Turner improperly testified concerning black talon bullets and the weapons used to shoot them, the anatomy of a projectile, and whether fragments she recovered could have been shot from a high velocity firearm. He also argues that Dr. McMaster's testimony about the types and calibers of the bullets recovered was improper. The petitioner asserts that while Dr. Turner was certified as an expert in pathology, forensic pathology, and anatomical pathology and Dr. McMaster was certified as an expert in forensic pathology, neither doctor was certified as an expert in ballistics.

The petitioner did not question trial counsel at the evidentiary hearing concerning their failure to object to the testimony. Furthermore, this court has recognized that "[a]n expert's qualification in one area will not necessarily preclude testimony concerning a closely related subject." State v. Pulliam, 950 S.W.2d 360, 364 (Tenn. Crim. App. 1996) (citing Sotka v. State, 503 S.W.2d 212, 226 (Tenn. Crim. App. 1972)). Dr. McMaster acknowledged that she was not an expert in firearms and identified the types and caliber of bullets recovered as consistent with those she had observed in other cases. Finally, TBI Agent Shelly Betts, the ballistics expert presented by the State, offered testimony similar to that of Dr. Turner and Dr. McMaster. Thus, even if trial counsel were deficient, such deficiency did not result in prejudice.

### 5. Failure to Properly Cross-Examine Witnesses

The petitioner avers that trial counsel were ineffective in failing to (1) fully cross-examine Larry Taylor regarding Johnny Emerson's affair with Mrs. Jordan and (2) confront Paul Forsythe with "discrepant testimony" from Sonny Grimm, who accompanied Mr. Forsythe to the scene. The petitioner did not question trial counsel at the evidentiary hearing regarding these claims. He also failed to present the testimony of Mr. Taylor at the post-conviction hearing. Absent Mr. Taylor's testimony as to his knowledge of the relationship between Mr. Emerson and Mrs. Jordan, we cannot conclude that trial counsel was deficient in their cross-examination of Mr. Taylor. The petitioner is not entitled to relief with regard to this claim.

The petitioner contends that after Mr. Forsythe testified that when the petitioner pointed a gun at Mr. Gordon, Mr. Gordon raised his hands and attempted to plead for his life, trial counsel should have confronted Mr. Forsythe on cross-examination with Mr. Grimm's statement that Mr. Gordon did not gesture or speak to the petitioner before he was shot. As noted by the post-conviction court, on cross-examination, Mr. Forsythe acknowledged that when he gave a statement to the police on the day of the shootings, he

106

did not mention Mr. Gordon's saying anything to the petitioner. Accordingly, any deficiency by trial counsel did not result in prejudice.

### K. Failure to File a Motion to Suppress the Petitioner's Statements to the Police

The petitioner faults trial counsel for failing to seek to suppress his statements to the police as involuntary. According to the petitioner, his intoxication, prescription drug use, addiction, and sleep deprivation were factors affecting the voluntariness of his statements, and trial counsel could have challenged the statements as involuntary had they retained the appropriate experts and conducted an adequate investigation into his intoxication.

At trial, Sergeant Johnny Briley of the Tennessee Highway Patrol testified that he arrived at the scene of the petitioner's arrest as two officers were placing handcuffs on the petitioner. Sergeant Briley said the petitioner stated, "She f***** me over, Johnny." Sergeant Briley replied, "No, she didn't, David." The petitioner said, "Yes, she did. She f***** me over." Sergeant Briley stated, "No, David, you f***** up."

The petitioner was then placed in a patrol car with Officer Rodney Anderson and Officer Tikal Greer and transported to the jail. Officer Anderson testified that the petitioner spontaneously told them that

> he could have cut the police in half with his weapon, that he had full auto. He stated that his wife's dead and she's full of holes. He stated she drove him crazy . . . by f****** around on him, and he advised that he shot her with her brother's gun. He also stated that he feels sorry for his daughters, and that Mrs. Jordan wouldn't be f****** around on anybody else.

The petitioner said the other people "just got in the way" and asked how many people were hurt. He also said that his wife "hurt him and tore his heart out" and that he had been "going crazy" for a month.

In explaining why he did not file a motion to suppress the petitioner's statements to the police, lead counsel testified that he believed the statements were voluntary. The post-conviction court found that the petitioner was in custody when he made the statements and that he was not advised of his <u>Miranda</u> rights prior to making the statements. The court also found that the petitioner's statements were "spontaneous" and were not the result of police interrogation. The court concluded that, as a result, the statements were not given in violation of <u>Miranda</u>. The post-conviction court did not address the petitioner's claim that the statements were otherwise involuntary.

The voluntariness test is grounded in both the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment and recognizes that coerced confessions are inherently unreliable. Dickerson v. United States, 530 U.S. 428, 433 (2000); State v. Climer, 400 S.W.3d 537, 567-68 (Tenn. 2013). The voluntariness test is distinct from Miranda. Dickerson, 530 U.S. at 434-35; Climer, 400 S.W.3d at 568. While Miranda "asks whether a suspect received certain warnings and knowingly and voluntarily waived certain rights, . . . the essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion." Climer, 400 S.W.3d at 568 (citing Dickerson, 530 U.S. at 433-35; State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996)). "'Statements and confessions not made as a result of custodial interrogations must also be voluntary to be admissible.'" State v. Tyler James Reed, No. M2012-02542-CCA-R3-CD, 2013 WL 6123155, at *11 (Tenn. Crim. App. Nov. 20, 2013), perm. app. denied (Tenn. Apr. 14, 2014) (quoting State v. Thacker, 164 S.W.3d 208, 248 (Tenn. 2005)).

Voluntariness must be determined upon examining the totality of the circumstances surrounding the giving of a confession, "'both the characteristics of the accused and the details of the interrogation.'" Climer, 400 S.W.3d at 568 (quoting Dickerson, 530 U.S. at 434). Circumstances relevant to this determination include:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

Id. (citations omitted).

While the petitioner presented various mental health experts at the evidentiary hearing to testify regarding his mental state and intoxication at the time of the shootings, none of these experts specifically addressed the effect of his mental state and intoxication on his ability to make voluntary statements to the police. As a result, the petitioner has not demonstrated that his statements were involuntary due to intoxication and mental health problems. Rather, the evidence presented established that shortly after his arrest, the petitioner made spontaneous statements to police officers. These statements were not made as a result of any interrogation or coercion by the officers. The petitioner has failed

to establish that these statements were involuntary. Accordingly, the petitioner has failed to demonstrate that had trial counsel sought to suppress these statements, the motion to suppress would have been granted.

We also conclude that the petitioner has failed to demonstrate that his statements were involuntary. The post-conviction court found that despite the testimony of various experts regarding the petitioner's mental state, "it appears, based upon [Investigator] Miller's observations, petitioner was able to understand the warnings provided him and was capable of waiving his rights and speaking to police about the events surrounding the murders." The post-conviction court noted that Investigator Miller testified that he did not believe the petitioner was intoxicated when he made the statements, and the petitioner denied that he was under the influence of drugs or alcohol at the time. The court also noted that Investigator Miller said the petitioner was steady on his feet, was able to answer questions, appeared "very coherent," and was able to sign the waiver of rights form and his statement. The evidence does not preponderate against the post-conviction court's findings. The petitioner is not entitled to relief with regard to this issue.

### L.  Failure to File Motion to Suppress Evidence
### Obtained During the Search of Petitioner's Home

The petitioner contends that trial counsel were ineffective in failing to challenge the initial warrantless entry into his home following his arrest during which officers discovered a pistol and the letter written by the petitioner. At trial, Sergeant Chad Lowery of the Madison County Sheriff's Department testified that shortly after the petitioner was apprehended, he was instructed to go to the petitioner's home to "check the welfare of some children that might have possibly been in the home." While looking for any children in the home, Sergeant Lowery saw a handwritten note on the kitchen counter, a gun on top of the refrigerator, and several other firearms in the house.

Lead counsel testified that he did not believe that a legal basis to challenge the search existed. The post-conviction court found that the initial entry was based on exigent circumstances. The court noted that no one could account for the petitioner's children at that time and that the police entered the residence to determine the welfare of the children. The court found that the evidence was in plain view of the officer.

The United States Constitution and the Tennessee Constitution prohibit unreasonable searches and seizures. U.S. Const. amend. IV; Tenn. Const. art. I, §7. Generally, law enforcement officers cannot conduct a search without first obtaining a valid warrant. California v. Carney, 471 U.S. 386, 390 (1985); R.D.S. v. State, 245 S.W.3d 356, 365 (Tenn. 2008). One of the exceptions to the requirement of a search warrant is probable cause to search with exigent circumstances. See State v. Meeks, 262

S.W.3d 710, 722 (Tenn. 2008); State v. Brock, 327 S.W.3d 645, 681 (Tenn. Crim. App. 2009). The petitioner does not assert that the officer lacked probable cause to enter the home. Rather, he maintains that there were no exigent circumstances justifying the entry.

Exigent circumstances arise where "'the needs of law enforcement [are] so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'" Meeks, 262 S.W.3d at 723 (quoting Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006)). Circumstances that have been found to be sufficiently exigent to render a warrantless search of a home reasonably include, but are not limited to: "(1) hot-pursuit, (2) to thwart escape, (3) to prevent the imminent destruction of evidence, (4) in response to an immediate risk of serious harm to the police officers or others, and (5) to render emergency aid to an injured person or to protect a person from imminent injury." Id. (citations omitted). In determining the constitutionality of a warrantless search, courts must examine whether "the circumstances give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant." Id. Courts must evaluate the exigency of the circumstances based upon the totality of the circumstances known to the officer at the time of the entry. Id. The circumstances must be viewed objectively, and the officer's subjective intent is irrelevant. Id. "Where the asserted ground of exigency is risk to the safety of the officers or others, the governmental actors must have an objectively reasonable basis for concluding that there is an immediate need to act to protect themselves and others from serious harm." Id. at 724.

The petitioner did not present any evidence at the post-conviction hearing to support his claim that had trial counsel challenged the initial warrantless entry into the home, the motion to suppress would have been granted. Rather, the limited evidence of the circumstances surrounding the initial warrantless entry that was presented at trial established that after the petitioner was apprehended for shooting multiple people, including his wife, officers learned that children were living in the petitioner's home, and no one could account for the petitioner's children. Given the petitioner's actions, the officers' concern for the safety of the children was reasonable. Accordingly, exigent circumstances justified the officer's initial warrantless entry into the petitioner's home. The petitioner does not challenge the post-conviction court's finding that the items were in the officer's plain view. We conclude that had trial counsel filed a motion to suppress the evidence discovered during the initial entry into the petitioner's home, the motion would have been denied.

### M. Failure to File Various Discovery and Evidentiary Motions

The petitioner maintains that trial counsel were ineffective in failing to challenge Dr. Matthews' "long, irrelevant, prejudicial narrations." In his brief, the petitioner does

not identify the testimony to which he claims trial counsel should have objected and does not state how the testimony was irrelevant or prejudicial. Accordingly, this issue is waived. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

The petitioner faults trial counsel for not filing a motion challenging the expert testimony of Dr. Matthews as failing to meet the criteria for admissibility of expert testimony set forth in McDaniel v. CSX Transp., Inc., 955 S.W.2d 257 (Tenn. 1997) and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). The admission of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702. Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703. Expert testimony also must be relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

In McDaniel, the Tennessee Supreme Court adopted a non-exclusive list of factors for courts to consider when determining the reliability of expert testimony:

111

(1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

955 S.W.2d at 265. In exercising its gatekeeping function, the trial court must ensure that "'an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Brown v. Crown Equip. Corp., 181 S.W.3d 268, 275 (Tenn. 2005) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999) (holding that a trial court may consider the factors set forth in Daubert, 509 U.S. at 593-94, in assessing the reliability of nonscientific expert testimony in accordance with the Federal Rules of Evidence)).

During the evidentiary hearing, post-conviction counsel questioned Dr. Martell regarding the "forensic behavioral analysis," the method employed by both Dr. Matthews and Dr. Martell in evaluating the petitioner. This method assesses a person's mental capacity through an analysis of his or her behavior at the time of the offense. Dr. Martell testified that he believed a detailed reconstruction of a defendant's behavior before, during, and after the offense was "standard forensic practice." He did not believe that the method was taught only by his mentor, Dr. Park Dietz. Dr. Martell did not know whether the method was taught in graduate school, but he employed the method as part of his post-doctoral training. He also had trained others on the method. Post-conviction counsel objected to Dr. Martell's testimony based upon the criteria set forth in McDaniel and Daubert. The post-conviction court found that Dr. Martell was qualified to render an opinion and stated that the petitioner could explore the issue further as part of "impeachment." In its order, the post-conviction court also found no basis upon which trial counsel could have challenged Dr. Matthews' testimony.

The petitioner contends that the "forensic behavioral analysis" fails to meet the criteria set forth in McDaniel. He argues that the method "has not been tested; it has not been subjected to peer review or publication; no potential rate of error is known; this methodology is not generally accepted in the scientific community; and the methodology was not developed independent of litigation." However, the McDaniel factors need not be applied rigidly. State v. Copeland, 226 S.W.3d 287, 302 (Tenn. 2007); Brown, 181 S.W.3d at 277. Rather,

[t]he reasonableness of the McDaniel factors in assessing reliability depends upon the nature of the issue, the witness's particular expertise, and

112

the subject of the expert's testimony. The <u>McDaniel</u> factors may apply, subject to the trial court's discretion, when they are reasonable measures of the reliability of the expert testimony.

<u>Id.</u> (citations omitted).

At trial, Dr. Matthews testified that he was a forensic psychiatrist and was board certified in forensic psychiatry. Dr. Matthews explained that while psychiatry involves the diagnosis and treatment of mental diseases, forensic psychiatry is a "sub-specialty of psychiatry that exists for the purpose of answering questions that the legal system asks." Dr. Matthews was on the faculty at several universities and has been practicing forensic psychiatry since 1981. He conducted forensic evaluations for the United States Army and taught forensic psychiatry to the physicians at Trippler Army Medical Center. He served as an examiner with the American Board of Psychiatry and Neurology to determine whether young psychiatrists were qualified to practice psychiatry and forensic psychiatry. He also served on the committee that determines the standards for practicing forensic psychiatry and drafts the certifying examination and was involved in determining the standards for court-appointed psychiatrists and psychologists in Hawaii and Arkansas. He was a member of the American Academy of Psychiatry and the Law, the primary professional organization in forensic psychiatry. He had written one or two books, chapters in other books, and numerous journal articles. Dr. Matthews had served as a court-appointed expert and had been retained by both the prosecution and the defense in numerous cases. He had been qualified as an expert in forensic psychiatry and had testified in 100 to 200 cases.

Dr. Matthews interviewed the petitioner and reviewed various documents, police reports, and statements. He met with the petitioner for approximately six hours and conducted a mental status examination. Based upon his review of the records, his interview with the petitioner, and the application of the "forensic behavioral analysis," Dr. Matthews rendered an opinion regarding the petitioner's mental state at the time of the offenses.

While the petitioner bases his claims on Dr. Logan's testimony, Dr. Logan acknowledged that he was an experimental psychologist and was not qualified in the field of forensic psychology. Rather, Dr. Martell testified that the method employed was generally accepted in the field of forensic psychiatry and that he employed the same method in evaluating the petitioner for purposes of the post-conviction hearing. As Dr. Matthews explained at trial, the purpose of forensic psychiatry is to answer questions posed by the legal system. Thus, the <u>McDaniel</u> factor requiring an examination of whether the research had been conducted independent of litigation is not a reasonable measure of the reliability of Dr. Matthews' testimony. <u>See</u> <u>Brown</u>, 181 S.W.3d at 277.

113

Rather, we conclude that Dr. Matthews employed in the courtroom "the same level of intellectual rigor that characterizes the practice of an expert" in the field of forensic psychiatry. Id. at 275. The post-conviction court properly found that trial counsel had no basis on which to challenge the admissibility of Dr. Matthews' testimony. The petitioner is not entitled to relief with regard to this issue.

The petitioner asserts that trial counsel were ineffective in failing to file a motion to limit the size of the crime scene photographs and request that they be displayed in black and white rather than in color. The petitioner, however, failed to question trial counsel at the evidentiary hearing regarding their failure to file such a motion. As noted by the post-conviction court, trial counsel were able to prevent some crime scene photographs from being admitted at trial. Even if trial counsel were deficient, the petitioner has failed to demonstrate a reasonable probability that, but for the deficiency, the result of the proceedings would have been different.

The petitioner maintains that trial counsel were ineffective in failing to file a motion seeking treatment and preservation of his mental health. According to the petitioner, trial counsel should have sought appropriate psychiatric and medical care for him while he was incarcerated awaiting trial and during trial. In denying the claim, the post-conviction court found as follows:

> On March 8, 2005, approximately two months after his arrest, petitioner was evaluated by Dr. Winston of Pathways Clinic and found to be competent to proceed to trial. The report indicates jailers at the . . . [j]ail informed Dr. Winston petitioner's behavior was normal. Dr. Winston further reported petitioner understood the role of the judge, prosecuting attorney, jury and witnesses. Dr. Winston states petitioner was aware of the nature of the charges pending against him and was aware of the consequences of his actions and the possible penalties he faced. Dr. Winston reported petitioner denied having hallucinations or delusions and petitioner indicated he was eating well and sleeping well and felt his energy level was good and denied having any suicidal ideation. . . . This court further notes, during this time petitioner was also being evaluated by Dr. Caruso and Dr. Wilson; thus, this court does not find counsel were ineffective in failing to move the court to provide additional psychiatric and medical care to petitioner while he awaited trial.

The evidence does not preponderate against the findings of the post-conviction court. The petitioner is not entitled to relief with regard to this issue.

114

## N.  Failure to Seek Jury Instructions

The petitioner faults trial counsel for failing to request jury instructions during the penalty phase for the following mitigating circumstances:  residual doubt as to mental state, mental disorders, neuropsychological impairments, sleep disorder and deprivation, adverse social history, history of depression and anxiety disorders, panic attacks, head trauma, drug-induced psychosis, headaches, and chronic pain.  During the penalty phase, the trial court instructed the jury as to the following mitigating circumstances:

> Tennessee law provides that in arriving at the punishment, the jury shall consider . . . any mitigating circumstances raised by the evidence which shall include but are not limited to the following:
>
> Number 1:  The murder was committed while the [petitioner] was under the influence of extreme mental or emotional disturbance.
>
> Number 2: The capacity of the [petitioner] to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment.
>
> Number 3: The [petitioner] has adjusted well to the structure of prison life.
>
> Number 4: The [petitioner] has expressed remorse, has accepted responsibility for his actions and is willing to accept punishment for his crimes.
>
> Number 5:  The [petitioner] has a loving and supportive family.
>
> Number 6: Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing. That is, you shall consider any aspect of the [petitioner's] character or record or any aspect of the circumstances of the offense favorable to the [petitioner] which is supported by the evidence.

Jordan, 325 S.W.3d at 36 (citing Tenn. Code Ann. § 39-13-204(j)(2), (8), (9)).  In light of the mitigating circumstances instructed by the trial court to the jury, we cannot conclude that trial counsel were deficient in failing to request the additional mitigating circumstances or that any deficiency resulted in prejudice.

## O. Failure to Develop and Present Evidence of Disproportionality

The petitioner submits that trial counsel were ineffective in failing to develop and present evidence of disproportionality of his death sentences in the trial court and in presenting only a limited argument regarding disproportionality on appeal. He further submits that his death sentences are disproportionate given his cognitive impairments, mental illness, intoxication at the time of the offenses, and inability to premeditate the offenses. Both the Tennessee Supreme Court and this court thoroughly analyzed the issue of proportionality on direct appeal and concluded that the petitioner's death sentences were not disproportionate to the penalty imposed for similar crimes. See Jordan, 325 S.W.3d at 76-79; David Lynn Jordan, 2009 WL 1607902, at *47-51. The petitioner has failed to establish that any additional evidence or argument would have resulted in a different conclusion and, therefore, is not entitled to relief regarding this issue.

## II. Venue in Madison County

The petitioner asserts that the trial court erred in failing to change the venue of the trial from Madison County *sua sponte* due to the extent of the publicity and the impact of the shootings on the community. The petitioner further asserts that the failure to change the venue violated his rights to a fair trial and to due process. This issue is waived due to the petitioner's failure to raise the claim on direct appeal. See Tenn. Code Ann. § 40-30-106(g) (A ground for post-conviction relief is waived "if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented.").

## III. Prosecutorial Misconduct

The petitioner maintains that the State committed prosecutorial misconduct by destroying his blood and urine samples without prior notice to the defense and cites to State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), to support his claim. Trial counsel raised this issue on direct appeal, and this court held that the petitioner was not entitled to relief on the claim. See David Lynn Jordan, 2009 WL 1607902, at *34-35. As a result, the post-conviction court found that the claim was previously determined.

Tennessee Code Annotated section 40-30-106(h) provides:

> A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to

116

call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

A claim that is previously determined cannot form a basis for post-conviction relief. Cauthern v. State, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004). The petitioner maintains that due process concerns overcome the bar on previously determined issues and invoke the exceptions of the law of the case doctrine in urging this court to reconsider the Ferguson issue. The petitioner asserts that the evidence pertaining to the issue of the destruction of the samples presented during the post-conviction hearing was substantially different than the evidence presented by trial counsel in the trial court because trial counsel were ineffective in discovering and presenting the evidence.

"[U]nder the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal." Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd., 975 S.W.2d 303, 306 (Tenn. 1998). The law of the case doctrine is not a constitutional mandate but a "longstanding discretionary rule of judicial practice which is based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited." Id. There are three "limited circumstances" that may justify a departure from the law of the case doctrine and subsequent reconsideration of an issue decided in a previous appeal:

> (1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal.

Id.

"No Tennessee court has yet invoked the law of the case doctrine's exceptions, however, to support reconsideration of a previously determined issue in the post-conviction context." William G. Allen v. State, No. M2009-02151-CCA-R3-PC, 2011 WL 1601587, at *8 (Tenn. Crim. App. Apr. 26, 2011), perm. app. denied (Tenn. Aug. 25, 2011). "A petitioner may not relitigate a previously determined issue by presenting additional factual allegations." Cone v. State, 927 S.W.2d 579, 582 (Tenn. Crim. App. 1995); see Phedrek T. Davis v. State, M2009-01616-CCA-R3-PC, 2010 WL 1947379, at *2 (Tenn. Crim. App. May 14, 2010), perm. app. denied (Tenn. Nov. 10, 2010). "To allow for a wider conception of a previously determined claim would violate a fundamental rule of post-conviction proceedings: relitigating decided legal questions."

Phedrek T. Davis, 2010 WL 1947379, at *2 (citing Ray v. State, 489 S.W.2d 849, 851 (Tenn. Crim. App. 1971)). Because the Ferguson issue was previously raised by trial counsel and addressed by this court on direct appeal, the claim is previously determined and cannot serve as a basis for post-conviction relief.

The petitioner next contends that trial counsel were ineffective in presenting the Ferguson issue in the trial court and on appeal. In light of this court's analysis of the issue on direct appeal, the petitioner has failed to establish that trial counsel were deficient in failing to present additional evidence to support the Ferguson claim or that that any deficiency resulted in prejudice. The petitioner is not entitled to relief regarding this claim.

In a footnote, the petitioner contends that the State suppressed the underlying records of the data from the testing of his urine and blood samples by the TBI Crime Laboratory and cites to Brady v. Maryland, 373 U.S. 83 (1963). The petitioner failed to develop any argument in his brief regarding how the elements of the Brady claim are satisfied. The only citation to the record that the petitioner included to support his claim was Dr. Lipman's report. Accordingly, this issue is waived. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

## IV.  Selection of Grand Jury

The petitioner submits that his conviction was the product of an unconstitutionally selected and impaneled grand jury due to race and gender discrimination. He avers that the State is precluded from raising the issue of waiver in this appeal because the State failed to argue waiver of this issue in the post-conviction court. Regardless of waiver, we note that "the method of selection of the grand jury foreperson is relevant only to the extent that it affects the racial composition of the entire grand jury." Bondurant, 4 S.W.3d at 675. As the post-conviction court found, the petitioner failed to present any evidence establishing the composition of the grand jury as a whole or the systematic exclusion of minorities or other cognizable groups. The petitioner is not entitled to relief regarding this issue.

## V.  Denial of Continuance

The petitioner contends that the post-conviction court erred in denying his motion to continue the evidentiary hearing. He maintains that after the post-conviction court granted the State's motion to continue the hearing, original post-conviction counsel left the Office of the Post-Conviction Defender and that replacement counsel were inadequately prepared to represent him during the hearing. The petitioner also maintains

that the post-conviction court's denial of a continuance constituted a denial of due process.

On June 17, 2011, the petitioner filed a pro se petition for post-conviction relief in which he stated that Bradley A. MacLean, an assistant post-conviction defender, assisted him in preparing the petition. On June 20, the post-conviction court entered a preliminary order appointing the Office of the Post-Conviction Defender to represent the petitioner. The court ordered the petitioner to file an amended petition within thirty days and scheduled the evidentiary hearing for October 31 through November 2, 2011. The petitioner filed multiple motions requesting extensions of time in which to file an amended petition and continuances of the evidentiary hearing. The petitioner filed an amended petition on February 15, 2012, and the evidentiary hearing was scheduled for August 27 through August 31, 2012. Prior to the evidentiary hearing, the petitioner filed a motion to recuse the post-conviction judge, and the judge granted the motion. A new judge was appointed to hear the case, and the evidentiary hearing was rescheduled to June 18 through June 21, 2013.

On May 24, 2013, the State filed a motion to continue the evidentiary hearing stating that the prosecutor recently learned that the State's expert in forensic pharmacology was under investigation for improper drug abuse. The State said that while the prosecutor had recently contacted Dr. Glynn Farr, Dr. Farr was unavailable on the dates of the hearing and the District Attorney's Conference had not yet approved funding to retain Dr. Farr. The petitioner filed a response in opposition to the State's motion. He stated that Bradley MacLean and Avram Frey, the only attorneys from the Office of the Post-Conviction Defender's Office who had been involved in the case, were leaving the office effective June 30, 2013. The petitioner argued that due to understaffing at the office, new counsel would require "potentially a year or more" to prepare for a hearing. Following a telephonic hearing, the post-conviction court granted the State's motion and set the hearing for May 12 through May 16, 2014, almost one year later. Other counsel for the Post-Conviction Defender's Office was subsequently assigned to the petitioner's case.

On April 7, 2014, the petitioner filed a supplemental amended petition for post-conviction relief and a motion to continue the evidentiary hearing. Counsel argued that due to staffing issues and counsel's caseload, additional time was needed to prepare for the hearing. Counsel further stated that Franklin Wells, an attorney expert witness, was unavailable for one of the hearing dates. The petitioner stated that in August 2013, following the departure of Mr. MacLean and Mr. Frey, attorney Sarah King was assigned to the petitioner and attorney Kelly Gleason was assigned as a supervisor. In October 2013, attorney Stacie Leiberman was assigned as co-counsel but left the office in January 2014. Ms. Gleason then was assigned as co-counsel. According to the petitioner,

119

paralegal Rebecca Dodd and investigator Chris Pennell, both of whom were assigned to the petitioner's case, resigned in January 2014 and February 2014, respectively.

On April 21, 2014, the post-conviction court entered an order denying the petitioner's motion for a continuance. The court stated that during the hearing on the State's motion for a continuance, Mr. MacLean informed the court that the investigation of the petitioner's case had been completed, that all witnesses had been interviewed and were ready to proceed, and that counsel were prepared to present the petitioner's proof. The court noted that in granting the State's motion for a continuance, the court reset the case for almost one year to allow new counsel to familiarize themselves with the petitioner's case. The court found that lead counsel, Ms. King, was assigned the case in August 2013 and had nine months to familiarize herself with the case and prepare for the hearing. The court found counsel had adequate time to prepare for the hearing in light of prior counsel's assertion that the investigation had been completed. The court stated that Ms. Leiberman only served as co-counsel for three months before she resigned and that as a result, she likely did not contribute substantially to the preparation of the petitioner's case. The court found that given Ms. Gleason's role as supervisor since August 2013, she had a working knowledge of the petitioner's case before she was assigned as co-counsel. The court noted that should a continuance be granted, more staff changes could occur, giving rise to a new claim for a continuance. The court stated that because "this case has been pending for nearly three years, this court finds to become ensnared in a revolving cycle of personnel changes and requests for further continuance[s] which could inevitably result [in] further delay is an untenable position for both the court and the petitioner."

The court further found that the absence of Mr. Wells for one day of hearings was not sufficient cause for a continuance. The court stated that counsel could arrange the presentation of the proof in such a way as to accommodate Mr. Wells's schedule and ensure that he was present for the testimony that was most critical to rendering an expert opinion. The court found that the "procedure [wa]s a fair compromise between the needs of the expert, the needs of counsel, the right of petitioner to have this matter handled in a timely manner and the needs of the court to advance this matter as required by Rule and statute."

On May 6, 2014, the petitioner filed another motion to continue the evidentiary hearing. The petitioner alleged that a continuance was necessary due to (1) the unavailability of Dr. Bronson, an expert in jury selection, and Skip Gant, an attorney expert witness, (2) the need to interview Dr. Ferslew, the State's consulting toxicology expert, (3) the petitioner's medical issues involving his back, and (4) the need for additional expert services. During the evidentiary hearing on May 12, counsel requested a continuance and stated that she was not prepared to proceed with the hearing. The post-conviction court denied the motion.

120

The decision to grant a motion for a continuance is left to the trial court's discretion. State v. Russell, 10 S.W.3d 270, 275 (Tenn. Crim. App. 1999) (citing State v. Melson, 638 S.W.2d 342, 359 (Tenn. 1982); Baxter v. State, 503 S.W.2d 226, 230 (Tenn. Crim. App. 1973)). This court will not overturn the denial of a continuance unless the trial court abused its discretion and the defendant was prejudiced by the denial. State v. Thomas, 158 S.W.3d 361, 392 (Tenn. 2005). "An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted." Id. (citing State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995)). "[A] defendant who asserts that the denial of a continuance constitutes a denial of due process or the right to counsel must establish actual prejudice." State v. Odom, 137 S.W.3d 572, 589 (Tenn. 2004) (citing Morris v. Slappy, 461 U.S. 1, 11-12 (1983)).

We conclude that the post-conviction court did not abuse its discretion in denying the petitioner's motion for a continuance. The case had been pending for almost three years. When the post-conviction court granted the State's motion, it took into account the fact that the petitioner would be assigned new counsel and continued the hearing for almost one year to allow counsel time to prepare. At the time of the hearing, new counsel had been assigned to the petitioner's case for approximately nine months, and prior counsel had previously asserted that the investigation was complete. The post-conviction court also granted the petitioner's counsel leeway in the presentation of their proof to ensure the presence of the experts.

Following the conclusion of the proof on May 15, 2014, the post-conviction court continued the hearing to June 30. The post-conviction court later continued the matter to September 5, 2014, to allow the petitioner to secure the testimony of Dr. Bronson, the expert in jury selection. During that time period, the petitioner was able to secure the deposition testimony of Dr. Ferslew and Dr. Bronson. The petitioner has failed to identify any evidence that he was unable to present at the post-conviction hearing as a result of the post-conviction court's denial of a continuance. Therefore, the petitioner also has failed to establish that the denial of the continuance resulted in prejudice.

## VI. Allowing Trial Counsel to Assist the State

The petitioner contends that the post-conviction court erred in permitting trial counsel to sit at the prosecutor's table and assist the State during the post-conviction hearing. The petitioner further contends that trial counsel's actions violated the petitioner's due process rights and trial counsel's ethical duty of loyalty and created an appearance of impropriety and a conflict of interest.

Prior to the evidentiary hearing, the State requested an interview with trial counsel regarding the petitioner's petition. Lead counsel sent a letter to the prosecutor requesting that he seek court approval of the interview in light of American Bar Association (ABA) formal ethics opinion 10-456, which addressed the role of prior counsel in post-conviction matters and stated that "it is highly unlikely that a disclosure in response to a prosecution request, prior to a court-supervised response by way of testimony or otherwise, will be justifiable." Lead counsel acknowledged that this ABA formal ethics opinion seemed to differ from Tennessee case law and requested court approval of the interview in light of the potential conflict and the serious nature of the case.

As a result, the State filed a motion seeking permission from the post-conviction court to discuss the issues raised by the petitioner in his initial petition and amended petition with trial counsel. The State argued that trial counsel were material witnesses for the State and that disallowing the State to discuss the issues raised with trial counsel prior to the hearing would deny the State the opportunity to fully develop the evidence that it would use in defense of the issues raised in the petition. The petitioner filed a response in opposition to the State's motion. The petitioner argued that even if an ineffective assistance of counsel claim gave rise to an implied waiver of attorney-client confidences, trial counsel's disclosures should be made only in a formal, judicial-supervised proceeding, such as the evidentiary hearing where the State could examine trial counsel and the petitioner's current counsel would be in a position to protect the petitioner's rights. The petitioner further argued that to the extent that the post-conviction court permits disclosure of privileged or confidential information, the court should enter a protective order limiting the use of such information to the post-conviction proceeding and prohibiting its use in any retrial or other proceeding.

Following a hearing, the post-conviction court entered an order on May 6, 2013, finding that by claiming ineffective assistance of counsel, the petitioner waived attorney-client privilege as it related to the allegations. The court also found that under Tennessee case law and the applicable ethics rules, "pre-hearing unsupervised disclosure of confidential attorney-client communications is allowed to the extent reasonably necessary to defend against petitioner's claims of ineffective assistance of counsel." The court allowed trial counsel to discuss the issues with either party but declined to require trial counsel to do so. The court denied the petitioner's motion for a protective order, finding that it was not in the proper posture "to determine the appropriate prospective use of any confidential communications which may be revealed during either pre-hearing meetings with the parties or during the post-conviction hearing itself."

On June 14, 2013, Tennessee Board of Professional Responsibility Formal Ethics Opinion 2013-F-156 was released and addressed the issue of whether "a criminal defense lawyer alleged by a former criminal client to have rendered ineffective assistance of

counsel [may] voluntarily provide information to the prosecutor defending the claim outside the court supervised setting." The panel concluded that the Tennessee Rules of Professional Conduct permit, but do not require, a criminal defense attorney to make "limited voluntary disclosure to the prosecution of information relating to the representation of the former client outside the in-court proceeding without judicial supervision or approval." The panel also concluded that such disclosure is limited only to information "(1) which the lawyer reasonably believes necessary to respond to the specific claims or allegations in the petition as required by RPC 1.6(b)(5) or (2) which has become 'generally known' as defined in RPC 1.9, cmt. [8a]."

On March 25, 2014, the State issued a letter to trial counsel agreeing that no information revealed to the prosecution by trial counsel would be utilized in any retrial unless the information was presented by the petitioner or his experts at the post-conviction hearing or was in possession of the State or its agents prior to any discussion with trial counsel.

Prior to the evidentiary hearing, the State requested that trial counsel be allowed to remain with the State during the hearing as their representatives. The petitioner's counsel objected and invoked the "rule of separation of witnesses." The post-conviction court granted the State's request and permitted trial counsel to sit at the table with the prosecution. During co-counsel's testimony, the petitioner's counsel continued to object and noted that lead counsel was sitting at the prosecutor's table and reviewing documents with the prosecutor. The post-conviction court overruled the petitioner's objection. While lead counsel was testifying, the petitioner's counsel noted for the record that co-counsel was sitting at the prosecutor's table. The petitioner's counsel noted other instances in the post-conviction hearing during which lead counsel sat with the prosecutor.

Although the petitioner claims that trial counsel's presence and actions at the evidentiary hearing violated his due process rights and trial counsel's ethical duty of loyalty and created an appearance of impropriety and a conflict of interest, the petitioner did not raise these issues in the post-conviction court. Rather, the petitioner objected based upon "the rule of sequestration" provided in Tennessee Rule of Evidence 615. Accordingly, the petitioner has waived these arguments by failing to raise them in the post-conviction court. See Tenn. R. App. P. 36.

Regardless of waiver, the petitioner is not entitled to relief. This court has recognized that "'[g]iven the special circumstances which arise in a post-conviction proceeding in which a petitioner claims that his trial attorney was ineffective, it is entirely reasonable to conclude that the trial attorney's presence would be essential for the presentation of the state's case.'" Palmer v. State, 108 S.W.3d 887, 898 (Tenn. Crim.

App. 2002) (quoting <u>State v. Jerome Brown</u>, No. 03C01-9107-CR-00201, 1992 WL 259357, at *7 (Tenn. Crim. App. Oct. 7, 1992)). This court has repeatedly held that the post-conviction court did not abuse its discretion in allowing trial counsel to remain in the courtroom during a post-conviction hearing. <u>See, e.g.</u>, <u>Dameion Nolan v. State</u>, No. E2012-00429-CCA-R3-PC, 2013 WL 3353333, at *8 (Tenn. Crim. App. June 28, 2013), <u>perm. app. denied</u> (Tenn. Feb. 21, 2014); <u>Shavon Page v. State</u>, No. E2012-00421-CCA-R3-PC, 2013 WL 68904, at *9 (Tenn. Crim. App. Jan. 7, 2013); <u>Kevin White v. State</u>, No. E2004-02986-CCA-R3-PC, 2005 WL 1981484, at *1 (Tenn. Crim. App. Aug. 12, 2005), <u>perm. app. denied</u> (Tenn. Dec. 5, 2005).

Furthermore, the petitioner does not challenge the post-conviction court's order entered prior to the hearing permitting trial counsel to speak to the prosecutor regarding the issues raised by the petitioner in his post-conviction petition outside of a formal judicially-supervised proceeding. <u>See also</u> <u>Bryan v. State</u>, 848 S.W.2d 72, 80 (Tenn. Crim. App. 1992) (holding that when a petitioner attacks the competency of trial counsel in post-conviction proceedings, the attorney-client privilege "is viewed as waived regarding the representation in issue"). The petitioner did not present any evidence establishing what trial counsel and the prosecutor discussed during the post-conviction hearing. Accordingly, the petitioner has failed to establish that the post-conviction court erred in permitting trial counsel to remain in the courtroom and sit with the prosecutor during the hearing or that the court's decision resulted in prejudice.

The petitioner appears to contend that trial counsel assisted the State prior to the hearing by requesting court approval before trial counsel agreed to an interview. The petitioner, however, did not raise this issue in the post-conviction court. Accordingly, this argument is waived. <u>See</u> Tenn. R. App. P. 36.

## VII. Exclusion of Expert Testimony

The petitioner asserts that the post-conviction court erred in excluding attorney Franklin Wells as an expert witness. During the post-conviction hearing, the petitioner tendered Mr. Wells, an attorney from Asheboro, North Carolina, as an expert in the prevailing professional norms of representation of defendants in capital trials in the United States. The post-conviction court allowed counsel to make an offer of proof before deciding whether to accept Mr. Wells as an expert.

Mr. Wells testified that he graduated law school in 1985 and had tried twenty-six to twenty-eight capital cases. Eight cases proceeded to the penalty phase, and one client received the death penalty. Mr. Wells said he practiced law primarily in state and federal district courts in North Carolina. Mr. Wells had attended national training sessions in capital defense and had trained other attorneys in capital defense. He was familiar with

124

case law from the United States Supreme Court on capital issues and with the American Bar Association guidelines for representation in capital cases. Mr. Wells acknowledged that he had not previously testified as an expert but stated he had submitted affidavits in a "couple" of capital post-conviction cases and one noncapital post-conviction case in North Carolina.

Mr. Wells opined that trial counsel were deficient in jury selection, their presentation of a mental health defense, and their presentation of mitigation evidence. In reaching his opinion, Mr. Wells reviewed the trial transcript and a summary of the trial transcript; the opinions of Dr. Matthews, Dr. Caruso, Dr. Wilson, Dr. Martell, Dr. Farr, Dr. Brown, Dr. Spica, Dr. Lipman, Dr. Smith, Dr. Bronson, and Skip Gant; the petitioner's medical records; and the opinions from this court and the Tennessee Supreme Court on direct appeal. Mr. Wells was present for the post-conviction testimony of trial counsel and Ms. Shettles. Mr. Wells acknowledged that he did not review the files from Inquisitor, Incorporated, in preparing for his testimony and was unaware that Ms. Shettles had compiled two boxes of mitigation proof. Mr. Wells did not know what information that Ms. Shettles had discovered in her investigation.

The post-conviction court found that Mr. Wells was not qualified as an expert due to his failure to disclose his prior disciplinary action and his failure to review Ms. Shettles' files, which the post-conviction court noted were critical to Mr. Wells's opinion. The post-conviction court also found that Mr. Wells's testimony would not assist the trier of fact. The court stated that it had previously presided over capital cases and did not require the assistance of an expert attorney to aid in evaluating the petitioner's claims.

Questions about the qualifications, admissibility, relevancy, and competency of expert testimony generally are left to the discretion of the trial court. State v. Howell, 185 S.W.3d 319, 337 (Tenn. 2006). We will not overturn a trial court's decision to admit or exclude expert testimony unless the trial court abuses its discretion. Id. A trial court abuses its discretion "by applying an incorrect legal standard or reaching an illogical or unreasonable decision that causes the complaining party to suffer injustice." Id.

Admissibility of expert testimony in Tennessee is governed in part by Tennessee Rule of Evidence 702, which provides that "if scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise." The admissibility of expert testimony pursuant to Rule 702 is more stringent than under the federal rule. Howell, 185 S.W.3d at 337. Federal Rule of Evidence 702 requires that the testimony "assist the trier of fact," while the Tennessee rule requires that the testimony

125

"substantially assist the trier of fact." Thus, "the probative force of the testimony must be stronger before it is admitted in Tennessee." McDaniel, 955 S.W.2d at 264.

The Tennessee Supreme Court addressed the issue of an attorney testifying as an expert in post-conviction proceedings in Howell. The court concluded that the trial court did not abuse its discretion by excluding such expert testimony based upon the trial court's finding that it did not need the assistance of an expert to determine whether counsel was ineffective and that the attorney's testimony would not substantially assist the trier of fact. Howell, 185 S.W.3d at 338. Similar to the trial court in Howell, the post-conviction court explained that it had previously presided over capital cases and did not need the assistance of a legal expert to evaluate the petitioner's claims. As a result, Mr. Wells's testimony would not have substantially assisted the trier of fact.

We conclude that the post-conviction court did not abuse its discretion in excluding Mr. Wells as an expert witness. Because Mr. Wells's testimony did not meet the requirements of Rule 702 of the Tennessee Rules of Evidence by substantially assisting the trier of fact, we need not determine whether the post-conviction court erred in finding that Mr. Wells was not qualified to serve as an expert witness.

## VIII. Constitutionality of Tennessee's Death Penalty Scheme

The petitioner raises multiple challenges to the constitutionality of Tennessee's death penalty scheme. He asserts that Tennessee lacks statewide standards for pursuing the death penalty in violation of his right to equal protection. The Tennessee Supreme Court has rejected general challenges to the unlimited discretion to seek the death penalty vested in prosecutors in this state. See State v. Thomas, 158 S.W.3d 361, 407 (Tenn. 2005); State v. Keen, 31 S.W.3d 196, 233 (Tenn. 2000) (Appendix). Moreover, this court has concluded that Bush v. Gore, 531 U.S. 98 (2000), a voting rights case relied on by the petitioner, does not apply in the context of a criminal prosecution. See Robert Faulkner v. State, No. W2012-00612-CCA-R3-PD, 2014 WL 4267460, at *102 (Tenn. Crim. App. Aug. 29, 2014). The petitioner is not entitled to relief on this issue.

The petitioner argues that the death penalty impinges on his fundamental right to life and the prohibition against cruel and unusual punishment. The Tennessee Supreme Court has rejected these claims. See, e.g., State v. Sexton, 368 S.W.3d 371, 427 (Tenn. 2012); State v. Kiser, 284 S.W.3d 227, 275-76 (Tenn. 2009).

The petitioner maintains that his death sentences were imposed in an arbitrary and capricious manner in that:

(1) No uniform standards or procedures for jury selection existed to ensure open inquiry concerning potentially prejudicial subject matter. This argument has been rejected. See State v. Caughron, 855 S.W.2d 526, 542 (Tenn. 1993).

(2) The death qualification process skewed the makeup of the jury and resulted in a guilt-prone jury. This argument also has been rejected. See State v. Harbison, 704 S.W.2d 314, 318 (Tenn. 1986).

(3) The petitioner was prohibited from addressing each juror's misconceptions about matters relevant to sentencing. Our supreme court has rejected this argument. See State v. Brimmer, 876 S.W.2d 75, 87 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994).

(4) The petitioner was prohibited from presenting a final closing argument in the penalty phase of the trial since only the State is permitted a rebuttal closing argument. The Tennessee Supreme Court also has rejected this argument. See, e.g., State v. Sexton, 368 S.W.3d 371, 428 (Tenn. 2012).

(5) The jury was required to agree unanimously to a life verdict in violation of Mills v. Maryland, 486 U.S. 367 (1988), and McKoy v. North Carolina, 494 U.S. 433 (1990). This argument has been rejected. See State v. Hester, 324 S.W.3d 1, 77 (Tenn. 2010); Brimmer, 876 S.W.2d at 87.

(6) A reasonable likelihood exists that jurors believed that they were required to unanimously agree as to the existence of mitigating circumstances because of the failure to instruct the jury on the meaning and function of mitigating circumstances and because the jury was not told the effect of a non-unanimous verdict. This argument also has been rejected. See State v. Banks, 271 S.W.3d 90, 157 (Tenn. 2008); State v. Thompson, 768 S.W.2d 239, 251-52 (Tenn. 1989).

(7) The jury was not required to make the ultimate determination that death is the appropriate penalty. Our supreme court has rejected this argument. Brimmer, 876 S.W.2d at 87.

The petitioner maintains that his rights under the federal and state constitutions were violated because the aggravating factors making him eligible for the death penalty were not included in the indictment and were not returned by the grand jury. "The Tennessee Supreme Court has consistently rejected this argument by holding that aggravating circumstances need not be pled in the indictment." Banks, 271 S.W.3d at 167 (citing State v. Reid, 164 S.W.3d 286, 312 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 59 (Tenn. 2004); State v. Berry, 141 S.W.3d 549, 562 (Tenn. 2004); State v. Holton,

126 S.W.3d 845, 863 (Tenn. 2004); State v. Dellinger, 79 S.W.3d 458, 467 (Tenn. 2002)). The supreme court has also repeatedly held "that the provisions of Rule 12.3 satisfy the constitutional requirements of notice" such that grand jury review is not constitutionally required for death notices. Berry, 141 S.W.3d at 562 (citing Odom, 137 S.W.3d at 572 n.13; Dellinger, 79 S.W.3d at 467; State v. Bush, 942 S.W.2d 489, 520 (Tenn. 1997); State v. Johnson, 762 S.W.2d 110, 117 (Tenn. 1988)).

The petitioner argues that the appellate review process is not meaningful because (1) the courts could not reweigh proof due to the absence of written findings concerning mitigating circumstances; (2) the information relied upon for comparative review was inadequate and incomplete; and (3) the methodology, in which only cases where a death sentence was upheld are reviewed, is fundamentally flawed. The Tennessee Supreme Court has rejected this claim. See Banks, 271 S.W.3d at 159.

Finally, the petitioner contends that Tennessee's current protocols for carrying out executions are illegal under state and federal laws, including laws regarding the handling of controlled substances. The post-conviction court found that because the Tennessee Department of Correction promulgates execution protocols pursuant to Tennessee Code Annotated section 40-23-114(c), any challenges to the protocol must first be undertaken administratively through the TDOC grievance process and then via a lawsuit in the Chancery Court for Davidson County pursuant to Tennessee Code Annotated section 4-5-225. Furthermore, the petitioner has failed to present any evidence regarding the protocols or otherwise meet his burden established in Glossip v. Gross, __ U.S. __, 135 S. Ct. 2726 (2015). The petitioner is not entitled to relief with regard to this issue.

## IX. Proportionality

The petitioner requests that this court conduct another proportionality review "given his cognitive impairments, mental illness, intoxication at the time of the offenses, and inability to premeditate the offenses." The Tennessee Supreme Court conducted a proportionality analysis on direct appeal and concluded that the death penalties imposed on the petitioner were "not excessive or disproportionate." Jordan, 325 S.W.3d at 79. It is well established that post-conviction proceedings may not be employed to raise and re-litigate issues previously determined on direct appeal. See, e.g., Miller v. State, 54 S.W.3d 743, 747-48 (Tenn. 2001); see also Robert Faulkner, 2014 WL 4267460, at *85 (declining to conduct another proportionality review in light of evidence that the petitioner presented during the post-conviction hearing regarding partial fetal alcohol syndrome). The petitioner is not entitled to relief regarding this claim.

128

## X. Cumulative Error

The petitioner requests this court to consider the cumulative effect of the errors he has alleged above in deciding whether to grant him relief in this post-conviction appeal. Because we have found no single instance wherein trial counsel were deemed ineffective or wherein the petitioner was otherwise denied his constitutional right to a fair and impartial trial, there is no basis to conclude that any cumulative error resulted in an unfair trial.

## CONCLUSION

For the foregoing reasons, we conclude that the petitioner is not entitled to post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.


_____
ALAN E. GLENN, JUDGE